## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE: THE HONORABLE M. MILLER BAKER**

| | |
|---|---|
| CORNERSTONE CHEMICAL COMPANY ) ) ) )<br><br>Plaintiff, )<br>)<br>v. )<br>)<br>UNITED STATES )<br>)<br>Defendant. ) | **NON-CONFIDENTIAL VERSION**<br><br>**Court No. 25-00005** |

## PLAINTIFF'S RULE 56.2 MOTION
## FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of this Court, Plaintiff Cornerstone Chemical Company ("Cornerstone" or "Plaintiff") hereby moves for judgment upon the agency record with respect to the U.S. Department of Commerce's final negative determination in its antidumping duty investigation of melamine from Qatar. *See Melamine From Qatar: Final Negative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 89 Fed. Reg. 97,592 (Dep't Commerce Dec. 9, 2024) (the "*Final Determination*"), and the accompanying Issues and Decision Memorandum ("*Final IDM*").

For the reasons explained in the accompanying Rule 56.2 Brief in Support of Plaintiff's Motion for Judgment on the Agency Record, Plaintiff respectfully moves that this Court find that the *Final Determination* is not supported by substantial evidence and is otherwise not in accordance with law. Plaintiff respectfully moves

that this Court remand the *Final Determination* to the U.S. Department of

Commerce with instructions to correct it in accordance with the proposed order.

Respectfully submitted,

*/s/ Stephen J. Orava*
Stephen J. Orava
Patrick J. McLain
Nicholas K. Paster
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 737-0500
sorava@kslaw.com

*Counsel for Plaintiff Cornerstone Chemical
Company*

Date: July 24, 2025

NON-CONFIDENTIAL VERSION

## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE M. MILLER BAKER

|  |  |
|---|---|
| CORNERSTONE CHEMICAL COMPANY | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| UNITED STATES | )<br>)<br>) |
| Defendant. | ) |

Court No. 25-00005

**NON-CONFIDENTIAL VERSION**

Business proprietary information removed from page 10.

## RULE 56.2 BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

Stephen J. Orava
Patrick J. McLain
Nicholas K. Paster
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 737-0500
sorava@kslaw.com

*Counsel for Plaintiff Cornerstone Chemical Company*

Date: July 24, 2025

# TABLE OF CONTENTS

RULE 56.2 STATEMENT ........................................................................................................1

   I.   Administrative Determination Under Review ....................................................1

   II.  Issues Presented And Summary Of Argument ..................................................1

STANDARD OF REVIEW .....................................................................................................3

STATEMENT OF FACTS ......................................................................................................4

ARGUMENT ...........................................................................................................................8

   I.   Commerce's Use Of Türkiye As A Third Country Comparison Market Is Unsupported By Substantial Evidence ...............................................................8

      A.   Legal Standard...........................................................................................9

      B.   Commerce Unreasonably Declined To Find A Sales-Based Particular Market Situation In Türkiye ........................................................................9

   II.  Commerce Unreasonably Refused To Compare The Qatari Respondents' U.S. Sales To Constructed Value.................................................................................16

   III. Commerce Unreasonably And Unlawfully Failed To Apply Its Regulations For Addressing Distortions Arising From Transactions Between Affiliated Parties ..............17

      A.   Legal Standard.........................................................................................18

      B.   Commerce Unreasonably And Unlawfully Disregarded Market-Determined Prices Submitted To The Record By Petitioner .............................................18

CONCLUSION......................................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chemours Company FC, LLC v. United States*,
    443 F. Supp. 3d 1315 (Ct. Int'l Trade 2020) ..................................... 13

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966) ................................................................................. 3

*Huaiyin Foreign Trade Corp. (30) v. United States*,
    322 F.3d 1369 (Fed. Cir. 2003) ........................................................... 3

*Ningbo Dafa Chem. Fiber Co. v. United States*,
    580 F.3d 1247 (Fed. Cir. 2009) ........................................................... 3

*Ticaret A.S. v. United States*,
    Slip Op. 25-63, 2025 WL 1453843 ...................................................... 3

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474 (1951) ............................................................................... 13

*Yantai Xinke Steel Structure Co. v. United States*,
    38 CIT 478, 503 (2014) ......................................................................... 12

