UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| CORNERSTONE CHEM. CO., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant. | Court No. 25-00005 |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S RULE 56.2
MOTION FOR JUDGMENT ON THE AGENCY RECORD**

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. MᴄCARTHY
Director

TARA K. HOGAN
Assistant Director

OF COUNSEL

JONZACHARY FORBES
Attorney
Office of the Chief Counsel for
    Trade Enforcement &
    Compliance
U.S. Department of Commerce

KRISTIN E. OLSON
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480 | Ben Franklin
Station
Washington, D.C. 20044
Tel: (202) 307-6299
kristin.olson@usdoj.gov

*Attorneys for the United States*

TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................... iii

GLOSSARY ............................................................................ v

STATEMENT PURSUANT TO RULE 56.2 ............................ 1

    I.    The Administrative Determination Under Review ............... 1

    II.   Issues Presented For Review ...................................... 2

STATEMENT OF FACTS ....................................................... 2

SUMMARY OF THE ARGUMENT ......................................... 5

ARGUMENT .......................................................................... 7

    I.    Standard Of Review .................................................... 7

    II.   Commerce's Selection of Türkiye as a Third-Country
        Comparison Market Is Supported by Substantial
        Evidence ..................................................................... 8

        A.   Legal Framework ............................................... 9

            1.   Comparison Third Country Market
                Selection .............................................. 9

            2.   Particular Market Situation
                Determination ..................................... 11

        B.   Commerce Reasonably Selected Türkiye as the
            Third Country Comparison Market and Declined
            to Find a Particular Market Situation ................ 12

    III.  Commerce Reasonably Determined that No
        Adjustment Was Necessary to Respondents' Cost of
        Manufacturing ........................................................... 22

CONCLUSION .................................................................... 24

# TABLE OF AUTHORITIES

Page(s)

Cases

*Am. Silicon Techs. v. United States*,
334 F.3d 1033 (Fed. Cir. 2003) ........................................................... 22

*Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*,
701 F.3d 1367 (Fed. Cir. 2012) ........................................................... 21

*Coal. of Am. Millwork Producers v. United States*,
581 F. Supp. 3d 1295 (Ct. Int'l Trade 2022) ...................................... 19

*Consolidated Edison Co. v. NLRB*,
305 U.S. 197 (1938) ............................................................................... 7

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966) ............................................................................... 7

*Fujitsu Gen. Ltd. v. United States*,
88 F.3d 1034 (Fed. Cir. 1996) ........................................................... 7, 8

*Garg Tube Export LLP v. United States*,
527 F. Supp. 3d 1362 (Ct. Int'l Trade 2021) ...................................... 12

*Goldlink Indus. Co. v. United States*,
431 F.Supp.2d 1323 (Ct. Int'l Trade 2006) ........................................... 8

*Hyundai Elec. & Energy Sys. Co. v. United States*,
15 F.4th 1078 (Fed. Cir. 2021) ............................................................... 8

*Hyundai Steel Company v. United States*,
19 F.4th 1346 (Fed. Cir. 2021) ........................................................... 22

*Meridian Prods., LLC v. United States*,
851 F.3d 1375 (Fed. Cir. 2017) ............................................................. 7

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ............................................................................... 20

*NMB Singapore Ltd. v. United States*,
   557 F.3d 1316 (Fed. Cir. 2009) ........................................................... 20

*Saha Thai Steel Pipe Company Limited v. United States*,
   87 F.4th 1328 (Fed. Cir. 2023) ........................................................... 22

*Usinor v. United States*,
   342 F. Supp. 2d 1267 (Ct. Int'l Trade 2004) .................................... 9, 18

