# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE M. MILLER BAKER

|  |  |
|---|---|
| CORNERSTONE CHEMICAL COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | Court No. 25-00005 |
| ) | |
| Defendant, ) | **PUBLIC DOCUMENT** |
| ) | |
| and ) | Contains No Business |
| ) | Proprietary Information |
| QATAR MELAMINE ) | |
| COMPANY (A QATARI ) | |
| PRIVATE SHAREHOLDING ) | |
| COMPANY), QATARENERGY ) | |
| MARKETING (1) (A QATARI ) | |
| PRIVATE SHAREHOLDING ) | |
| COMPANY), ) | |
| ) | |
| Defendant-Intervenors. ) | |
| ) | |

# RESPONSE BRIEF OF DEFENDANT-INTERVENORS QATAR MELAMINE COMPANY AND QATARENERGY MARKETING

Jay C. Campbell
Richard G. King
Matthew W. Solomon

**White & Case LLP**

701 Thirteenth Street, N.W.

Washington, D.C. 20005
202-626-3600

*Counsel to Defendant-Intervenors Qatar Melamine Company (a Private Shareholding Company in the State of Qatar) and QatarEnergy Marketing (a Private Shareholding Company in the State of Qatar)*

Dated:  January 23, 2026

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................. 1

II.   STATEMENT PURSUANT TO RULE 56.2 .................................. 1

    A.    The Administrative Determination under Review ................ 1

    B.    Issues of Law Presented ................................................ 2

III.  STATEMENT OF FACTS ...................................................... 2

IV.  SUMMARY OF ARGUMENT .................................................. 8

V.    STANDARD OF REVIEW .................................................... 10

VI.  ARGUMENT ...................................................................... 12

    A.    Commerce's Selection of Türkiye as the Third-Country
        Comparison Market and Rejection of Plaintiff's Sales-
        Based PMS Allegation Is Supported by Substantial
        Evidence ................................................................... 12

        1.    Legal Framework ................................................ 12

        2.    Commerce Reasonably Selected Türkiye as the
               Comparison Market Because Petitioner's Sales-
               Based PMS Allegation Was Inadequate ..................... 14

    B.    Even If Türkiye Were Not a Viable Third-Country
        Market, Commerce Would Have the Discretion To
        Select a Different Third-Country Market ........................... 20

    C.    Commerce Lawfully Applied the Major Input and
        Transactions-Disregarded Rules to Natural Gas
        Purchases ................................................................ 23

        1.    Legal Framework ................................................ 24

        2.    Commerce Properly Applied Both Rules Using

Prices in the "Market Under Consideration" .............. 26

3.  Commerce Correctly Declined to Make a PMS
Adjustment ................................................................. 27

4.  Plaintiff's Benchmark Evidence Was
Fundamentally Flawed ............................................... 28

5.  Commerce Did Not "Disregard" Plaintiff's
Benchmark Data .......................................................... 29

VII.  CONCLUSION ............................................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ad Hoc Shrimp Trade Action Comm. v. United States,*
515 F.3d 1372 (Fed. Cir. 2008) ........................................................ 21

*Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States,*
701 F.3d 1367 (Fed. Cir. 2012) ........................................................ 23

*China Nat'l Mach. Imp. & Exp. Corp. v. United States,*
264 F. Supp. 2d 1229 (Ct. Int'l Trade 2003) ................................ 17, 19

*Consolidated Edison Co. of New York, Inc. v. N.L.R.B.,*
305 U.S. 197 (1938) ........................................................................ 10

*Consolo v. Fed. Maritime Comm'n,*
383 U.S. 607 (1966) ........................................................................ 10

*Daewoo Elecs. Co. v. United States,*
6 F.3d 1511 (Fed. Cir. 1993) ............................................................ 12

*Giorgio Foods, Inc. v. United States,*
2025 Ct. Intl. Trade LEXIS 93 (July 16, 2025) ................................ 23

*Husteel Co. v. United States,*
471 F. Supp. 3d 1349 (Ct. Int'l Trade 2020) .................................... 13

*Hyundai Steel Company v. United States,*
19 F.4th 1346 (Fed. Cir. 2021) ................................................ 9, 25, 27

*Koyo Seiko Co. v. United States,*
36 F.3d 1565 (Fed. Cir. 1994) .......................................................... 11

*Matsushita Electric Industrial Co. v. United States,*
750 F.2d 927 (Fed. Cir. 1984) .......................................................... 11

*Mitsubishi Heavy Indus. v. United States,*
275 F.3d 1056 (Fed. Cir. 2001) ........................................................ 10

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29 (1983) ............................................................................... 11

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006) ....................................................... 20

*NSK Ltd. v. United States*,
    346 F. Supp. 2d 1312 (Ct. Int'l Trade 2004) ..................................... 11

*PAM, S.p.A. v. United States*,
    582 F.3d 1336 (Fed. Cir. 2009) ....................................................... 10

*Saha Thai Steel Pipe Company Limited v. United States*,
    87 F.4th 1328 (Fed. Cir. 2023) ........................................................ 27

*Ta Chen Stainless Steel Pipe Inc. v. United States*,
    298 F.3d 1330 (Fed. Cir. 2002) ....................................................... 11

*Torrington Co. v. United States*,
    881 F. Supp. 622 (Ct. Int'l Trade 1995) ............................................ 11

