# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| **CORNERSTONE CHEMICAL COMPANY**<br><br>**Plaintiff,**<br><br>v.<br><br>**UNITED STATES**<br><br>**Defendant,**<br><br>**and**<br><br>**QATAR MELAMINE COMPANY (A QATARI PRIVATE SHAREHOLDING COMPANY), QATARENERGY MARKETING (A QATARI PRIVATE SHAREHOLDING COMPANY),**<br><br>**Defendant-Intervenors.** | **Court No. 25-00005**<br><br>**NON-CONFIDENTIAL VERSION**<br><br>**Business Proprietary Information Removed from Pages 3-4 and 12-14.** |

## PLAINTIFF'S REPLY BRIEF IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Stephen J. Orava
Patrick J. McLain
Kanzanira Thorington

KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, D.C. 20006
(202) 737-0500

*Counsel for Plaintiff Cornerstone
Chemical Company*

Date: February 27, 2026

# TABLE OF CONTENTS

I.    Commerce Erred In Selecting Türkiye As A Third Country Comparison Market…………………………………………………3

II.   On Remand, The Court Should Instruct Commerce To Consider Comparing Qatari Respondents' U.S. Sales To Constructed Value………………………………………………………………14

III.  Commerce Unreasonably And Unlawfully Failed To Address Distortions Arising In Transactions Between the Qatari Respondents and QatarEnergy………………………………………..16

Pursuant to the Court's rules, and consistent with Federal Circuit Rule 25.1(e)(1)(B), this brief contains confidential material that has been omitted on pages 3-4 and 12-14. The material omitted on pages 3-4, 12, and 14 concerns the proportion of supply of melamine in Türkiye that is accounted for by imports. The material omitted on page 13 relates to the pricing of melamine in Türkiye. All the omitted information was treated as business confidential and subject to an administrative protective order by the U.S. Department of Commerce in the underlying proceedings.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Best Mattresses Int'l Co. v. United States*,
622 F. Supp. 3d 1347 (Ct. Int'l Trade 2023) ................................. 16, 19

*China National Machinery Imp. & Exp. v. United States*,
264 F. Supp. 2d 1229 (Ct. Int'l Trade 2003) ....................................... 10

*Ellwood City Forge Co. v. United States*,
582 F. Supp. 3d 1259 (Ct. Int'l Trade 2022) ...................................... 20

*Hyundai Steel Co. v. United States*,
19 F.4th 1346 (Fed. Cir. 2021) .................................................... 18

*Itochu Building Products, Co. v. United States*,
163 F. Supp. 3d 1330 (Ct. Int'l Trade 2016) ...................................... 11

*Luoyang Bearing Corp. v. United States,*
347 F. Supp. 2d 1326 (Ct. Int'l Trade 2004) ................................. 20, 21

*NMB Singapore v. United States*,
557 F.3d 1316 (Fed. Cir. 2009) ..................................................... 9

*Saha Thai Steel Pipe Co. v. United States*,
87 F.4th 1328, 1331 (Fed. Cir. 2023)............................................... 18

*SKF USA v. United States*,
630 F.3d 1365 (Fed. Cir. 2011) .................................................... 11

*Yantai Xinke Steel Structure Co. v. United States*,
38 CIT 478 (2014)................................................................... 10

**Statutes**

19 U.S.C. § 1677b(a)(1)(B)(ii)(III) ................................................. 3

19 U.S.C. § 1677b(f)(2)................................................................. 16

19 U.S.C. § 1677b(f)(3)................................................................. 16

**Regulations**

19 C.F.R. § 351.404(f) ................................................................. 16

**Legislative materials**

H.R. Rep. No. 100-576 (1988), reprinted in 1988
    U.S.C.C.A.N........................................................................... 10

**Administrative Decisions**

*Melamine from Germany, India, Japan, Netherlands, Qatar,
    and Trinidad and Tobago,*
    Inv. Nos. 701-TA-706-709 and 731-TA-1667-1672,
    USITC Pub. 5503 (Apr. 2024)........................................... 5, 6

*Melamine From the People's Republic of China: Final
    Affirmative Countervailing Duty Determination,*
    80 Fed. Reg. 68847 (Dep't Commerce Nov. 6, 2015)......................... 5, 9