**Statutes**

19 U.S.C. § 1516a(a)(2)(B)(ii), (b)(1)(B)(i) ................................................ 3

19 U.S.C. §1677b(a)(1)(B)(ii)(III) ............................................................... 9

19 U.S.C. §§ 1677b(a)(1)(B)(ii), 1677b(a)(4) ........................................... 16

19 U.S.C. §1677b(a)(1)(B)-(C) ..................................................................... 9

19 U.S.C. § 1677b(f)(2) ................................................................................. 18

19 U.S.C. § 1677b(f)(3) ................................................................................. 18

**Other Authorities**

19 C.F.R. § 351.404(b)-(c) ............................................................................ 9

19 C.F.R. § 351.404(c)(2)(i) .......................................................................... 9

19 C.F.R. § 351.404(f) ................................................................................... 16

**Administrative Determinations**

*Melamine From Germany, India, Japan, the Netherlands, Qatar, and Trinidad and Tobago: Initiation of Less-Than-Fair-Value Investigations*, 89 Fed. Reg. 17,413 (Dep't Commerce Mar. 11, 2024) ................................................................................................ 4

*Melamine From Germany, India, Qatar, and Trinidad and Tobago: Initiation of Countervailing Duty Investigations*, 89 Fed. Reg. 17,381 (Dep't Commerce Mar. 11, 2024) .................................................................................................................................... 4

*Melamine From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 68847, 68849 (Dep't Commerce Nov. 6, 2015) .................... 11

*Melamine From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 80 Fed. Reg. 68851 (Dep't Commerce Nov. 6, 2015) ............................ 11

*Melamine From Qatar: Final Negative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 89 Fed. Reg. 97,592 (Dep't Commerce Dec. 9, 2024) ...................................................................................... 1, 6

*Melamine From Qatar: Preliminary Negative Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 77,824 (Dep't Commerce Sept. 24, 2024) ........................................ 4

*Melamine from Qatar; Termination of Investigation,* 89 Fed. Reg. 104,206 (Int'l Trade Comm'n Dec. 20, 2024) ...................................................................................................... 8

*Melamine from Germany, India, Japan, Netherlands, Qatar, and Trinidad and Tobago*, Inv. Nos. 701-TA-706-709 and 731-TA-1667-1672, USITC Pub. 5503 (April 2024) ................. 10, 11

**Legislative Authorities**

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 100-576, reprinted in 1988 U.S.C.C.A.N. ................................................... 12

On behalf of Plaintiff Cornerstone Chemical Company ("Cornerstone" or "Plaintiff"), the petitioner in the underlying agency investigation, we respectfully submit this Rule 56.2 Brief in Support of Plaintiff's Motion for Judgment on the Agency Record. As demonstrated below, certain aspects of the U.S. Department of Commerce's final determination in the less-than-fair-value investigation of melamine from Qatar are unsupported by substantial evidence and are otherwise not in accordance with law. We therefore request that the Court remand Commerce's final determination for further proceedings.

## RULE 56.2 STATEMENT

### I.     Administrative Determination Under Review

Plaintiff challenges certain aspects of Commerce's final negative determination in the less-than-fair-value investigation of melamine from Qatar. *See Melamine From Qatar: Final Negative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 89 Fed. Reg. 97,592 (Dep't Commerce Dec. 9, 2024) (the "*Final Determination*") (Appx00001656-Appx00001657), and the accompanying Issues and Decision Memorandum ("*Final IDM*") (Appx00001336-Appx00001356).

### II.     Issues Presented And Summary Of Argument

Certain aspects of Commerce's *Final Determination* are unsupported by substantial evidence and are otherwise not in accordance with law because Commerce:

1.  Selected Türkiye as a third country comparison market despite the existence of a sales-based particular market situation in that country during the period of investigation.

2. Correctly found that a particular market situation exists in Qatar for natural gas, but failed to make an adjustment because none of the U.S. sales in Commerce's calculation were being compared to constructed value.

3. Failed to make cost adjustments to address distortions arising from transactions made between affiliated parties.

First, Commerce erred by selecting Türkiye as a third country market to calculate normal value for purposes of comparison to U.S. sales prices. Cornerstone submitted extensive support for its claim that a sales-based particular market situation existed in Türkiye during the period of investigation that prevents or does not permit a proper price comparison. The record shows that Qatari sales prices of melamine in Türkiye are not "representative" within the meaning of the statute, and Commerce unreasonably treated it as if it were a viable market against which to compare the Qatari Respondents' U.S. sales.

Second, Commerce's improper rejection of the sales-based particular market situation allegation led the agency to use Türkiye as a third country comparison market, rather than base normal value on constructed value. Consequently, Commerce failed to make an adjustment for the particular market situation that it found exists in Qatar for natural gas.