    <u>Statutes</u>

19 U.S.C. § 1677(15) .......................................................................... 11

19 U.S.C. § 1677(33)(B) ....................................................................... 3

19 U.S.C. § 1677b(a)(1)(B)(ii) .......................................................... 12

19 U.S.C. § 1677b(a)(1)(C) ............................................................ 4, 10

19 U.S.C. § 1677b(e) ..................................................................... 12, 22

19 U.S.C. § 1677b(f)(2) ...................................................................... 23

19 U.S.C. § 1677b(f)(3) ...................................................................... 24

    <u>Regulations</u>

19 C.F.R. § 351.401(f) .......................................................................... 3

19 C.F.R. § 351.404(e) ................................................................... 10, 12

19 C.F.R. § 351.407(b) ....................................................................... 24

GLOSSARY

| Abbreviation | Term |
|---|---|
| Cornerstone or Plaintiff | Cornerstone Chemical Company |
| Commerce | U.S. Department of Commerce |
| IDM | Issues and Decision Memorandum |
| Muntajat | Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C. |
| PDM | Preliminary Decision Memorandum |
| QAFCO | Qatar Fertiliser Company (P.S.C.) |
| QMC | Qatar Melamine Company |

Pursuant to Rule 56.2 of the Rules of United States Court of International Trade, defendant, the United States, respectfully submits this response in opposition to the motion for judgment on the administrative record filed by the plaintiff, Cornerstone Chemical Company (Cornerstone).  ECF No. 36 (Cornerstone Br.).  Cornerstone challenges the United States Department of Commerce's final negative determination issued in the less than fair value investigation on melamine from Qatar.  Because Commerce's final determination is supported by substantial evidence and in accordance with law, the Court should deny Cornerstone's motion and enter judgment in favor of the United States.

## STATEMENT PURSUANT TO RULE 56.2

I.    The Administrative Determination Under Review

The administrative determination under review is the final determination in the less than fair value investigation on melamine from Qatar, issued and published as *Melamine From Qatar:  Final Negative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 89 Fed. Reg. 97,592 (Dep't Commerce Dec. 9, 2024) (*Final Determination*) (Appx00001656-

Appx00001657), and the accompanying Issues and Decision

Memorandum (IDM) (Appx00001336-Appx00001356).  The period of

investigation that Commerce examined is January 1, 2023, through

December 31, 2023.

II.    Issues Presented For Review

1.    Whether Commerce's selection of Türkiye as a third country

comparison market is supported by substantial evidence and in

accordance with law.

2.    Whether Commerce's determination that no adjustment is

necessary to respondents' cost of manufacturing is supported by

substantial evidence and in accordance with law.

## STATEMENT OF FACTS

Commerce initiated a less than fair value investigation of

melamine from Qatar on March 11, 2024.  *Melamine From Germany,*

*India, Japan, the Netherlands, Qatar, and Trinidad and Tobago:*

*Initiation of Less-Than- Fair-Value Investigations*, 89 Fed. Reg. 17,413

(Dep't Commerce Mar. 11, 2024) (Appx00012288-Appx00012293).

Commerce selected Qatar Melamine Company (QMC) and Qatar

Chemical and Petrochemical Marketing and Distribution Company

2

(Muntajat) Q.P.J.S.C. as the two mandatory respondents in the investigation.  *See* Preliminary Decision Memorandum (Sept. 18, 2024) at 2 (PDM) (Appx00014017).

In the preliminary determination on September 24, 2024, Commerce calculated a *de minimis* estimated weighted-average dumping margin for the respondents, and accordingly preliminarily determined that melamine from Qatar is not being, or is not likely to be, sold at less than fair value in the United States.  *See Melamine From Qatar:  Preliminary Negative Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 77,824, 77,825 (Dep't Commerce Sept. 24, 2024) (Appx00001333- Appx00001335).

Commerce determined that QMC, Muntajat, Qatar Fertiliser Company P.S.C. (QAFCO), and QatarEnergy are affiliated within the meaning of 19 U.S.C. § 1677(33)(B), (F), and (G), and that QMC, Muntajat, and QAFCO should be collapsed and treated as a single entity consistent with 19 C.F.R. § 351.401(f).  PDM at 4 (Appx00014019).

Commerce also determined that QMC and Muntajat's aggregate volume of home market sales was less than five percent of the aggregate

volume of its U.S. sales of subject merchandise and accordingly determined that the home market of Qatar was not viable consistent with 19 U.S.C. § 1677b(a)(1)(C).  PDM at 8-9 (Appx00014023-Appx00014024).  Accordingly, Commerce selected Türkiye as the most appropriate third country comparison market consistent with 19 U.S.C. § 1677b(a)(1)(B)(ii).  PDM at 9 (Appx00014024).  In its analysis, Commerce found that Cornerstone did not sufficiently support its allegation that a sales-based particular market situation existed in Türkiye during the period of investigation as a result of Chinese imports of melamine into Türkiye.  Third Country Selection Memorandum (Aug. 21, 2024) at 6 (Appx00001005).