## STATUTES AND REGULATIONS

19 U.S.C. § 1516a(b)(1)(B)(i) ................................................................ 10

19 U.S.C. § 1677(33)(B) ........................................................................ 3

19 U.S.C. § 1677(33)(F) ......................................................................... 3

19 U.S.C. § 1677(33)(G) ......................................................................... 3

19 U.S.C. § 1677b(a)(1)(B)(ii) ................................................................ 4

19 U.S.C. § 1677b(a)(1)(C) ............................................................. 12, 13

19 U.S.C. § 1677b(a)(1)(C)(ii) ................................................................ 23

19 U.S.C. § 1677b(f)(2) ................................................................ passim

19 U.S.C. § 1677b(f)(3) ................................................................. 6, 32

19 C.F.R. § 351.309(c)(2) ...................................................................... 29

19 C.F.R. § 351.309(d)(2) ..................................................................... 29

19 C.F.R. § 351.404(e) ................................................................. passim

19 C.F.R. § 351.404(f) ..................................................................... 22

19 C.F.R. § 351.407(b) ................................................................. 24, 32

19 C.F.R. § 351.407(b)(2) ................................................................. 25

## ADMINISTRATIVE DETERMINATIONS

*Melamine From Qatar: Final Negative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances,*
    89 Fed. Reg. 97,592 (Dep't Commerce Dec. 9, 2024) ................. passim

*Melamine From Qatar: Preliminary Negative Determination of Sales at Less Than Fair Value,*
    89 Fed. Reg. 77,824 (Dep't Commerce Sept. 24, 2024) ............... 2, 3, 6

## OTHER MATERIALS

*Antidumping Duties; Countervailing Duties,*
    62 Fed. Reg. 27,296 (Dep't Commerce May 19, 1997) ...................... 17

# GLOSSARY

| Abbreviation | Term |
|---|---|
| AD | Antidumping duty |
| AUV | Average unit value |
| Commerce | U.S. Department of Commerce |
| Cornerstone | Cornerstone Chemical Company |
| CV | Constructed value |
| IDM | Issues and Decision Memorandum |
| ITC | U.S. International Trade Commission |
| Muntajat | Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C. |
| NFI | New factual information |
| NV | Normal value |
| PMS | Particular market situation |
| POI | Period of investigation |
| QAFCO | Qatar Fertiliser Company P.S.C. |
| QEM | QatarEnergy Marketing (a Private Shareholding Company in the State of Qatar) |
| QMC | Qatar Melamine Company (a Private Shareholding Company in the State of Qatar) |
| Respondents | QMC and Muntajat |

## I.    INTRODUCTION

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Defendant-Intervenors QMC and QEM (formerly known as Muntajat) hereby submit this brief in response to arguments raised in the July 24, 2025, brief filed by Plaintiff Cornerstone in support of its Rule 56.2 motion for judgment on the agency record.  Br. of Cornerstone Chem. Co. Supp. Rule 56.2 Mot. J. Agency R. (July 24, 2025), ECF No. 36 ("Pl. Br.").

## II.    STATEMENT PURSUANT TO RULE 56.2

### A.    The Administrative Determination under Review

The administrative determination under review is the final determination by Commerce in the less than fair value investigation on Melamine from Qatar, issued and published as *Melamine From Qatar: Final Negative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 89 Fed. Reg. 97,592 (Dep't Commerce Dec. 9, 2024) ("Final Determination") (Appx00001656-Appx00001657), and the accompanying Issues and Decision Memorandum ("Final IDM") (Appx00001336-Appx00001356).

### B.    Issues of Law Presented

1.  Whether Commerce's selection of Türkiye as the third-country comparison market is supported by substantial evidence and otherwise in accordance with law.

2.  Whether Commerce's determination that no adjustment was necessary to respondents' cost of manufacturing is supported by substantial evidence and otherwise in accordance with law.

### III.  STATEMENT OF FACTS

This case arises from Commerce's final determination in the AD investigation of Melamine from Qatar.

Commerce initiated a less-than-fair-value investigation of melamine from the State of Qatar on March 11, 2024.  *Melamine From Germany, India, Japan, the Netherlands, Qatar, and Trinidad and Tobago: Initiation of Less-Than-Fair-Value Investigations*, 89 Fed. Reg. 17,413 (Dep't Commerce Mar. 11, 2024) (Appx00012288-Appx00012293).

Commerce selected as the two mandatory respondents QMC and Muntajat, which are affiliated companies.  *See Melamine From Qatar: Preliminary Negative Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 77,824, 77,825 (Dep't Commerce Sept. 24, 2024)

(Appx00001333-Appx00001335) ("Preliminary Determination"), and accompanying Preliminary Decision Memorandum at 2 (Appx00014017) ("PDM"). As reported, QMC produced melamine, the subject merchandise, while Muntajat had the exclusive rights to market and sell the melamine produced by QMC. See QMC/Muntajat Section A Questionnaire Response at A-2 (Appx00002993).

Commerce published its Preliminary Determination on September 24, 2024, calculating a *de minimis* estimated weighted-average dumping margin for the Respondents and finding that melamine from the State of Qatar is not being, or is not likely to be, sold at less than fair value in the United States. *See* Preliminary Determination (Appx00001333-Appx00001335).

Commerce also preliminarily determined that QMC, Muntajat, QAFCO, and QatarEnergy were affiliated within the meaning of 19 U.S.C. § 1677(33)(B), (F), and (G), and that QMC, Muntajat, and QAFCO should be collapsed and treated as a single entity. PDM at 4 (Appx00014019). QAFCO is QMC's immediate parent company and supplied QMC with inputs, including urea solution, for QMC's production of melamine. QMC/Muntajat Section A Questionnaire

Response at A-8 (Appx00002999). QatarEnergy is QMC's ultimate

parent company and supplied QAFCO with natural gas for QAFCO's

production of urea solution. *Id*. (Appx00002999).