*Issues and Decision Memorandum for the Final
    Determination in the Less-Than-Fair-Value
    Investigation of Melamine from Qatar*
    (Dep't Commerce Dec. 2, 2024)....................................... 3, 7, 15, 17, 21

*Melamine From Qatar: Final Negative Determination of
    Sales at Less Than Fair Value and Final Negative
    Determination of Critical Circumstances,*
    89 Fed. Reg. 97,592 (Dep't Commerce Dec. 9, 2024) .......... 2, 3, 8, 9, 23

## GLOSSARY OF ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| AD | Antidumping Duty |
| AUV | Average unit value |
| Act | Tariff Act of 1930 |
| Br. | Brief |
| CIT | United States Court of International Trade |
| COP | Cost of Production |
| Cornerstone | Cornerstone Chemical Company |
| Cornerstone Sales Case Br. | Petitioner's Case Brief Concerning Sales and General Issues, filed on October 24, 2024 |
| CV | Constructed Value |
| CVD | Countervailing Duty |
| EU | European Union |
| *Final Determination* | *Melamine From Qatar: Final Negative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 89 Fed. Reg. 97,592 (Dep't Commerce Dec. 9, 2024) (Appx00001656-00001657) |
| *Final IDM* | Issues and Decision Memorandum accompanying the *Final Determination* (Appx00001336-00001356) |
| GOQ | Government of Qatar |
| IDM | Issues and Decision Memorandum |
| Muntajat | Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C. |
| Plaintiff | Cornerstone Chemical Company |
| PMS | Particular Market Situation |
| Qatari Respondents | Qatar Melamine Company, Qatar |

| | |
|---|---|
| | Fertiliser Company (P.S.C.), and Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C. |
| QAFCO | Qatar Fertiliser Company (P.S.C.) |
| QMC | Qatar Melamine Company |
| QatarEnergy | QatarEnergy Marketing (a Private Shareholding Company in the State of Qatar) |
| U.S. | United States |

**PLAINTIFF CORNERSTONE CHEMICAL COMPANY'S
REPLY BRIEF IN SUPPORT OF RULE 56.2 MOTION
<u>FOR JUDGMENT UPON THE AGENCY RECORD</u>**

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Cornerstone Chemical Company ("Plaintiff" or "Cornerstone") submits this reply brief in support of its Motion for Judgment on the Agency Record and accompanying Memorandum of Law (ECF No. 35) ("Pl. Br.") and in opposition to the response briefs filed by Defendant United States (ECF No. 44) ("Def. Br.") and by Defendant-Intervenors Qatar Melamine Company and QatarEnergy Marketing (ECF No. 51.) ("Def.-Int. Br.").

At its core, this case concerns two major failings by the U.S. Department of Commerce ("Commerce") in determining the normal value benchmark used to assess whether imports of melamine from Qatar were dumped in the U.S. market during the 2023 period of investigation. First, Commerce selected Türkiye as the third country comparison market. In doing so, Commerce ignored key evidence that this market was distorted by the dominant presence of low-priced imports from China that its own determinations establish are subsidized and otherwise unfairly traded. Second, Commerce valued the

Qatari Respondents' purchases of natural gas inputs from QatarEnergy, an affiliated, government-owned supplier, despite finding that QatarEnergy's prices are distorted by the interventions of the Qatari government.

Defendant and Defendant-Intervenors fail to rebut Plaintiff's demonstration that Commerce's determinations on these issues are unsupported by substantial evidence and otherwise not in accordance with law. Their repeated attempts to characterize Plaintiff as asking the Court to reweigh the record evidence, *see*, *e.g.*, Def. Br. at 6, 15, 20; Def.-Int. Br. at 8, 19, 20, ignore that Plaintiff's challenges are supported by relevant findings that *Commerce itself made* but did not address adequately (if at all) in reaching its conclusions on the issues before the Court.