Finally, Commerce erred in declining to make an adjustment under the major input rule or, alternatively, the transactions disregarded rule. A cost adjustment was necessary because QatarEnergy provided natural gas to the Qatari Respondents at prices that were not at arms' length. Despite clear evidence of the Government of Qatar's domination of its domestic natural gas industry, which Commerce acknowledged by way of its finding that a particular market situation

exists in Qatar with respect to natural gas, Commerce failed to make any

adjustments to account for this distortion.

## STANDARD OF REVIEW

The statute provides that this Court "shall hold unlawful any determination,

finding or conclusion" that is "unsupported by substantial evidence on the record, or

otherwise not in accordance with law." 19 U.S.C. § 1516a(a)(2)(B)(ii), (b)(1)(B)(i).

"Substantial evidence" means "more than a mere scintilla" of evidence that "a

reasonable mind might accept as adequate to support a conclusion." *Ningbo Dafa*

*Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1253 (Fed. Cir. 2009) (citation

omitted). Commerce acts contrary to law if it fails to provide "an explanation of the

basis for its determination that addresses relevant arguments, made by interested

parties who are parties to the investigation or review (as the case may

be), concerning the establishment of dumping." *Assan Aluminyum Sanayi ve Ticaret*

*A.S. v. United States*, Slip Op. 25-63, 2025 WL 1453843, at * 5 (CIT May 21, 2025)

(quoting 19 U.S.C. § 1677f(i)(3)(A)).

The Court determines whether substantial evidence exists by considering the

record as a whole, including any evidence that supports or fairly detracts from the

substantiality of the evidence. *Huaiyin Foreign Trade Corp. (30) v. United States*,

322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Atl. Sugar, Ltd. v. United States*, 744

F.2d 1556, 1562 (Fed. Cir. 1984)). Even if the Court could draw two inconsistent

conclusions from the evidence contained in the record, doing so does not prevent an

agency's determination from being supported by substantial evidence. *Consolo v.*

*Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citation omitted).

## STATEMENT OF FACTS

On February 14, 2024, Cornerstone filed antidumping and countervailing duty petitions with Commerce and the U.S. International Trade Commission, alleging that a domestic industry is materially injured or threatened with material injury by reason of unfairly traded imports of melamine from Germany, India, Japan, the Netherlands, Qatar, and Trinidad and Tobago. With respect to imports of melamine from Qatar, Cornerstone petitioned for both antidumping duties and countervailing duties. Commerce published the notice of initiation of antidumping and countervailing duty investigations of melamine from Qatar on March 11, 2024. *Melamine From Germany, India, Japan, the Netherlands, Qatar, and Trinidad and Tobago: Initiation of Less-Than-Fair-Value Investigations*, 89 Fed. Reg. 17,413 (Dep't Commerce Mar. 11, 2024); *Melamine From Germany, India, Qatar, and Trinidad and Tobago: Initiation of Countervailing Duty Investigations*, 89 Fed. Reg. 17,381 (Dep't Commerce Mar. 11, 2024) (Appx00012288-Appx00012293).

On September 24, 2024, Commerce published its preliminary negative antidumping duty determination with respect to melamine from Qatar in the *Federal Register. Melamine From Qatar: Preliminary Negative Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 77,824 (Dep't Commerce Sept. 24, 2024) (Appx00001333-Appx00001335). Using Türkiye as the comparison market for determining normal value and declining to make any adjustments to reported costs of production, Commerce preliminarily calculated a dumping margin below the *de*

*minimis* threshold and therefore made a negative dumping determination for the collapsed entity consisting of Qatar Melamine Company ("QMC"), Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C. ("Muntajat"), and Qatar Fertiliser Company (P.S.C.) ("QAFCO") (collectively, "Qatari Respondents").

Cornerstone and Qatari Respondents filed case briefs and rebuttal briefs concerning sales and general issues on October 24, 2024, and October 31, 2024, respectively. Cornerstone also filed a case brief regarding cost issues on November 12, 2024, and Qatari Respondents filed a rebuttal brief concerning cost issues on November 19, 2024. *See Final IDM* at 2 (Appx00001337).

Cornerstone argued in its case briefs that Commerce's preliminary negative dumping determination was based on erroneous decisions. In particular, Cornerstone argued that Commerce erred in preliminarily selecting Türkiye as a third country market to calculate normal value for purposes of comparison to U.S. sales prices. Cornerstone claimed that a sales-based particular market situation existed in Türkiye during the period of investigation because of the dominance of unfairly traded Chinese melamine imports in that market. According to Cornerstone, Türkiye is not a viable comparison market because the particular market situation in that country prevents or does not permit a proper price comparison, and because Muntajat's prices in Türkiye are not "representative" within the meaning of the statute.