Finally, Commerce found that a cost-based particular market situation existed in Qatar with regard to the purchase price of natural gas, but it did not make any adjustment because Commerce did not use constructed values in its comparisons to U.S. sales.  PDM at 12 (Appx00014027).

Commerce published the negative final determination on December 9, 2024, continuing to find that melamine from Qatar is not being, or is not likely to be, sold at less than fair value in the United

States.  89 Fed. Reg. at 97,592 (Appx00001656).  Commerce continued

to find Türkiye to be the most appropriate third country comparison

market and that Cornerstone failed to adequately support its allegation

that a particular market situation existed in Türkiye during the period

of investigation that would preclude its selection.  IDM at 13-15

(Appx00001348-Appx00001350).  Commerce also continued to decline to

make adjustments to its transaction disregarded and major input

analyses for purchases of natural gas of QMC/QAFCO from

QatarEnergy due to Cornerstone's particular market situation

allegation.  IDM at 20-21 (Appx00001355-Appx00001356).

## SUMMARY OF THE ARGUMENT

Commerce's determination to select Türkiye as the most

appropriate third country comparison market is supported by

substantial evidence.  Commerce reasonably determined that

Cornerstone did not adequately support its allegation that a sales-based

particular market situation existed in Türkiye during the period of

investigation that would preclude its selection.  Commerce provided a

sufficient explanation addressing the arguments of Cornerstone in its

final determination.  Cornerstone's arguments largely request this

Court to reweigh record evidence and find that the only reasonable determination based on its proffered evidence is to find a particular market situation. This Court should decline to reweigh record evidence, especially here where Cornerstone's arguments rest largely on generalizations and suppositions.

Additionally, Commerce's determination to not make adjustments to its affiliated party transaction analyses due to the natural gas particular market situation allegation is supported by substantial evidence and in accordance with law. Commerce's comparison of affiliated transactions to unaffiliated transactions in the Qatari market was consistent with the statute and Commerce's practice, regardless of Commerce's affirmative particular market situation finding for the Qatari natural gas market. Cornerstone's arguments are inconsistent with Federal Circuit precedent establishing that Commerce may not make a particular market situation adjustment outside of the context of comparisons to constructed value, which did not occur in this investigation.

6

## ARGUMENT

### I.    Standard Of Review

Commerce's determinations shall be sustained if "supported 'by substantial evidence on the record' and otherwise 'in accordance with law.'" *Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1381 (Fed. Cir. 2017) (citing 19 U.S.C. § 1516a(b)(1)(B)).  Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  Substantial evidence may be "less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

"{T}he antidumping statute reveals tremendous deference to the expertise of the Secretary of Commerce in administering the antidumping law." *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996) (internal citations omitted).  "Antidumping and countervailing duty determinations involve complex accounting decisions of a technical nature, for which agencies possess far greater

expertise than courts." *Id.* (internal citations omitted). "This deference is both greater than and distinct from that accorded the agency in interpreting the statutes it administers, because it is based on Commerce's technical expertise in identifying, selecting and applying methodologies to implement the dictates set forth in the governing statute, as opposed to interpreting the meaning of the statute itself where ambiguous." *Id.*

Furthermore, "{t}he court may not substitute its judgment for that of the agency when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Goldlink Indus. Co. v. United States*, 431 F.Supp.2d 1323, 1326 (Ct. Int'l Trade 2006) (internal citations omitted). Likewise, the Court may not "reweigh the evidence or substitute its own judgment for that of the agency." *Usinor v. United States*, 342 F. Supp. 2d 1267, 1272 (Ct. Int'l Trade 2004).