Further, Commerce preliminarily found that QMC and Muntajat

did not have a viable home market because the aggregate volume of

home-market sales was less than five percent of the aggregate volume

of U.S. sales of subject merchandise. PDM at 8-9 (Appx00014023-

Appx00014023). Commerce therefore was required to determine NV

based on third-country sales, if such sales were available and

appropriate. *See* 19 U.S.C. § 1677b(a)(1)(B)(ii). The Respondents

reported that they had three viable third-country markets during the

POI: Türkiye, Germany, and Spain. Third Country Selection

Memorandum at 4 (Appx00001003). Commerce evaluated the

potential third-country comparison markets pursuant to the criteria in

19 C.F.R. § 351.404(e), including volume of sales, similarity of

merchandise, and comparability of sales circumstances. *See id*. at 3-6

(Appx00001002-Appx00001005). Applying those criteria, Commerce

found that Türkiye was the Respondents' largest third-country market

during the POI and the only viable market in which they sold all

melamine with sales channels comparable to those for their U.S. sales of melamine.  *Id.* at 5 (Appx00001004).  Consequently, Commerce preliminarily selected Türkiye as the appropriate third-country comparison market.  PDM at 9 (Appx00014024).

Commerce did so despite Cornerstone's allegation that a sales-based PMS precluded the use of Respondents' sales in Türkiye as the basis for NV.  Cornerstone had argued that the presence of Chinese melamine imports suppressed market prices for melamine in Türkiye, undermining the reliability of Turkish prices for purposes of NV.  Petitioner's Market Viability Comments at 9 (Appx00004656).  After reviewing the evidence submitted, Commerce concluded that Cornerstone had "failed to sufficiently support its allegation."  Third Country Selection Memorandum at 6 (Appx00001005).

Commerce explained that the factors cited by Cornerstone – namely, the volumes of melamine imported into Türkiye, foreign trade remedies imposed on melamine by other jurisdictions, and AUV data – did not establish that Turkish transaction prices for melamine were abnormal or unreliable.  *Id.* (Appx00001005).

At the same time, Commerce preliminarily found that a cost-based PMS existed in Qatar with regard to the purchase price of natural gas, which QAFCO purchased from QatarEnergy. Because Commerce did not use CV in its comparisons to U.S. sales, however, Commerce did not make any adjustment to QMC's cost to produce melamine. PDM at 12 (Appx00014027).

As noted, QatarEnergy supplied natural gas to QAFCO, which, in turn, produced urea solution for QMC's production of melamine. Consequently, Commerce also evaluated the prices of natural gas purchased by QAFCO from its affiliate, QatarEnergy. *See* Preliminary Decision Memorandum on PMS at 5-6 (Appx00001311-Appx00001312). In doing so, Commerce applied the major input rule and the transactions-disregarded rule under 19 U.S.C. § 1677b(f)(2)-(3). *See id.* (Appx00001311-Appx00001312); *see also* Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Determination at 2-3 (Appx00001304-Appx00001305). Commerce preliminarily found that the transfer prices QAFCO paid QatarEnergy for natural gas exceeded both QatarEnergy's cost of production and the price of QatarEnergy's sales of natural gas to unaffiliated customers, *see*

Preliminary Decision Memorandum on PMS at 5-6 (Appx00001311-Appx00001312), and therefore concluded that no adjustment to QMC's reported costs was warranted, *see* PDM at 12 (Appx00014027).

Commerce issued a final negative determination of sales at less than fair value. *See* Final Determination and accompanying Final IDM (Appx00001656-Appx00001657, Appx00001336-Appx00001356). Commerce continued to find that Türkiye was the most appropriate third-country comparison market and that Cornerstone failed to support its allegation that a sales-based PMS existed in Türkiye during the POI. Final IDM at 13-15 (Appx00001348-Appx00001350). Commerce also again declined to adjust QMC's costs under either the transactions-disregarded or major input analyses because the transfer prices of QAFCO's purchases of natural gas from QatarEnergy exceeded the latter company's cost of production and price for sales of natural gas to unaffiliated customers. Final IDM at 20-21 (Appx00001355-Appx00001356).

Based on these and other findings, Commerce determined that the Respondents did not sell melamine in the United States at less than fair value.

## IV. SUMMARY OF ARGUMENT

Commerce's Final Determination should be sustained because it is supported by substantial evidence and fully consistent with the statutory framework.

First, Commerce's selection of Türkiye as the appropriate third-country comparison market based on the regulatory criteria in 19 C.F.R. § 351.404(e) is supported by substantial evidence. Commerce reasonably rejected Plaintiff's sales-based PMS allegation because Plaintiff did not adequately support it. In doing so, Commerce fully addressed each element of petitioner's allegation and provided reasonable explanations for its decision. Plaintiff now asks the court to reweigh the record evidence, largely based on generalizations and unsupported assumptions. The Court's role under the "substantial evidence" standard of review is *not* to reweigh the evidence and decide whether it would have come to the same conclusion as the administrative agency, but rather to decide whether the evidence reasonably leads to the agency's conclusion. Here, Commerce's decision that Plaintiff failed to adequately support its sales-based PMS allegation was reasonable based on the evidentiary record and, thus,

supported by substantial evidence.  Consequently, there also is no basis for Commerce to use CV, as plaintiff urges.