Accordingly, for the reasons explained in Plaintiff's initial brief and as further detailed below, this Court should remand with instructions for Commerce to reconsider the challenged aspects of its final determination. *See Melamine From Qatar: Final Negative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 89 Fed. Reg. 97,592 (Dep't

NON-CONFIDENTIAL VERSION:
PROPRIETARY INFORMATION SUBJECT TO PROTECTIVE ORDER REMOVED

Commerce Dec. 9, 2024) (the "*Final Determination*") (Appx00001656-00001657), and accompanying Issues and Decision Memorandum ("*Final IDM*") (Appx00001336-00001356).

## ARGUMENT

## I.    Commerce Erred In Selecting Türkiye As A Third Country Comparison Market

The statute provides that a third country market is not a viable comparison market if a particular market situation exists in such market that would prevent a proper price comparison. 19 U.S.C. § 1677b(a)(1)(B)(ii)(III). As demonstrated in Plaintiff's opening brief, Commerce erred in selecting Türkiye as a third country to calculate the normal value for purposes of comparison to U.S. sales prices. *See* Pl. Br. at 11-21. In the underlying proceeding, Plaintiff submitted briefing and extensive evidence for its claim that a sales-based particular market situation existed in Türkiye during the period of investigation that prevents or does not permit a proper price comparison, and that Muntajat's prices in Türkiye are not "representative" within the meaning of the statute. Importantly, the following points remain uncontroverted:

<span style="color:red">proportion<br>↓</span>

- Imports supply [ ] demand for melamine in Türkiye,

Petitioner's Allegation Regarding Market Viability (May 13, 2024) at 7 (Appx00004654); Pl. Br. at 13;

- According to UN COMTRADE data, China accounted for 65.9 percent of all imports into Türkiye in calendar year 2023 (the period of investigation), and Qatar, at 21.4 percent, was the only other source accounting for more than 6 percent of imports, Petitioner's Allegation Regarding Market Viability (May 13, 2024) at Exhibit 2B (Appx00004723-00004729); Pl. Br. at 13;

- Thus, China accounted for a significant majority of the [ proportion ↓ ] supply of melamine in Türkiye in 2023, and imports of melamine from Qatar were the only other supply source able to gain a substantial share of that market, Pl. Br. at 13-14; *see also* Cornerstone Sales Case Br. at 6 (Appx00012110);

- Moreover, the average unit value of Chinese imports in Türkiye is lower than the average unit value for all but one of the top six countries, Petitioner's Allegation Regarding Market Viability (May 13, 2024) at Exhibit 2B (Appx00004723-00004729); Pl. Br. at 20; *see also*

Cornerstone Sales Case Br. at 6 (Appx00012110) ("the Turkish market is dominated by unfairly traded melamine from China and it necessarily follows that the {average unit values} of imports from other countries have been driven down as they attempt to gain some share of Turkish sales");

- Price is an important factor in purchasing decisions for melamine, as the U.S. International Trade Commission found, *Melamine from Germany, India, Japan, Netherlands, Qatar, and Trinidad and Tobago*, Inv. Nos. 701-TA-706-709 and 731-TA-1667-1672, USITC Pub. 5503 (Apr. 2024) (Preliminary) at 34; Pl. Br. at 14;

- During the period of investigation, imports from China were subject to U.S. countervailing duties ("CVD") and antidumping ("AD") duties at rates of at least 154 percent and 363.31 percent, respectively, in addition to antidumping measures in the European Union and India, *see, e.g.*, *Melamine From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 68847, 68849 (Dep't Commerce Nov. 6, 2015); *Melamine from*

5

*Germany, India, Japan, Netherlands, Qatar, and Trinidad*

*and Tobago*, USITC Pub. 5503 at I-5, VII-17; Pl. Br. at 15.

In other words, Cornerstone's sales-based particular market situation allegation was supported by evidence showing that Chinese imports dominate the market for melamine in Türkiye; melamine sales are price-sensitive; and Chinese imports in Türkiye benefit from countervailable subsidies and are otherwise unfairly traded. Given these circumstances, a compelling basis exists to conclude that the market for melamine in Türkiye during 2023 was distorted by the significant presence of unfairly traded imports from China. Nevertheless, Commerce selected Türkiye as the third country comparison market. In doing so, the agency disregarded key record evidence and failed to reasonably explain how a third country market dominated by imports of subsidized Chinese melamine could serve as an appropriate basis for determining normal value. Remand is therefore required. Defendant and Defendant-Intervenors have failed to show otherwise, as discussed below.