Cornerstone then argued that Commerce should instead base normal value on

constructed value. *See* Cornerstone Case Br. at 9 (Appx00012113). Cornerstone also

argued that, in basing normal value on constructed value, Commerce should make

an adjustment to account for the cost-based particular market situation that the

agency preliminarily found to exist in Qatar with respect to natural gas. *Id.*

(Appx00012113). Cornerstone argued that Commerce erred in its preliminary

determination in declining to make an adjustment to address distortions arising

from the use of cost data for the collapsed entity that reflect natural gas

transactions between affiliated parties. Cornerstone Cost Case Br. at 2-8

(Appx00012164-Appx00012170). Commerce preliminarily compared QatarEnergy's

transfer price to QAFCO with QatarEnergy's prices to unaffiliated entities in order

to find a purportedly arm's-length price. However, Cornerstone claimed that this

comparison is an invalid arm's length test because QatarEnergy is a government-

owned entity, and its natural gas prices are government-controlled rather than

market-determined. Cornerstone Cost Case Br. at 1-2 (Appx00012163-

Appx.00012164).

On December 2, 2024, Commerce issued the *Final Determination*, and this

negative determination was published in the *Federal Register* on December 9, 2024.

*Melamine from Qatar: Final Negative Determination of Sales at Less Than Fair

Value and Final Negative Determination of Critical Circumstances,* 89 Fed. Reg.

97,592 (Dep't Commerce Dec. 9, 2024) (Appx00001656-Appx00001657). In the *Final

Determination*, Commerce rejected Cornerstone's arguments that a sales-based

particular market situation existed in Türkiye during the period of investigation

because that market was flooded by low-priced imports of melamine from China, driving prices down in a manner that prevents or does not permit a proper price comparison. Commerce stated that evidence indicating that both the EU and China had antidumping duty orders on melamine from China "alone does not constitute evidence that melamine from Qatar is dumped in another country." *Final IDM* at 15 (Appx00001350). Commerce also stated that "AUVs are not evidence of subsidized or dumped prices, and the AUVs provided by the petitioner do not prove the argument that the dominant presence of low-priced Chinese imports distorted the Turkish market and significantly depressed the price of melamine in Türkiye." *Id.* (Appx00001350).

Commerce continued to use Türkiye as a third country comparison market for determining normal value, and on this ostensible basis, it declined to use constructed value. *Id.* at 7 (Appx00001342). Commerce found that a cost-based particular market situation exists in Qatar with respect to natural gas, but it did not make a particular market situation adjustment because "no sales were compared to CV." *Id.* at 4-5 (Appx00001339-Appx00001340).

Finally, Commerce rejected Cornerstone's arguments that Commerce should make an adjustment under the major input rule or the transactions disregarded rule to address the collapsed entity's purchases of natural gas from QatarEnergy. *Id.* at 20-21 (Appx00001355-Appx00001356). Commerce stated that, "in evaluating the arm's-length nature of QAFCO's/QMC's purchases of natural gas from QatarEnergy, Commerce compared the transfer price paid for this input to QatarEnergy's COP

and to a market price based on QatarEnergy's sales to unaffiliated customers," and that based on that comparison, "no adjustment was warranted to QAFCO's/QMC's cost of manufacturing." *Id.* at 20 (Appx00001355). Commerce did so despite stating that it "agrees with the petitioner and determines that a cost-based PMS exists in Qatar with respect to the purchase price of natural gas." *Id.* at 21 (Appx00001356). Commerce thus rejected Cornerstone's argument that Commerce should use the natural gas market price information it submitted in conducting its major input analysis. *Id.* at 20-21 (Appx00001355-Appx00001356).

On December 17, 2024, the ITC terminated its antidumping investigation into melamine from Qatar because Commerce made the aforementioned final negative determination in its antidumping investigation of melamine from Qatar, and the ITC published this termination notice in the *Federal Register* on December 20, 2024. *Melamine from Qatar; Termination of Investigation,* 89 Fed. Reg. 104,206 (Int'l Trade Comm'n Dec. 20, 2024). On January 16, 2025, Cornerstone appealed the ITC's termination of its *Melamine from Qatar* antidumping investigation by filing a summons and a complaint with this Court. That action currently is before this Court as Court No. 25-00021, and it has been stayed pending the outcome of this action. *Order Staying Further Proceedings*, ECF No. 12, Court NO. 25-00021 (Feb. 20, 2025).