II.   Commerce's Selection of Türkiye as a Third-Country Comparison Market Is Supported by Substantial Evidence

Commerce's selection of Türkiye as the most appropriate third-country comparison market to calculate normal value is supported by substantial evidence. Cornerstone did not sufficiently demonstrate that

a sales-based particular market situation existed in Türkiye during the period of investigation that would prevent the selection of Türkiye, and this Court should sustain Commerce's weighing of relevant facts and ultimate assessment as supported by substantial evidence.

### A.    Legal Framework

#### 1.    Comparison Third Country Market Selection

The statute provides that Commerce will base normal value on third country market prices when (1) the foreign like product is not sold (or offered for dale) for consumption in the exporting country; (2) Commerce determines that the aggregate quantity (or if quantity is not appropriate, value) of the foreign like product sold in the exporting country is insufficient to permit a proper comparison to U.S. sales; or (3) a particular market situation in the exporting country does not permit a proper comparison with U.S. price.  *See* 19 U.S.C. § 1677b(a)(1)(C).  For purposes of the second basis, Commerce normally will consider a quantity (or value) to be insufficient if it is less than five percent of the aggregate quantity (or value) of sales of the subject merchandise to the United States.  *Id.*

When Commerce determines that a home market is not viable under one of the above bases, 19 U.S.C. § 1677b(a)(1)(B)(ii) directs Commerce to base normal value on prices in a third country market if: (1) such prices in that market are representative; (2) the aggregate quantity (of if quantity is not appropriate, value) of sales in the third country market is five percent or more of the aggregate quantity (or value) of U.S. sales; and, (3) no particular market situation exists that would prevent appropriate comparisons with U.S. prices.

Where prices in more than one third country market satisfy the requirements above, Commerce will generally select the third country market consistent with the following criteria listed in 19 C.F.R. § 351.404(e): (1) whether the foreign like product exported to a particular third country market is more similar to the subject merchandise exported to the United States, (2) whether the volume of sales to a particular third country market is larger than the volume of sales to other third countries; and, (3) other factors that Commerce may consider appropriate. If all factors are equal, Commerce's practice is to select the largest third country market by volume. *See* Third Country Market Selection Memorandum (Aug. 21, 2024) at 4 (citing *Honey from*

10

*Argentina:  Preliminary Results of Antidumping Duty Administrative Review*, 69 Fed. Reg. 621, 623-624 (Jan. 6, 2004), unchanged in *Honey from Argentina:  Final Results of Antidumping Duty Administrative Review*, 69 Fed. Reg. 30,283 (May 27, 2004)) (Appx00001003).

2.    <u>Particular Market Situation Determination</u>

Pursuant to 19 U.S.C. § 1677(15), Commerce shall find "sales and transactions" to be "outside the ordinary course of trade" in situations in which it "determines that the particular market situation prevents a proper comparison with the export price or constructed export price." The statute does not define exactly what may constitute a particular market situation; however, the Statement of Administrative Action accompanying the Uruguay Round Agreements Act provides:

> The Agreement does not define "particular market situation," but such a situation might exist where a single sale in the home market constitutes five percent of sales to the United States or where there is government control over pricing to such an extent that home market prices cannot be considered to be competitively set.  It also may be the case that a particular market situation could arise from differing patterns of demand in the United States and in the foreign market.

H.R. Doc. No. 103–316, vol. 1, at 822 (1994).

11

A "sales-based" particular market situation is one that prevents an accurate comparison between prices in the foreign market and prices for U.S. sales pursuant to 19 U.S.C. §§ 1677b(a)(1)(B)(ii)(III), (C)(iii); whereas a "cost-based" particular market situation is a situation where the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade pursuant to 19 U.S.C. § 1677b(e). *See also Garg Tube Export LLP v. United States*, 527 F. Supp. 3d 1362, 1369-70 (Ct. Int'l Trade 2021).

B.    Commerce Reasonably Selected Türkiye as the Third Country Comparison Market and Declined to Find a Particular Market Situation

In the final determination, Commerce determined that Türkiye is the most appropriate third country comparison market consistent with 19 U.S.C. § 1677b(a)(1)(B)(ii) and 19 C.F.R. § 351.404(e). IDM at 13-14 (Appx00001348-Appx00001349). Commerce reasonably declined to find a sales-based particular market situation in Türkiye during the period of investigation

that would preclude its selection under 19 U.S.C.