Second, Commerce's refusal to adjust QMC's costs under the major input and transactions-disregarded analyses based on its finding of a natural gas PMS in Qatar is supported by substantial evidence and in accordance with law.  Plaintiff's argument for a cost-based PMS adjustment to QAFCO's transfer prices for natural gas supplied to QMC is inconsistent with the Federal Circuit's holding in *Hyundai Steel Co. v. United States*, 19 F.4th 1346, 1352 (Fed. Cir. 2021) that such adjustments may not be made outside the context of CV.  Plaintiff's other arguments for adjustments to these transfer prices are inconsistent with the law and the record evidence.  Specifically, because Commerce found that the transfer price exceeded both QatarEnergy's cost of production and its prices to unaffiliated customers in the market under consideration, the statute and regulation required valuation at the transfer price and foreclosed reliance on external "global" benchmarks.

## V.    STANDARD OF REVIEW

In reviewing a challenge to Commerce's determination in an AD proceeding, the Court "shall hold unlawful any determination, finding, or conclusion found … to be unsupported by substantial evidence on the record, or otherwise not in accordance with law …." 19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 619-20 (1966) (quoting *Consolidated Edison Co. of New York, Inc. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)); *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009). It is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo*, 383 U.S. at 620. To the extent that a plaintiff claims that the evidence before Commerce "could be open to multiple interpretations, its argument does not require, or even allow, reversal." *Mitsubishi Heavy Indus. v. United States*, 275 F.3d 1056, 1062 (Fed. Cir. 2001).

The Court's role is not to reweigh the evidence and decide whether it would have come to the same conclusion as the administrative agency, but rather to decide whether there was evidence which could reasonably lead to the agency's conclusion. *See Matsushita Electric Industrial Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Commerce must "articulate a satisfactory explanation for its action," which includes making a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted).

Congress intended, as this Court has affirmed, that "Commerce is afforded great latitude in the choice of methodology to be employed in antidumping investigations." *See Torrington Co. v. United States*, 881 F. Supp. 622, 646 (Ct. Int'l Trade 1995) (citation omitted); *see also NSK Ltd. v. United States*, 346 F. Supp. 2d 1312, 1335 (Ct. Int'l Trade 2004), aff'd, 481 F.3d 1355 (Fed. Cir. 2007) (citation omitted). The Federal Circuit also has noted that Commerce's "special expertise in administering the anti-dumping law entitles its decisions to deference from the courts." *Ta Chen Stainless Steel Pipe Inc. v. United States*, 298 F.3d 1330, 1335 (Fed. Cir. 2002) (citations omitted); *see also Koyo Seiko*

*Co. v. United States*, 36 F.3d 1565, 1570 (Fed. Cir. 1994) ("Deference to

an agency's statutory interpretation is at its peak in the case of a court's

review of Commerce's interpretation of the antidumping laws") (citing

*Daewoo Elecs. Co. v. United States*, 6 F.3d 1511, 1516 (Fed. Cir. 1993)).

## VI.   ARGUMENT

### A.   Commerce's Selection of Türkiye as the Third-Country Comparison Market and Rejection of Plaintiff's Sales-Based PMS Allegation Is Supported by Substantial Evidence

Plaintiff indirectly challenged Commerce's use of NV – as opposed

to CV – based on an unsubstantiated sales-based PMS allegation that

Chinese imports distorted melamine prices in Türkiye, the comparison

market selected by Commerce.  *See* Pl. Br. at 13-21.  Because Plaintiff

failed to demonstrate the existence of a sales-based PMS in Türkiye,

Commerce's selection of Türkiye as the most appropriate third-country

comparison market is supported by substantial evidence.

#### 1.   Legal Framework

Where Commerce determines that the home market is not viable,

the statute directs Commerce to base NV on prices in a third country if

that market is viable.  19 U.S.C. § 1677b(a)(1)(C).  A third-country

market is viable if:  (1) prices in that market are representative;  (2) the

aggregate quantity (or, if quantity is not appropriate, value) of the foreign like product sold in the third country market is five percent or more of the aggregate quantity (or value) of U.S. sales of the subject merchandise; and (3) no PMS exists in the third country that would prevent an appropriate comparison with U.S. prices. 19 U.S.C. § 1677b(a)(1)(C). If prices in more than one third-country market meet the above criteria, Commerce selects the most "appropriate" third-country market based on a number of factors, including the volume of sales in each viable third-country market and the similarity of the merchandise sold in the United States and each viable third-country market. 19 C.F.R. § 351.404(e).

To establish the existence of a sales-based PMS, Commerce evaluates whether substantial evidence demonstrates that the alleged market conditions actually impair price comparability. *See, e.g.*, *Husteel Co. v. United States*, 471 F. Supp. 3d 1349, 1362 (Ct. Int'l Trade 2020) ("To establish the existence of a PMS, Commerce must demonstrate both that there are distortions present in the market and that those distortions prevent a proper comparison of normal value with export price or constructed export price. Those determinations must be

13

supported by substantial evidence, such that a reasonable mind might

accept the evidence as adequate to support its conclusion while

considering contradictory evidence" (citations omitted)).

The existence of imports, competitive pressure, or even allegations

of below-cost pricing do not – absent substantial evidence of price

distortion – disqualify a comparison market under the regulatory

market-selection criteria or establish the existence of a sales-based

PMS.  Final IDM at 15 (Appx00001350).