Importantly, Commerce's errors include a failure to address the evidence showing that Chinese melamine is unfairly subsidized, in

addition to being dumped in multiple jurisdictions. *Compare Final IDM* at 15 (Appx00001350), *with* Pl. Br. at 16; Cornerstone Case Br. at 3-4 (Appx00012107-00012108) (referring to imports of melamine from China that "the United States and other jurisdictions have found to be subsidized and otherwise unfairly traded"). To the extent that Commerce addressed the evidence showing that Chinese melamine is unfairly traded, it exhibited confusion, stating that "the EU and China have AD orders on melamine from China, this alone does not constitute evidence that melamine from Qatar is dumped in another country." *See Final IDM* at 15 (Appx00001350). As explained in Plaintiff's opening brief, Commerce's finding is erroneous in that it refers to China's (rather than India's) AD order on melamine from China and improperly frames the issue as being whether melamine from Qatar is being dumped, rather than correctly assessing whether melamine from *China* distorts the Turkish market to create a sales-based particular market situation. Pl. Br. at 18. Defendant attempts to minimize Commerce's statement as a "harmless typographical error" and argues that "Commerce's broader point is that a finding of unfair trading by one country does not necessarily demonstrate that the same goods are

unfairly traded in another country." Def. Br. at 19. These arguments merely re-state Commerce's inadequate explanation in the *Final Determination* that foreign countries' antidumping orders do not "alone" constitute sufficient evidence to demonstrate a particular market situation in Türkiye. They do not address Commerce's own determinations that Chinese melamine is unfairly traded – including that this melamine is subsidized to a very high degree.

Defendant further argues that Commerce's failure to address the U.S. CVD and AD orders and rates on melamine from China during the period of investigation was covered "squarely" by its "statements that such orders do not demonstrate sufficient evidence to establish that products are necessarily unfairly traded into another market." Def. Br. at 19. However, Commerce did not make any such statements with respect to the U.S. CVD/AD orders. Therefore, Commerce never addressed its own determination – which was applicable during the period of investigation – that melamine from China was unfairly subsidized at rates of at least 154 percent, despite Cornerstone having emphasized the subsidization of imports from China in its case brief to Commerce. *See* Cornerstone Case Br. at 3-4 (Appx00012107-00012108)

(referring to imports of melamine from China that "the United States and other jurisdictions have found to be subsidized and otherwise unfairly traded"); *see also Melamine From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 68847, 68849 (Dep't Commerce Nov. 6, 2015). It remains the case that Commerce failed to address the U.S. CVD and AD orders on imports of melamine from China, including with respect to Plaintiff's argument that the U.S. findings of subsidization support the conclusion that "sales of melamine in Turkey during the {period of investigation} were dominated and distorted by imports from China . . . ." Cornerstone Sales Case Br. at 3 (Appx00012107). Contrary to Defendant's arguments, the *Final Determination* does not provide any relevant analysis – let alone a reasonably discernible rationale – as to how Commerce could treat the unfair trade aspect of Plaintiff's allegation as unproven when Commerce itself has found Chinese melamine to be subsidized at rates of at least 154 percent. *Cf.* Def. Br. at 19 (citing *NMB Singapore v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009)).

Thus, Commerce failed to address a key aspect of Plaintiff's particular market situation allegation, as presented in its case brief. In

doing so, Commerce failed to act consistent with the purpose of the statute to "avoid using any prices which it has reason to believe or suspect may be dumped or subsidized prices . . . base{d} on information generally available to it at that time."  H.R. Rep. No. 100-576, at 590-91 (1988), reprinted in 1988 U.S.C.C.A.N. at 1623-24, *quoted in Yantai Xinke Steel Structure Co. v. United States*, 38 CIT 478, 503 (2014) ("Commerce's general practice is not to use financial statements to calculate financial ratios from companies that are known to receive countervailable subsidies. This practice results, in part, from Congress's direction in the legislative history to the Omnibus Trade and Competitiveness Act of 1988 . . . ."); *see also China National Machinery Imp. & Exp. v. United States,* 264 F. Supp. 2d 1229, 1238 (Ct. Int'l Trade 2003) ("{G}iven that the overarching purpose of the antidumping and countervailing duty law is to counteract dumping and subsidies, the court cannot conclude that Congress would condone the use of any value where there is 'reason to believe or suspect' that it reflects dumping or subsidies.").