## ARGUMENT

I.   **Commerce's Use Of Türkiye As A Third Country Comparison Market Is Unsupported By Substantial Evidence**

Cornerstone submitted evidence and argument demonstrating that Türkiye is

not a viable third country comparison market because Chinese imports dominate and distort the melamine market in that country to the extent that a sales-based particular market situation exists. Nevertheless, Commerce selected Türkiye as the third country comparison market for purposes of determining normal value. In doing so, the agency failed to articulate a rational explanation for its decision, and it failed completely to address a core aspect of Cornerstone's arguments. Thus, Commerce's decision on this issue is unsupported by substantial evidence and requires remand.

### A.    Legal Standard

In an antidumping investigation, Commerce compares a foreign exporter's U.S. sales to normal value, and the default basis for normal value is comparable sales of merchandise in the exporting country. Under Section 773 of the of the Tariff Act of 1930, as amended (the "Act"), and the agency's regulations, Commerce may use sales to a third country as the basis for normal value where a respondent does not have a viable home market, but only where certain criteria are met. 19 U.S.C. §1677b(a)(1)(B)-(C); 19 C.F.R. § 351.404(b)-(c). In relevant part, the statute does not permit the use of third country sales if Commerce has determined that a particular market situation "prevents a proper comparison with the export price or constructed export price." 19 U.S.C. §1677b(a)(1)(B)(ii)(III); *see also* 19 C.F.R. § 351.404(c)(2)(i).

### B.    Commerce Unreasonably Declined To Find A Sales-Based Particular Market Situation In Türkiye

Cornerstone presented Commerce with evidence demonstrating that a sales-

based particular market situation existed in Türkiye during the period of investigation as a result of distortions caused by large volumes of unfairly traded melamine imports from China. This evidence shows that imports supply [ ← proportion domestic consumption of melamine in Türkiye. Petitioner's Allegation Regarding Market Viability (May 13, 2024) at 7 (Appx00004654). Furthermore, imports from China accounted for most supply to the Turkish market during the period of investigation, with Qatar being the only other supply source with a substantial share. Specifically, UN COMTRADE data show that imports from China accounted for 65.9 percent of all imports of melamine in 2023 and that imports from Qatar accounted for 21.4 percent of total imports (87.3 percent combined), whereas the third largest source (Russia) accounted for 5.7 percent. Petitioner's Allegation Regarding Market Viability (May 13, 2024) at Exhibit 2B (Appx00004723-Appx00004729). Thus, Chinese imports dominated the Turkish market for melamine during the period of investigation, and imports of melamine from Qatar were the only other supply source able to gain a substantial share of that market.

China's dominant position meant that its imports had a strong effect on melamine prices in Türkiye – including those for Qatari imports – during the period of investigation. As Cornerstone informed Commerce, the ITC found in its parallel injury investigation that "price is an important factor in purchasing decisions for melamine," and this fact remains uncontroverted. *Melamine from Germany, India, Japan, Netherlands, Qatar, and Trinidad and Tobago*, Inv. Nos. 701-TA-706-709 and 731-TA-1667-1672, USITC Pub. 5503 (April 2024) (Preliminary) at 34. Thus, the

only reasonable conclusion from the record is that the Qatari Respondents' sales into Türkiye were affected by the prices of Chinese imports in that country.

Critically, those Chinese imports were unfairly traded. During the period of investigation, imports from China were subject to U.S. countervailing and antidumping duties at rates of at least 154 percent and 363.31 percent, respectively, in addition to antidumping measures in the European Union and India. *See Melamine From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 80 Fed. Reg. 68851 (Dep't Commerce Nov. 6, 2015); *Melamine From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 68847, 68849 (Dep't Commerce Nov. 6, 2015); *Melamine from Germany, India, Japan, Netherlands, Qatar, and Trinidad and Tobago*, Inv. Nos. 701-TA-706-709 and 731-TA-1667-1672, USITC Pub. 5503 (April 2024) (Preliminary) at I-5, VII-17. Although the existence and extent of dumping may theoretically vary from country to country, the subsidization giving rise to countervailing duties generally does not depend on whether a Chinese producer is selling to the United States, Türkiye, or another export market. In this regard, the only reasonable inference from the record is that the imports of melamine from China in the Turkish market were unfairly subsidized. Moreover, Cornerstone emphasized the subsidization of Chinese imports in its case brief to Commerce. *See* Cornerstone Case Br. at 3-4 (Appx00012107-Appx00012108) (referring to imports of melamine from China that "the United States and other jurisdictions have found to be subsidized and otherwise unfairly traded").