§ 1677b(a)(1)(C)(iii).

Cornerstone argues that a sales-based particular market situation existed in Türkiye based on the majority share of melamine imports into Türkiye from China, the fact that the average unit value of Chinese melamine imports was slightly lower than most other countries, and the existence of antidumping and countervailing duty measures placed on Chinese melamine by various countries. Cornerstone Br. 13-21. However, Commerce reasonably weighed record evidence and determined that Cornerstone failed to adequately support its allegations and that the arguments were not persuasive to find a sales based particular market situation in Türkiye. IDM at 13-15 (Appx00001348-00001350).

Cornerstone first argues that Chinese imports of melamine into Türkiye constituted 65.9 percent of all imports in 2023 and therefore its imports had a "strong effect" on melamine prices in Türkiye. Cornerstone Br. at 14. Cornerstone cites the International Trade Commission's finding in the separate injury

investigation that pricing is an important factor in purchasing decisions. Commerce reasonably found that the average unit value data provided by petitioners did not adequately demonstrate the alleged "strong effect" of Chinese imports creating significant distortion in the Turkish melamine market. IDM at 15 (Appx00001350). Cornerstone does not identify any other record evidence that would establish why China's share of 65.9 percent necessarily means Chinese imports significantly distort the Turkish market such that Turkish sales prices should be found outside the ordinary course of trade. While such fact may be relevant in Commerce's analysis, the paucity of the totality of circumstances does not undermine Commerce's reasoned ultimate determination.

Indeed, looking at the average unit value of imports, Commerce correctly concluded that the average unit value of Chinese imports was not even the lowest and that Qatar's average unit values were the second highest, roughly ten percent higher than from China. IDM at 15 (Appx00001350). Commerce reasonably concluded that this data did not sufficiently

demonstrate that the Turkish melamine market was significantly distorted by Chinese imports.

Cornerstone argues that Commerce should have found that despite the higher Qatari average unit values, that they would have been significantly higher but for Chinese imports. Cornerstone Br. at 21. Cornerstone asks this Court to rely on mere presumptions about the nature of the Turkish melamine market, which is why Commerce correctly concluded that Cornerstone failed to *adequately* support its allegation. IDM at 14 (Appx00001349). Indeed, were the Court to accept Cornerstone's argument and reweigh such evidence as only supporting a particular market situation finding, this would mean Commerce would be compelled to find a particular market situation for any market merely based on a majority share of Chinese imports in said market.

Cornerstone also argues that the majority share of Chinese imports in the Turkish market is sufficient to compel a particular market situation finding because certain countries, including the United States, have applied antidumping and countervailing

duties on Chinese melamine into their respective jurisdictions.
Cornerstone Br. at 14-19.  Commerce reasonably concluded that
such evidence was not availing in that it does not sufficiently
demonstrate that Chinese imports were unfairly traded into
Türkiye, such that that alone would demonstrate a particular
market situation.  IDM at 15 (Appx00001350).

Cornerstone points to the investigations covering 2013 and
2014 periods of investigation for melamine from China, where
Commerce based on total adverse facts available respectively
found dumping and countervailable subsidies, and accordingly
assigned estimated rates based on total adverse facts available, as
well as orders from the European Union and India.  Cornerstone
Br. at 14-15 (citing *Melamine From the People's Republic of China:
Final Determination of Sales at Less Than Fair Value*, 80 Fed.
Reg. 68,851 (Dep't Commerce Nov. 6, 2015); *Melamine From the
People's Republic of China:  Final Affirmative Countervailing Duty
Determination*, 80 Fed. Reg. 68,847 (Dep't Commerce Nov. 6,
2015)).  Commerce correctly addressed this evidence, concluding
that the existence of such orders alone does not constitute

evidence that melamine is unfairly traded into Türkiye, let alone is sufficient to establish the existence of a particular market situation.  IDM at 15 (Appx00001350).