> ### 2. Commerce Reasonably Selected Türkiye as the Comparison Market Because Petitioner's Sales-Based PMS Allegation Was Inadequate

Applying the criteria set forth in 19 C.F.R. § 351.404(e),

Commerce found that Türkiye was the most appropriate third-country

market because it was the Respondents' largest third-country market,

and the Respondents' sales to Türkiye were fully comparable to their

U.S. sales of melamine in terms of product similarity, sales volume, and

channels of distribution.  Final IDM at 13-14 (Appx00001348-

Appx00001349).  Plaintiff did not dispute any of these findings before

Commerce.  Instead, Plaintiff alleged that a sales-based PMS

(purportedly unfairly traded Chinese imports) distorted prices in

Türkiye's melamine market.  Pl. Br. at 13-21.  Commerce, however, weighed the record evidence and reasonably determined that Cornerstone failed to support its sales-based PMS allegation.  Final IDM at 15 (Appx00001350).

### a.    The Market Share and Average Unit Values of Chinese Imports of Melamine Do Not Establish the Existence of a PMS

In its final determination, Commerce reasonably rejected Plaintiff's allegation of a sales-based PMS based solely on (1) Chinese imports' share of total melamine imports into Türkiye; and (2) AUVs of melamine imports into Türkiye.  Pl. Br. at 18-20.  As Commerce explained, relative import volumes and AUVs alone fail to demonstrate that prices in a particular market are distorted or unsuitable for comparison.  Final IDM at 15 (Appx00001350).

In arguing that the volume of Chinese melamine imports into Türkiye distorted the market, Plaintiff failed to offer any evidence connecting Chinese import levels to actual price effects in Türkiye's melamine market during the POI.  Commerce therefore reasonably declined to infer price distortion from market structure alone.  *Id.* (Appx00001350).

Plaintiff also relied on AUV data for melamine imports into Türkiye, as if such general information were sufficient to demonstrate market distortion.  Pl. Br. at 19-21.  In the underlying proceeding, Commerce correctly explained that "AUVs are not evidence of subsidized or dumped prices, and the AUVs provided by the petitioner do not prove the argument that the dominant presence of low-priced Chinese imports distorted the Turkish market and significantly depressed the price of melamine in Türkiye."  Final IDM at 15 (Appx00001350).  Nor did the AUV data provide even superficial support for Plaintiff's theory:  rather, the AUV data showed wide variability among country sources of melamine and showed that the AUVs for imports of melamine from the State of Qatar were among the highest in Türkiye.  *Id.* (Appx00001350) (noting "a wide variability in the AUVs of the top six exporting countries to Türkiye," and that "Qatar's melamine AUV was second highest and 10 percent higher than China's, undercutting the petitioner's argument").  Thus, contrary to Plaintiff's allegation, the AUV data contradicted the notion that melamine prices in Türkiye were distorted or suppressed at all. Accordingly, Commerce reasonably found that the AUV data provided

insufficient evidence of price distortion.  *Id.* (Appx00001350).

With respect to the AUVs for melamine imports from Qatar, Plaintiff also criticizes Commerce for not quantifying hypothetical "but-for" prices.  Pl. Br. at 21 ("Commerce erroneously presumed (without further explanation or analysis) that the prices of imports from the State of Qatar would not have been significantly higher if the Turkish melamine market were not dominated by relatively low-priced and subsidized Chinese imports").  The statute, however, does not require Commerce to construct counterfactual markets to reject unsupported PMS allegations.  Rather, the burden rests on the party alleging a PMS to demonstrate that prices are unsuitable for comparison.  *See Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,357 (Dep't Commerce May 19, 1997) (final rule) ("the party alleging the existence of a 'particular market situation' … has the burden of demonstrating that there is a reasonable basis for believing that a 'particular market situation' exists").  Plaintiff failed to do so here. Speculative assumptions about what prices would have been under different circumstances fall short of substantial evidence.  *See China Nat'l Mach. Imp. & Exp. Corp. v. United States*, 264 F. Supp. 2d 1229,

1240 (Ct. Int'l Trade 2003) ("Conjectures are not facts and cannot constitute substantial evidence").

### b. Trade Remedies in Other Countries Do Not Establish a PMS in Türkiye

Plaintiff also erroneously relied on the existence of trade remedies (antidumping and/or countervailing duties) against Chinese melamine imposed by the United States, the European Union, and India to support its allegation that Chinese melamine imports distort the market in Türkiye.  Pl. Br. at 14-19.  In response, Commerce correctly found that such measures do not establish that Chinese melamine was unfairly traded into Türkiye, much less that Chinese imports distorted or significantly depressed melamine prices in Türkiye.  Final IDM at 15 (Appx00001350).

Plaintiff admits that "the existence and extent of dumping may theoretically vary from country to country …."  Pl. Br. at 15.  This is correct and is consistent Commerce's statement that a dumping finding in one country "does not constitute evidence that the same goods are dumped in another country."  *Id.* (Appx00001350) (citing QMC/Muntajat Sales Rebuttal Br. at 4 (Appx00012127)).