The Court should accordingly reject Defendant's post hoc rationalization that Commerce's statements about other countries' trade

remedy measures "squarely covers" Commerce's own determinations that Chinese melamine is subsidized and dumped. *See* Def. Br. at 19; *see also Itochu Building Products, Co. v. United States*, 163 F. Supp. 3d 1330, 1337 (Ct. Int'l Trade 2016)  ("{Commerce} is required to discuss 'issues material to the agency's determination.' Further, the Court may not accept 'post hoc rationalizations for agency action' and may only sustain the agency's decision 'on the same basis articulated in the order by the agency itself.'") (internal citations omitted); *see also SKF USA v. United States,* 630 F.3d 1365, 1373 (Fed. Cir. 2011) ("The antidumping statute is 'highly complex' and '{t}he more complex the statute, the greater the obligation on the agency to explain its position with clarity.'") (citations omitted).

Defendant and Defendant-Intervenors also fail in their other attempts to rehabilitate Commerce's inadequate analysis. Defendant contends that Plaintiff's allegation of distorted melamine pricing relies on "mere presumptions about the nature of the Turkish melamine market." Def. Br. at 15. Similarly, Defendant-Intervenors characterize Plaintiff's allegation as consisting of "{s}peculative assumptions about what prices would have been under different circumstances." Def.-Int.

NON-CONFIDENTIAL VERSION:
PROPRIETARY INFORMATION SUBJECT TO PROTECTIVE ORDER REMOVED

Br. at 17. To the contrary, where the record shows that subsidized

imports account for a significant majority of [ proportion ↓ ] supply of a price-

sensitive good in a market, and where those imports are at relatively

low prices, *see* Pl. Br. at 20; Cornerstone Case Br. at 5 (Appx00012109),

the case for a distorted market is far more than a matter of

presumption or speculation. Given this record, Defendant and

Defendant-Intervenors cannot sustain their attempts to dismiss

Petitioner's particular market situation allegation as speculative.

    Relatedly, Defendant and Defendant-Intervenors fail to show that

Commerce's refusal to find a particular market situation is supported

by the UN COMTRADE average unit value data on imports into

Türkiye. *See* Def. Br. at 14-15; Def.-Int. Br. at 15-16. Defendant

contends that the average unit value for Chinese imports "was not even

the lowest," Def. Br. at 14, but it ignores that the imports with the

lowest average unit value (from Russia) accounted for a relatively small

share of supply (5.7 percent of import volumes) that pales in comparison

to China's dominant share (65.9 percent of import volumes). Pl. Br. at

20; Petitioner's Allegation Regarding Market Viability (May 13, 2024) at

Exhibit 2B (Appx00004723-00004729). Furthermore, when Defendant

NON-CONFIDENTIAL VERSION: PROPRIETARY INFORMATION SUBJECT TO PROTECTIVE ORDER REMOVED

and Defendant-Intervenors cite the fact that the average unit value for Qatari imports is 10 percent higher than that of Chinese imports, Def. Br. at 14-15; Def.-Int. Br. at 15-16, they merely repeat Commerce's error in presuming that a large volume of lower-priced, unfairly traded Chinese imports did not exert downward pricing pressure on Qatari imports. There is certainly no record evidence supporting that presumption. In fact, as Plaintiff reiterated in its sales case brief, the downward price pressure of Chinese imports on other melamine prices in Türkiye [

pricing reference

] Cornerstone Sales Case Br. at 6 (Appx00012110) (citing Petitioner's Allegation Regarding Market Viability (May 13, 2024) at 8-9 (Appx00004655-00004656)).