In light of the evidence cited above, Commerce lacked substantial evidence for its decision not to find a sales-based particular market situation. Commerce did not contest the fact that Chinese imports held a dominant position in the Turkish market during the period of investigation. *See Final IDM* at 15 (Appx00001350). Rather, Commerce found insufficient evidence of distortions in the Turkish market for melamine. *Id.* (Appx00001350) However, Commerce's explanation fails to establish a rational connection between the record evidence and the conclusion that the agency reached.

Most important, Commerce never addressed its own determination, cited by Cornerstone, that melamine from China is unfairly subsidized at rates of at least 154 percent. This ruling, combined with the dominant position of Chinese melamine imports in Türkiye, constitutes strong evidence of a distorted market. After all, if most of a country's demand for a product is supplied by imported merchandise that receives very significant unfair subsidies, then it is not credible to conclude that prices in that country are market-determined and viable for use in calculating a fair value benchmark. Yet, Commerce failed to engage with this key issue. This failure is all the more glaring given Commerce's general practice in antidumping proceedings and the legislative history directing Commerce to "avoid using any prices which it has reason to believe or suspect may be dumped or subsidized prices . . . base{d} on information generally available to it at that time." H.R. Rep. No. 100-576, at 590-91, reprinted in 1988 U.S.C.C.A.N. at 1623-24, *quoted in Yantai Xinke Steel Structure Co. v. United States*, 38 CIT 478, 503 (2014) ("Commerce's general practice is not to

use financial statements to calculate financial ratios from companies that are known to receive countervailable subsidies. This practice results, in part, from Congress's direction in the legislative history to the Omnibus Trade and Competitiveness Act of 1988 . . . .") This failure by itself warrants remand. Commerce did not "tak{e} into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951). Nor did Commerce "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Chemours Company FC, LLC v. United States*, 443 F. Supp. 3d 1315, 1321 (Ct. Int'l Trade 2020) (citing *In re NuVasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016)).

In addition to the major omission discussed above, Commerce erred in what it did say about unfair trade in the context of the sales-based particular market situation analysis. The agency stated that, "{w}hile Commerce acknowledges that the petitioner correctly cited to evidence indicating that both the EU and China have AD orders on melamine from China, this alone does not constitute evidence that melamine from Qatar is dumped in another country." *Final IDM* at 15 (Appx00001350). This statement is incorrect in at least three respects. First, it erroneously refers to China having an AD order on melamine from China, which is non-sensical. Second, it frames the relevant issue as being whether "melamine from *Qatar* is dumped in another country," when the immediate question is instead whether melamine from *China* distorted the Turkish market to create a sales-based particular market situation. Third, Commerce's flawed dismissal of foreign

13

countries' AD orders as not "alone" constituting sufficient evidence for Cornerstone's claim underscores the agency's failure to address the U.S. CVD and U.S. AD orders that Commerce itself has imposed on melamine from China, as well as the pattern of unfairly traded melamine from China that is reflected in the multiple trade remedy measures imposed by the United States, the EU, and India. In other words, Cornerstone urged Commerce not to base normal value on a Turkish market dominated by Chinese imports that have been found to be unfairly traded multiple times, and the agency largely sidestepped the issue and erred in what it did say.

Commerce also unreasonably treated the UN COMTRADE volume and average unit value data submitted by Cornerstone as if it undermined the existence of a sales-based particular market situation in Türkiye. Commerce stated that "AUVs are not evidence of subsidized or dumped prices, and the AUVs provided by the petitioner do not prove the argument that the dominant presence of low-priced Chinese imports distorted the Turkish market and significantly depressed the price of melamine." *Final IDM* at 15  (Appx00001350). Here, Commerce is addressing an argument that was not made; Cornerstone never contended that average unit value data by themselves establish the existence of unfair prices. Similarly, Commerce unreasonably characterized variations in the import average unit values from the six largest sources of melamine to Türkiye, and the higher average unit value from Qatar relative to the Chinese average unit value, as if they undercut Cornerstone's argument. *See Final IDM* at 15  (Appx00001350). In fact, the average unit value data are entirely consistent with the existence of a particular market situation. As

14

reflected in the table below, the COMTRADE data show that the Chinese import average unit value is lower than the average unit value for all but one of the top six countries and that Chinese imports were by far the largest source of foreign melamine supply in Türkiye during the period of investigation.