Cornerstone seemingly concedes that with respect to antidumping duties, Commerce's position is reasonable. Cornerstone Br. at 15 ("Although the existence and extent of dumping may theoretically vary from country to country . . . ."). However, Cornerstone argues that countervailable subsidization instead is the more relevant aspect of its argument and that subsidization "*generally* does not depend on whether a Chinese producer is selling to the United States, Türkiye, or another market."  Cornerstone Br. at 15 (emphasis added).  In the next sentence, Cornerstone then states that "the *only reasonable inference* from the record is that the imports of melamine from China in the Turkish market were unfairly subsidized." Cornerstone Br. at 15 (emphasis added).  Cornerstone's own brief undermines its point by recognizing it rests on general statements, not specific evidence.  Such arguments do not *necessarily* establish that Chinese imports into Türkiye are

17

unfairly subsidized, let alone establish the relevant larger finding

that such imports created significant distortion requiring a

particular market situation finding.  Commerce's finding that

such arguments are not adequate to establish Cornerstone's

allegation is thus supported by substantial evidence. This Court

should not accede to Cornerstone's request to reweigh such

evidence.  *See Usinor*, 342 F. Supp. 2d at 1272 ("[T]he court may

not reweigh the evidence or substitute its own judgment for that

of the agency.").

Cornerstone finally contends that Commerce erred in its

analysis of this issue first by misstating "the {European Union}

and China have orders on melamine from China" rather than the

correct "the {European Union} and India have orders on melamine

from China."  Cornerstone Br. at 18.  Context makes clear that the

identification of China is a harmless typographical error:

Commerce correctly identified India earlier in the discussion of

this issue, IDM at 13 (Appx00001348), and the mistaken reference

to China does not affect Commerce's meaning.  *See, e.g., Coal. of*

*Am. Millwork Producers v. United States*, 581 F. Supp. 3d 1295,

1318 (Ct. Int'l Trade 2022) (rejecting allegation of Commerce error where context made clear Commerce's meaning despite mistaken reference).

Second, Cornerstone argues that Commerce missed the relevant point when it said such unfair trading determination do not constitute evidence that melamine from Qatar is dumped in another country. Cornerstone Br. at 18. However, Commerce's broader point is that a finding of unfair trading by one country does not necessarily demonstrate that the same goods are unfairly traded in another country. IDM at 14 (Appx00001349).

Lastly, Cornerstone contends that this Court should remand the determination because Commerce erred in not explicitly mentioning the U.S. unfair trading determinations. Cornerstone Br. at 16-17. However, as explained above, Commerce's statements that such orders do not demonstrate sufficient evidence to establish that products are necessarily unfairly traded into another market squarely covers the argument. Commerce's rationale is reasonably discernible. *See NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) ("We will …

'uphold a decision of less than ideal clarity if the agency's path

may reasonably be discerned.'" (citing *Motor Vehicle Mfrs. Ass'n v.*

*State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 (1983))).

Indeed, Cornerstone does not articulate a relevant distinction

between a third county's finding and a U.S. finding for

establishing that such products must be unfairly traded in

another separate market, such that Commerce's conclusion is not

applicable.

Commerce's determination that Cornerstone failed to

adequately support its allegation is supported by substantial

evidence and reasonably articulated.  Cornerstone's arguments

largely request the Court reweigh record evidence to find certain

factors dispositive in establishing a particular market situation.

Commerce reasonably declined to find that an import market was

significantly distorted to render its prices outside the ordinary

course of trade within the meaning of the statute simply where

there was a Chinese majority of imports and there are unfair

trading determinations on that product into the United States,

even if such factors may be relevant.  One could imagine how such

a low evidentiary threshold could compel a finding that a vast number of all global markets have particular market situations.

Lastly, Cornerstone argues that, if the Court were to remand Commerce's selection of Türkiye as a third country comparison market, that the Court should "direct Commerce to consider the use of constructed value to calculate normal value, including an appropriate adjustment to account for the cost-based particular market situation that was found to exist in Qatar with respect to natural gas." Cornerstone Br. at 22-23. While this Court should sustain Commerce's determination as explained above, if the Court remands the decision, the Court should direct Commerce to provide further explanation or reconsideration, rather than specifically direct an outcome on remand. *See Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F.3d 1367, 1374-75 (Fed. Cir. 2012) ("We generally disfavor limited remands that restrict Commerce's ability to collect and fully analyze data on a contested issue." (citing *Am. Silicon Techs. v. United States*, 334 F.3d 1033, 1038–39 (Fed. Cir. 2003))).