Plaintiff argues, however, that countervailable subsidization

"generally does not depend on whether a Chinese producer is selling to the United States, Türkiye, or another market" and that the "only reasonable inference from the record is that the imports of melamine from China in the Turkish market were unfairly subsidized." Pl. Br. at 15. This is simply an assumption, however, not evidence – let alone substantial evidence ("Conjectures are not facts and cannot constitute substantial evidence"). *China Nat'l Mach.*, 264 F. Supp. 2d at 1240. The record lacks any affirmative evidence (such as a determination by the Government of Türkiye) that exports of Chinese melamine to Türkiye were unfairly subsidized. Nor does Petitioner's claim, even if it were true, establish the existence of a market distortion sufficient to support a PMS finding.

Plaintiff's approach would require Commerce to find a PMS in any market where there are imports from China that are subject to trade remedies in other countries. The statute does not compel, and Commerce has never adopted, such an extreme approach. Consequently, Commerce's decision to accord little weight to this aspect of Petitioner's sales-based PMS allegation is supported by substantial evidence. Plaintiff here simply asks the Court to reweigh the evidence.

19

### c. Commerce Engaged Directly with Plaintiff's PMS Evidence and Provided a Reasoned Explanation

While Plaintiff repeatedly asserts that Commerce failed to engage with its PMS arguments, *see* Pl. Br. at 13-21, Commerce's Final IDM shows otherwise.  Commerce addressed each category of evidence Plaintiff presented – import shares, foreign trade remedies, and AUV data – and explained why none provided sufficient evidence of price distortion in Türkiye.  Final IDM at 15 (Appx00001350).  That is precisely what reasoned decision-making requires.  Plaintiff's mere disagreement with Commerce's conclusion does not mean that Commerce failed to weigh the evidence and draw reasonable conclusions supported by substantial evidence.  Petitioner improperly invites the Court to reweigh the evidence.  *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1359 (Fed. Cir. 2006) (finding that the CIT "erred … in reweighing the evidence").

### B. Even If Türkiye Were Not a Viable Third-Country Market, Commerce Would Have the Discretion To Select a Different Third-Country Market

Plaintiff's argument that a sales-based PMS disqualifies Türkiye as a comparison market is really a misguided attempt to compel Commerce to base NV on CV, which would have permitted cost-based

20

PMS adjustments with respect to natural gas.  Pl. Br. at 22-23.  As demonstrated above, Commerce reasonably rejected Plaintiff's sales-based PMS allegation and selected Türkiye as the most appropriate third-country market.  Final IDM at 15 (Appx00001350).  Even if the Court were to remand this issue to Commerce, however, Commerce would have the opportunity to reconsider and provide further explanation for its selection of Türkiye as the comparison market – not automatically resort to CV.  There is no legal basis for Plaintiff's admonition that the Court "should direct Commerce to consider the use of constructed value to calculate normal value …."  Pl. Br. at 23.  *See Ad Hoc Shrimp Trade Action Comm. v. United States*, 515 F.3d 1372, 1383 (Fed. Cir. 2008) ("{T}he Court of International Trade is precluded by statute from ever outright reversing a decision by Commerce … when reviewing countervailing duty and antidumping duty proceedings").

Moreover, Türkiye was not the only third country considered by Commerce in this case.  Commerce also considered Germany and Spain as additional viable third-country markets, as identified by QMC in its Section A questionnaire response.  *See* Final IDM at 15 (Appx00001350) (citing QMC/Muntajat Sales Rebuttal Br. at 3 (Appx00012126)); *see also*

Third Country Selection Memorandum at 4-5 (Appx00001003-
Appx00001004); QMC/Muntajat Section A Questionnaire Response at
Exhibit A-1 (Appx00003022-Appx00003023).  Commerce did not find –
nor does Plaintiff argue – that sales in Germany and Spain were
inappropriate under the regulatory criteria in 19 C.F.R. § 351.404(e).
In fact, Plaintiff recommended to Commerce that the selection of
Germany as the comparison market "merit{ed} consideration."  *See*
Third Country Selection Memorandum at 3 (Appx00001002) ("the
petitioner argues that Commerce should select Germany as a
comparison market for Qatari melamine" (citing Petitioner's Market
Viability Comments at 11-13 (Appx00004658-Appx00004660)).

In accordance with 19 C.F.R. § 351.404(f), Commerce "normally
will calculate normal value based on sales to a third country market
rather than on constructed value if adequate information is available
and verifiable …."  Accordingly, if Commerce were to determine on
remand that Türkiye should not have been selected as the comparison
market, then Commerce would have the discretion – if not the
obligation – to assess and choose between the Respondents' melamine
sales to Germany and Spain, and to collect information on the

22

Respondent's sales into the selected market.  *See, e.g., Giorgio Foods, Inc. v. United States*, 2025 Ct. Intl. Trade LEXIS 93 (July 16, 2025) (noting that, in its prior decision, "the court directed Commerce to reconsider its selection of Germany as the third country for determining normal value under 19 U.S.C. § 1677b(a)(1)(C)(ii) and 19 C.F.R. § 351.404(e)," and, "*{a}fter reopening the record*, the agency again picked that nation" (emphasis added)); *see also Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F.3d 1367, 1374-75 (Fed. Cir. 2012) ("We generally disfavor limited remands that restrict Commerce's ability to collect and fully analyze data on a contested issue" (citation omitted)).

### C. Commerce Lawfully Applied the Major Input and Transactions-Disregarded Rules to Natural Gas Purchases

Plaintiff's final challenge concerns Commerce's valuation of natural gas purchased by QAFCO from its affiliate, QatarEnergy, in conducting the below-cost test.  Plaintiff wrongly argues that Commerce was required to take its cost-based PMS finding into account – specifically, that Commerce should have used external benchmarks – rather than the prices required by the statute – to establish a "market-

determined" price for purposes of the major input and transactions-disregarded tests. *See* Pl. Br. at 25-27. Plaintiff is wrong. Commerce correctly applied the major input and transactions-disregarded rules in accordance with the statute in conducting the below-cost test.