Defendant and Defendant-Intervenors also fail in their attempts to characterize Plaintiff's arguments as seeking to compel a particular market situation finding in any case where the majority of imports in a market are from China or where there are imports from China that are subject to trade remedies in other countries. Def. Br. at 15; Def.-Int. Br.

at 19. Rather, the core of Cornerstone's claim – both during the investigation and before this Court – is that strong evidence of a particular market situation exists where a country's demand for a product is [    proportion ↓    ] supplied by imported merchandise; unfairly traded, low-priced imports account for a significant majority of such supply; and price is an important factor in purchase decisions for the product.

In sum, Defendant and Defendant-Intervenors fail to undermine Plaintiff's showing that Commerce failed to engage with a core element of its sales-based particular market situation allegation and failed to articulate a reasonable explanation for selecting Türkiye as the third country comparison market despite the ample record evidence demonstrating the distortive impact of Chinese imports in Türkiye. Therefore, Commerce's decision on this issue is unsupported by substantial evidence and requires remand.

## II.    On Remand, The Court Should Instruct Commerce To Consider Comparing Qatari Respondents' U.S. Sales To Constructed Value

Defendant and Defendant-Intervenors argue that, even if the Court remands Commerce's selection of Türkiye as a third country comparison market, the Court should not direct Commerce to consider

the use of constructed value to calculate normal value. Def. Br. at 21; Def.-Int. Br. at 20-22. Specifically, Defendant-Intervenors argue that Commerce could consider Germany and Spain as viable third-country markets, which were identified by QMC in its Section A questionnaire response. Def.-Int. Br. at 21. These arguments are misplaced.

As an initial matter, Plaintiff's claim regarding the use of constructed value is consequential in nature, as it is contingent on a remand of the Commerce's selection of Türkiye as a third country comparison market. *See* Pl. Br. at 22-23. Furthermore, Commerce asserted that its use of Türkiye as a third country comparison market justified its refusal to adjust the Qatari Respondents' reported costs to account for the cost-based particular market situation that the agency found to exist in Qatar. *Final IDM* at 5, 7 (Appx00001340, Appx00001342) ("For this final determination, we continue to find that a PMS exists in Qatar with respect to the purchase price of natural gas {sic} however, we did not apply a PMS adjustment because no sales were compared to CV."). Moreover, because it selected Türkiye, Commerce has not collected detailed data on sales and related adjustments regarding the Qatari Respondents' sales to Germany and

Spain. Without such data, Commerce does not have the "adequate information" that is required to use third country sales rather than constructed value. *See* 19 C.F.R. § 351.404(f). Given these circumstances, it would be entirely appropriate for the Court to instruct Commerce to consider using constructed value as the basis for normal value. Such an instruction would avoid potential confusion among the parties as to whether the use of constructed value is an open issue on remand.

### III.  Commerce Unreasonably And Unlawfully Failed To Address Distortions Arising In Transactions Between the Qatari Respondents and QatarEnergy

The statute provides the transactions disregarded rule, 19 U.S.C. § 1677b(f)(2), and the major input rule, 19 U.S.C. § 1677b(f)(3), to enable Commerce to address distortions that may arise in transactions between affiliated parties. *Best Mattresses Int'l Co. v. United States*, 622 F. Supp. 3d 1347, 1359 (Ct. Int'l Trade 2023) ("The underlying concern is that simply relying on the transaction purchase price for an input from an affiliated supplier ('transfer price'), without testing it against external measures of value, could be reflective of exporters' cost-sharing arrangements with affiliates or like distortions."). Here, Commerce

16

thwarted the purpose of these rules with respect to natural gas inputs that the Qatari Respondents obtained from QatarEnergy, a government-owned affiliate. Specifically, Commerce determined the supposed "market price" for QAFCO's/QMC's purchases of natural gas from QatarEnergy by using "QatarEnergy's sales to unaffiliated customers." *Final IDM* at 20 (Appx00001355). This approach is unreasonable because the record shows that QatarEnergy's sales of natural gas to unaffiliated customers in Qatar are distorted by the interventions of the Qatari government, which is the sole owner of QatarEnergy. Pl. Br. at 26-27. Indeed, Commerce itself agreed that QatarEnergy's prices are distorted by government intervention when it found that a cost-based particular market situation exists with respect to the market for natural gas in Qatar. Particular Market Situation Memo at 5 (Appx00001311); *see also* Pl. Br. at 27. Therefore, Commerce's treatment of QatarEnergy's prices to unaffiliated customers as if they reflected true market values of natural gas is unsupported by substantial evidence and otherwise contrary to law.