**UN COMTRADE DATA ON IMPORTS OF MELAMINE INTO TÜRKIYE: WORLD TOTAL AND TOP SIX COUNTRY SOURCES (2023)**

| Origin | Volume (Kg) | Share of Volume | Average Unit Value (USD/Kg.) |
|---|---|---|---|
| World Total | 70,093,507 | 100.0% | 1.00 |
| China | 46,223,326 | 65.9% | 0.97 |
| Qatar | 14,980,000 | 21.4% | 1.07 |
| Russian Federation | 4,021,000 | 5.7% | 0.95 |
| Germany | 2,600,077 | 3.7% | 1.00 |
| Netherlands | 1,275,216 | 1.8% | 1.25 |
| Austria | 944,800 | 1.3% | 1.03 |

Source: Petitioner's Allegation Regarding Market Viability
(May 13, 2024) at Exhibit 2B (Appx00004723-Appx00004729).

Given these facts, it would be unreasonable to infer that subsidized Chinese imports did not exert downward pricing pressure on melamine from Qatar that was simultaneously competing for sales in the Turkish market. Yet that is the implication of Commerce's decision. Indeed, Commerce cited the relatively higher average unit value of Qatari melamine as if it undermined the existence of a market distortion. *Final IDM* at 15 (Appx00001350). In this regard, Commerce erroneously presumed (without further explanation or analysis) that the Qatari prices would not

have been significantly higher if the Turkish melamine market were not dominated by relatively low-priced and subsidized Chinese imports.

In sum, Commerce failed to engage with a core element of Cornerstone's sales-based particular market situation allegation. Commerce also failed to articulate a rational connection between the record evidence and its choice to reject the particular market situation allegation and instead use the Qatari Respondents' prices in Türkiye as the basis for normal value. This issue must therefore be remanded to ensure that the Qatari Respondents' U.S. prices are compared to a proper fair value benchmark, rather than one distorted by large volumes of subsidized Chinese melamine.

## II.    Commerce Unreasonably Refused To Compare The Qatari Respondents' U.S. Sales To Constructed Value

Commerce's improper rejection of the sales-based particular market situation allegation discussed above led the agency to use Türkiye as a third country comparison market, rather than base normal value on constructed value. Section 773 of the Act provides that Commerce may use a third country market or constructed value to calculate normal value where a viable home market does not exist. 19 U.S.C. §§ 1677b(a)(1)(B)(ii), 1677b(a)(4). Commerce's regulations further provide that the agency normally will use third country sales rather than constructed value "if adequate information is available and verifiable." 19 C.F.R. § 351.404(f). As demonstrated above, however, Türkiye is not a viable third country comparison market. Accordingly, Commerce should have based normal value on

constructed value.

Because Commerce improperly refused to base normal value on constructed value, it consequently failed to apply a cost-based particular market situation adjustment to constructed value, despite finding that a cost-based particular market situation exists in Qatar with respect to the purchase price of natural gas. *Final IDM* at 5-7 (Appx00001340-Appx00001342). If the Court remands Commerce's decision to select Türkiye as a third country comparison market – as it should – it also should direct Commerce to consider the use of constructed value to calculate normal value, including an appropriate adjustment to account for the cost-based particular market situation that was found to exist in Qatar with respect to natural gas.

**III.    Commerce Unreasonably And Unlawfully Failed To Apply Its Regulations For Addressing Distortions Arising From Transactions Between Affiliated Parties**

Commerce improperly used the Qatari Respondents' reported natural gas costs without addressing the distortions arising from transactions between affiliated parties. It did so despite finding that a cost-based particular market situation existed in the Qatari market for natural gas during the period of investigation. The statute and Commerce's regulations provide the agency with multiple tools designed specifically to address distortions that may arise from related party transactions, but Commerce failed to use any of them in this investigation. As a result, Commerce's use of unadjusted costs for the Qatari Respondents is unsupported by

substantial evidence and otherwise contrary to law.

### A.    Legal Standard

Section 773(f)(3) of the Act sets forth the major input rule applicable to transactions between affiliated entities. *See* 19 U.S.C. § 1677b(f)(3). To implement this rule, Commerce has promulgated the following regulation providing that, where major inputs are purchased from affiliated parties, the value of the major input will be based on the higher of:

> (1) The price paid by the exporter or producer to the affiliated person for the major input;
>
> (2) The amount usually reflected in sales of the major input in the market under consideration; or
>
> (3) The cost to the affiliated person of producing the major input.

19 U.S.C. § 1677b(f)(3).

The statute also provides a transactions disregarded rule, which is not limited to transactions involving major inputs. Under this rule, a "transaction directly or indirectly between affiliated persons may be disregarded if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration." Unlike the major input rule, the transactions disregarded rule is not limited to transactions involving major inputs. *See* 19 U.S.C. § 1677b(f)(2).