III.    Commerce Reasonably Determined that No Adjustment Was
        Necessary to Respondents' Cost of Manufacturing

Cornerstone contends that Commerce was required to take into
account its particular market situation finding when conducting its cost
analyses.  However, Commerce declined to make such a particular
market situation adjustment outside of the context of constructed value.
This is consistent with Federal Circuit precedent preventing Commerce
from making a cost-based particular market adjustment outside of the
context of constructed value under 19 U.S.C. § 1677b(e).  *See e.g.*, *Saha
Thai Steel Pipe Company Limited v. United States*, 87 F.4th 1328, 1331
(Fed. Cir. 2023) ("The agency cannot use constructed value language
found in § 1677b(e) as a backdoor to slip in a {particular market
situation} adjustment for cost of production calculations." (citing
*Hyundai Steel Company v. United States*, 19 F.4th 1346 (Fed. Cir.
2021))).

After concluding that a cost-based particular market situation
exists in Qatar with respect to the purchase of natural gas, Commerce
correctly determined to "not apply a {particular market situation}
adjustment because no sales were compared to {constructed value}."
IDM at 4-5 (Appx00001339-Appx00001340).  Commerce properly

compared the transfer price paid for purchases of natural gas by
QAFCO to QatarEnergy's cost of production and to a price based on
QatarEnergy's sales to unaffiliated customers consistent with its
practice rather than comparing the purchases to data submitted in
Cornerstone's particular market situation allegation. IDM at 20-21
(Appx00001355-Appx00001356).

Cornerstone argues that Commerce erred in comparing transfer
prices to sales of unaffiliated customers in Qatar due to Commerce's
affirmative cost-based particular market situation finding for Qatar's
natural gas market. Cornerstone Br. at 25-27. However, Cornerstone
does not explain why its position is consistent with the statute or any
Commerce practice. It is not. Rather, 19 U.S.C. § 1677b(f)(2) directs
Commerce to look at "the amount representing that element {of value}
does not fairly reflect the amount usually reflected in sales of
merchandise under consideration in the market under consideration."
Accordingly, Commerce's practice of comparing affiliated transactions
with unaffiliated transactions in the market under consideration is
consistent with the statute and its practice. IDM at 20-21
(Appx00001355-Appx00001356). The fact that the transfer prices in

23

question were lower than the world benchmarks provided by the petitioner (or higher than unaffiliated transaction prices) does not detract from Commerce's lawful application of its major input analysis and conclusion that transfer prices for natural gas exceeded both the price to unaffiliated customers in the Qatari market and QatarEnergy's cost to produce the natural gas input consistent with 19 U.S.C. § 1677b(f)(3) and 19 C.F.R. § 351.407(b).  IDM at 20-21 (Appx00001355-Appx00001356).  Contrary to Cornerstone's arguments, Commerce's determination not to apply a particular market adjustment in its cost analyses is supported by substantial evidence and in accordance with law.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's final determination in the less than fair value investigation of melamine from Qatar and deny Cornerstone's motion for judgment on the agency record.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

OF COUNSEL                          s/ Kristin E. Olson
                                    KRISTIN E. OLSON
JONZACHARY FORBES                   Trial Attorney
Attorney                            U.S. Department of Justice
Office of the Chief Counsel for     Civil Division
    Trade Enforcement &             Commercial Litigation Branch
    Compliance                      P.O. Box 480
U.S. Department of Commerce         Ben Franklin Station
                                    Washington, D.C. 20044
                                    Tel: (202) 307-6299
                                    kristin.olson@usdoj.gov

January 9, 2025                     *Attorneys for the United States*

<u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the 14,000 word limitation authorized by the Court's scheduling order because the brief contains 4,039 words, excluding the parts of the brief exempted from the word limitation.  In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

I also certify that this submission was not prepared with the assistance of a generative artificial intelligence program based on natural language prompts—such as, but not limited to, ChatGPT or Google Bard.

<u>s/ Kristin E. Olson     </u>