### 1. Legal Framework

In conducting the below-cost sales analysis, Commerce may, in limited circumstances, adjust a respondent's reported input costs when those inputs are purchased from affiliated suppliers, pursuant to the "major input rule" or the "transactions-disregarded rule." 19 U.S.C. §§ 1677b(f)(2) (transactions-disregarded rule) and (f)(3) (major input rule).

As Commerce has explained, under the major input rule, "Commerce normally values the inputs at the higher of the affiliated party's transfer price, the market price of the inputs, or the actual costs incurred by the affiliated supplier in producing the input." Final IDM at 20 (Appx00001355); 19 U.S.C. § 1677b(f)(3); 19 C.F.R. § 351.407(b). In accordance with the statutory "major input" provision, if the affiliated transfer price is less than the cost to produce the input, Commerce may use the higher of the affiliated supplier's cost of production or "the amount usually reflected in sales of merchandise

24

under consideration *in the market under consideration*{,}" whichever is higher.  19 U.S.C. § 1677b(f)(3) (cross-referencing 19 U.S.C. § 1677b(f)(2)); *see also* 19 C.F.R. § 351.407(b)(2) (same instruction). Similarly, under the "transactions-disregarded" rule, the statute directs Commerce to examine whether the affiliated transfer price "does not fairly reflect the amount usually reflected in sales of merchandise under consideration *in the market under consideration*." 19 U.S.C. § 1677b(f)(2) (emphasis added).

Read together, these provisions require Commerce to assess whether the transfer price is consistent with arm's-length pricing conditions in the respondent's own market – here, the State of Qatar – rather than with price levels observed in other countries or in aggregated international benchmarks.

Moreover, this Court has held that Commerce may not make a PMS adjustment when conducting the below-cost test.  Rather, PMS adjustments may be made only when calculating NV based on CV.  *See Hyundai Steel Company v. United States,* 19 F.4th 1346, 1352 (Fed. Cir. 2021).

### 2. Commerce Properly Applied Both Rules Using Prices in the "Market Under Consideration"

Consistent with law and its practice, Commerce analyzed QAFCO's purchases of natural gas from its affiliate QatarEnergy under the major input and transactions-disregarded rules.

In its major input rule analysis, Commerce compared QatarEnergy's transfer price to QAFCO to both (1) QatarEnergy's cost to produce natural gas and (2) natural gas prices charged by QatarEnergy to unaffiliated customers in the State of Qatar and found that the transfer price exceeded both benchmarks, as required by the statute and regulation.  Final IDM at 20 (Appx00001355).  Because the statute and regulation require valuation at the higher of those benchmarks, Commerce was required to value the gas at the transfer price.

Commerce's findings also comport with the transactions-disregarded rule, which authorizes Commerce to disregard affiliated-party transactions only where the transfer price does not fairly reflect "sales of merchandise under consideration in the market under consideration."  19 U.S.C. § 1677b(f)(2).

Where, as here, the transfer price *exceeds* both the supplier's cost

of production and prices to unaffiliated customers in the market under

consideration, the statute provides no basis to disregard the

transactions.  Final IDM at 20-21 (Appx00001355-Appx00001356).

Thus, Commerce correctly determined both that the major input rule

required valuation at the transfer price and that the transactions-

disregarded rule was not applicable.

### 3.    Commerce Correctly Declined to Make a PMS Adjustment

Commerce also correctly declined to adjust QAFCO's purchases of

natural gas from QatarEnergy under the major input and transactions-

disregarded rules.  As noted above, this court has held that Commerce

may not make a cost-based PMS adjustment when conducting the

below-cost test.  Rather, PMS adjustments may be made only when

calculating NV based on CV.  *See Hyundai Steel Company,* 19 F.4th at

1352; *Saha Thai Steel Pipe Company Limited v. United States*, 87 F.4th

1328, 1331 (Fed. Cir. 2023) ("The agency cannot use constructed value

language found in § 1677b(e) as a backdoor to slip in a PMS adjustment

for cost of production calculations").  Here, Commerce correctly

determined to "not apply a {PMS} adjustment because no sales were

compared to {constructed value}."  Final IDM at 4-5 (Appx00001339-

Appx00001340).  Consequently, there is no basis to make a cost-based

PMS adjustment to QMC's cost of production under either the major

input rule or transactions-disregarded rule.

### 4. Plaintiff's Benchmark Evidence Was Fundamentally Flawed

Even if a PMS adjustment to QMC's cost of production were

lawful in the underlying investigation (which it was not), the

benchmark price for natural gas that Petitioner submitted as the basis

for its proposed PMS adjustment was fatally flawed.  Petitioner

submitted a "world market" natural gas price derived from UN

Comtrade data.  *See* Petitioner's Case Br. Regarding Cost Issues at 6

(Appx00012168); *see also* Final IDM at 4-5 (Appx00001339-00001340)

(citing the "natural gas world market prices provided by the petitioner"

derived from UN Comtrade data).  Respondents demonstrated that

Petitioner's benchmark was completely unreliable and grossly inflated.