In their response briefs, Defendant and Defendant-Intervenors attempt to characterize Plaintiff as seeking the impermissible

17

application of a particular market situation adjustment outside the context of constructed value. Def. Br. at 22; Def.-Int. Br. at 27-28 (citing *Hyundai Steel Co. v. United States*, 19 F.4th 1346 (Fed. Cir. 2021); *Saha Thai Steel Pipe Co. v. United States*, 87 F.4th 1328, 1331 (Fed. Cir. 2023)). That is not Plaintiff's argument. Rather, Plaintiff contends that the evidence and findings arising in the context of a particular market situation analysis may be, and in this case are, relevant to the application of statutory rules concerning transactions between affiliated parties. *See* Pl. Br. at 26-27. In this regard, Commerce found that "the GOQ dominates key natural gas industries and owns the companies involved in production and sale of subject merchandise"; "there is a distortion in the price of natural gas"; and "the record indicates that the price of natural gas in Qatar, which is provided by a state-owned entity, is significantly lower than world market prices for natural gas." Particular Market Situation Memo at 5 (Appx00001311). Given these findings, Commerce unreasonably treated QatarEnergy's natural gas prices to unaffiliated customers as if they represent market-determined prices.

The contrary position of Defendant and Defendant-Intervenors

18

relies on an unreasonably narrow interpretation of the statue. They characterize the affiliated party transaction rules as if they act as blinders allowing (or requiring) Commerce to mechanistically apply the major input rule to natural gas provided by QatarEnergy without accounting for its own findings regarding the distortions affecting the prices charged by the very same entity. *See* Def. Br. at 23-24; Def.-Int. Br. at 25-27.

For example, Defendant-Intervenors contend that "Commerce was required to value the {natural} gas at the transfer price" because "the statute and the regulation require valuation" of the natural gas major input "at the higher of" QatarEnergy's cost to produce natural gas and QatarEnergy's prices "to unaffiliated customers in the State of Qatar." Def.-Int. Br. at 26. This is wrong; the major input rule is not a straitjacket. Indeed, in reviewing the application of the major input rule in a dumping determination concerning a market economy country, this Court has upheld Commerce's use of Global Trade Atlas import data from third countries to calculate the cost of production of inputs purchased from affiliated suppliers in a non-market economy country. *Best Mattresses Int'l*, 622 F. Supp. 3d at 1377 (Ct. Int'l Trade 2023). In

sum, Commerce unreasonably refused to consider alternatives to QatarEnergy's prices to unaffiliated customers.

Regarding the alternative natural gas values available to Commerce, Plaintiff argued in its cost case brief to Commerce that the agency should use the UN COMTRADE natural gas world market benchmark price data that it submitted. Petitioner's Case Br. Regarding Cost Issues at 6 (Appx00012168). In its opening brief to the Court, Plaintiff noted that the record contains Qatari import data and Brazilian natural gas rates. Pl. Br. at 25-26. Defendant-Intervenors contend that Plaintiff failed to exhaust administrative remedies with respect to the Qatari import data. Def.-Int. Br. at 31. However, this argument is misplaced. "Although a plaintiff 'cannot circumvent the requirements of the doctrine of exhaustion by merely mentioning a broad issue without raising a particular argument,' the Court will also find 'plaintiff's brief statement of the argument is sufficient if it alerts the agency to the argument with reasonable clarity and avails the agency with an opportunity to address it.'" *Ellwood City Forge Co. v. United States*, 582 F. Supp. 3d 1259, 1273 (Ct. Int'l Trade 2022) (quoting *Luoyang Bearing Corp. v. United States*, 347 F. Supp. 2d 1326, 1352 (Ct.

Int'l Trade 2004)). Here, Plaintiff's cost case brief gave Commerce the opportunity to address the use of data other than QatarEnergy's prices to unaffiliated customers in valuing natural gas inputs, and Commerce's refusal to consider an alternative data source was based on its mistaken application of the major input rule as if it precluded *any* alternative data sources, rather than the merits of a particular alternative. *See Final IDM* at 20-21 (Appx00001355-00001356). Thus, the Court has an adequate record for reviewing Commerce's determination on this issue, and it should reject Defendant-Intervenors' exhaustion argument accordingly.