### B.    Commerce Unreasonably And Unlawfully Disregarded Market-Determined Prices Submitted To The Record By Petitioner

For purposes of its dumping analysis, Commerce collapsed the following

companies and treated them as a single entity: QMC, the producer of the subject merchandise; QAFCO, its affiliated input supplier; and Muntajat, the exporter of the subject merchandise. *Final IDM* at 1 n.2 (Appx00001336). In its analysis of the collapsed entity's costs, Commerce had to decide how to treat QAFCO's purchases of natural gas inputs from QatarEnergy, an affiliated party. *See Final IDM* at 20 (Appx00001355). The record contained Qatari import data, submitted by Cornerstone, that would allow Commerce to derive a market-determined price for natural gas. Petitioner's Submission of New Factual Information (May 16, 2024) at Exhibits 1-5 (Appx00004742-Appx00004769). In addition, Petitioner provided industrial Brazilian natural gas rates for 2023 as an alternative source. Petitioner's Submission of New Factual Information (May 16, 2024) at Exhibits 1-5 (Appx00004742-Appx00004769). Nevertheless, Commerce refused to use these data. Instead, Commerce stated that, because QAFCO did not purchase natural gas from unaffiliated parties, it derived a supposed "market price" for QAFCO's purchases of natural gas using "QatarEnergy's sales to unaffiliated customers." *See Final IDM* at 20 (Appx00001355).

The problem with this approach is that the record contradicts Commerce's presumption that QatarEnergy's sales to unaffiliated customers reflect market-determined prices. In parallel with this related party cost analysis, Commerce found that a particular market situation exists in the Qatari market for natural gas as a result of the Government of Qatar's interventions. *Final IDM* at 5, 21 (Appx00001340, Appx00001356). The record shows that QatarEnergy is a "Qatari

state-owned public corporation" that is 100-percent owned by the Government of

Qatar. Preliminary Collapsing and Affiliation Memo at 3 (Appx00001323).

Commerce itself found that "the GOQ dominates key natural gas industries and

owns the companies involved in production and sale of subject merchandise" in

Qatar. Particular Market Situation Memo at 5 (Appx00001311). Thus, Commerce's

cost analysis treated a government entity's natural gas prices to unaffiliated

customers as if they represent market-determined prices. No reasonable basis exists

for such an approach, given the facts of this case. Indeed, the Department itself

found that QatarEnergy's average transfer price for natural gas to QAFCO "is

significantly lower than the benchmarks provided by the petitioner" and that this

comparison indicated a distortion in the price of natural gas. Particular Market

Situation Memo at 5 (Appx00001311). According to the Department's arms' length

test, QatarEnergy's prices to unaffiliated entities are even lower than its prices to

QAFCO. *Final IDM* at 20 (Appx00001355 ). It was therefore illogical to use

QatarEnergy's prices to unaffiliated entities in Qatar to test whether its transfer

prices to QAFCO are at arm's length.

 In sum, Commerce improperly used distorted prices from a natural gas

market subject to a particular market situation when it should have used market-

determined prices to value the collapsed entity's natural gas costs. Thus,

Commerce's major input analysis unreasonably and unlawfully treated a

government-entity's natural gas prices to unaffiliated customers as if they represent

market-determined prices.

**CONCLUSION**

For the foregoing reasons, the Court should determine that the *Final Determination* is not supported by substantial evidence and is otherwise not in accordance with law and remand the *Final Determination* to Commerce with instructions to correct the errors set forth above.

Respectfully submitted,

*/s/ Stephen J. Orava*
Stephen J. Orava
Patrick J. McLain
Nicholas K. Paster
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 737-0500
sorava@kslaw.com

*Counsel for Plaintiff Cornerstone Chemical Company*

Date: July 24, 2025

NON-CONFIDENTIAL VERSION

## <u>CERTIFICATE OF COMPLIANCE WITH CHAMBERS PROCEDURES</u>

Pursuant to Court of International Trade Standard Chambers Procedures and this Court's April 24, 2025, Scheduling Order (ECF No. 29), setting the word limitation of Plaintiff's Rule 56.2 Brief to 14,000 words, counsel for Plaintiff Cornerstone Chemical Company certifies that the attached Rule 56.2 Brief contains 5,479 words, including headers and footnotes. This word count certification is made in reliance on the word-count feature contained in Microsoft Word.

Respectfully submitted,

_/s/ Stephen J. Orava_
Stephen J. Orava