As Respondents explained, the error in Petitioner's natural gas

benchmark stemmed from its use of kilograms – which were grossly

understated as reported in the UN Comtrade data – to measure natural

gas export volumes.  *See* QMC/Muntajat Benchmark Rebuttal Cmts. at

2-7 (Appx00013643-Appx00013648).  Respondents also submitted a

complete series of worksheets (and source data) demonstrating the

mathematical flaw in Petitioner's benchmark calculation, as well as an

accurate approach. *See id.* at Exhibit BMR-01 (Appx00013655-

Appx00013644). To illustrate the distortion, Respondents

demonstrated that, "{u}sing the UN Comtrade volumes in KG,

Petitioner proposed a benchmark reflecting a U.S. price of USD

22.65/MMBTU when it could purchase natural gas in the United States

for less than USD 3.00/MMBTU." QMC/Muntajat Cost Rebuttal Br. at

8-9 (Appx00012189-Appx00012190). Notably, Plaintiff did not attempt

to rebut those methodological flaws before Commerce.

### 5.    Commerce Did Not "Disregard" Plaintiff's Benchmark Data

Plaintiff wrongly asserts that Commerce "disregarded" Qatari

import data that "would allow Commerce to derive a market-

determined price for natural gas." Pl. Br. at 25. That argument fails

for multiple reasons.

To begin with, Plaintiff failed to raise this argument in the

proceeding below. Parties are required to present all arguments they

wish Commerce to consider in their case briefs. 19 C.F.R. §

351.309(c)(2), (d)(2). Because Plaintiff did not timely present this claim

to the agency, it is not properly before the Court.

Moreover, Plaintiff's characterization of the NFI record is inaccurate. *See* Pl. Br. at 25-26 (citing Appx00004742-Appx00004769). Contrary to Plaintiff's claim, the May 16 NFI submission cited by Plaintiff does not provide Qatari import data establishing market prices for domestic gas consumption in the State of Qatar. Pl. Br. at 25. Rather, the relevant import data were provided in Petitioner's Cost-Based Particular Market Situation Allegations at Exhibits 11A and 11B (Appx00005095-Appx00005100). In that submission, Cornerstone stated that "Qatar imported gaseous natural gas and liquid natural gas ('LNG'), but unlike the situation with urea imports discussed above, the natural gas and LNG imports were very small. Petitioner therefore calculated a weighted-average of 2023 global export prices for gaseous natural gas and LNG" – the UN Comtrade data that were grossly inflated, as discussed in the preceding section – and argued that Commerce "should compare this price to the natural gas prices reported by QMC in order to identify and quantify the distortion." *Id*. at 17 (Appx00004851). Petitioner subsequently resubmitted natural gas benchmarks that were also based on the UN Comtrade global export

volumes and values.  *See* Petitioner's Response to Request for Information (Appx00012777-Appx00012953).

Further, in its cost case brief, Petitioner argued that Commerce should use the UN Comtrade "world market price data" (not the Qatar import values) to adjust QMC's reported costs under the major input rule or the transactions-disregarded rule.  *See* Petitioner's Case Br. Regarding Cost Issues at 6 (Appx00012168).  Thus, in the proceeding before Commerce, Petitioners did not contend that Qatari import prices reflected market prices for domestic gas consumption in the State of Qatar; instead, they argued for the use of global benchmarks precisely because import volumes were not representative.  Plaintiff failed to exhaust its administrative remedies and its argument should be rejected for this reason as well.

Plaintiff also claims that Commerce should have relied on Brazilian natural gas prices.  Pl. Br. at 25.  This claim suffers from the defects discussed above.  First, Brazilian prices are not prices "in the market under consideration," as required by the statute and regulation, and therefore cannot be used to evaluate affiliated-party prices under the major input or transactions-disregarded rules.  19 U.S.C. §§

1677b(f)(2) and (f)(3); 19 C.F.R. § 351.407(b).  Second, Petitioners did not raise this argument in its briefs to Commerce, and thus also failed to exhaust its administrative remedies regarding this claim.

Accordingly, Commerce reasonably rejected Plaintiff's benchmark evidence both because it was legally irrelevant to the statutory tests under 19 U.S.C. §§ 1677b(f)(2) and (f)(3), and because it was methodologically incapable of reflecting market prices in the State of Qatar.  Final IDM at 20-21 (Appx00001355-Appx00001356).

## VII.  CONCLUSION

QMC/QEM respectfully request that the Court deny the motion for judgment on the agency record submitted by Cornerstone, and affirm in their entirety the portions of Commerce's Final Determination challenged by Cornerstone.

Respectfully submitted,

/s/ Jay C. Campbell
Jay C. Campbell
Richard G. King
Matthew W. Solomon

**White & Case LLP**
701 Thirteenth Street, N.W.
Washington, D.C.  20005
202-626-3500

*Counsel to Qatar Melamine Company
(a Private Shareholding Company in
the State of Qatar) and QatarEnergy
Marketing (a Private Shareholding
Company in the State of Qatar)*

Dated: January 23, 2026

## CERTIFICATE OF COMPLIANCE

I, Jay C. Campbell, certify that the attached brief complies with the word limitation requirement, as stated in the Court's Amended Scheduling Order (ECF No. 43). The word count for the Response Brief of Defendant-Intervenors Qatar Melamine Company and QatarEnergy Marketing, as computed by the White & Case word processing system (Microsoft Word 2016), is 5,552 words.

I also certify that this submission was not prepared with the assistance of a generative artificial intelligence program based on natural language prompts.

/s/ Jay C. Campbell
Jay C. Campbell