The Court should also reject Defendant-Intervenors' argument that Cornerstone's benchmark data are "fundamentally flawed." Def.-Int. Br. at 28. Defendant-Intervenors' criticisms of the benchmark data submitted by Cornerstone are premised on the assertion that the UN COMTRADE data submitted by Cornerstone are in kilograms and, therefore, are understated. *Id*. Cornerstone provided benchmark data that meet all the criteria specified by Commerce and that conform to Commerce's practice of using a broad-based benchmark derived from data from a basket of countries. *See* Memorandum To All Interested

Parties: Less-Than Fair-Value Antidumping Duty Investigation of Melamine from Qatar: Particular Market Situation Allegation Request for Information (Aug. 23, 2024) (Appx00012775-00012776). Indeed, Commerce correctly found that "{Cornerstone} provided natural gas benchmark data conforming to Commerce's requested parameters (*i.e.*, natural gas benchmarks for gaseous natural gas at world-market prices, in cubic meters, and appropriately adjusted for sales terms)." Preliminary Decision Memorandum on Particular Market Situation (Sept. 18, 2024) at 5 (Appx00001311).

In sum, Commerce improperly used natural gas prices it knew to be distorted when it valued the Qatari Respondents' natural gas inputs using QatarEnergy's sales to unaffiliated parties. Defendant's and Defendant-Intervenors' arguments to the contrary lack merit. Thus, Commerce's major input analysis unreasonably and unlawfully treated a government-entity's natural gas prices to unaffiliated customers as if they represent market-determined prices. Accordingly, the Court should remand this issue to Commerce with instructions to account for record evidence and the agency's own findings concerning distortions in QatarEnergy's prices.

## CONCLUSION AND PRAYER FOR RELIEF

For the reasons set forth above, Plaintiff requests that the Court enter judgment on the administrative record in its favor and remand the *Final Determination* with instructions for Commerce to correct the errors set forth above.

Respectfully submitted,


*/s/ Patrick J. McLain*
Stephen J. Orava
Patrick J. McLain
Kanzanira Thorington

KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, D.C. 20006
(202) 737-0500
sorava@kslaw.com

*Counsel for Plaintiff Cornerstone Chemical Company*

Date: February 27, 2026

# <u>CERTIFICATE OF COMPLIANCE</u><br><u>WITH WORD COUNT LIMITATIONS</u>

Pursuant to paragraph 2(B)(2) of the U.S. Court of International Trade's Standard Chambers Procedures and this Court's December 10, 2025, Amended Scheduling Order (ECF No. 43), setting the word limitation of Plaintiff's reply brief at 7,000 words, the undersigned certifies that this brief complies with applicable word count limitations. Exclusive of the exempted portions, as provided in paragraph 2(B)(1), this brief includes 4,081 words. This word count certification is made in reliance on the word-count feature contained in Microsoft Word.

Respectfully submitted,

*/s/ Patrick J. McLain*
Patrick J. McLain

## CERTIFICATE OF COMPLIANCE REGARDING NON-USE OF GENERATIVE ARTIFICIAL INTELLIGENCE

Pursuant to this Court's instructions for *Document Formatting and ECF Filing* (Sept. 19, 2025), counsel for Plaintiff certifies that this reply brief was not prepared with the assistance of a generative artificial intelligence program based on natural language prompts – such as, but not limited to, ChatGPT or Google Bard.

Respectfully submitted,

*/s/ Patrick J. McLain*
Patrick J. McLain

## **CERTIFICATION OF COMPLIANCE REGARDING CONFIDENTIAL MATERIAL**

Pursuant to this Court's instructions for *Document Formatting and ECF Filing* (Sept. 19, 2025), counsel for Plaintiff hereby certifies that the foregoing brief contains 44 unique words marked confidential. This number is below the maximum permitted by Federal Circuit Rule 25.1(d)(1)(B).

Respectfully submitted,

*/s/ Patrick J. McLain*
Patrick J. McLain