**Slip Op. 26-64**

**UNITED STATES
COURT OF INTERNATIONAL TRADE**

————————————

**Court No. 25-00005**

————————————

CORNERSTONE CHEMICAL COMPANY,

*Plaintiff*,

v.

UNITED STATES,

*Defendant*,

and

QATAR MELAMINE COMPANY (A QATARI PRIVATE SHAREHOLDING COMPANY) and QATARENERGY MARKETING (1) (A QATARI PRIVATE SHAREHOLDING COMPANY),

*Defendant-Intervenors.*

————————————

Before: M. Miller Baker, Judge

**OPINION**

[Sustaining Commerce's negative dumping determination in part and remanding in part.]

Dated: June 17, 2026

*Stephen J. Orava*, *Patrick J. McLain*, and *Nicholas K. Paster*, King & Spalding LLP, Washington, DC, on the briefs for Plaintiff.

*Kristin E. Olson*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, on the brief for Defendant. Of counsel for Defendant was *JonZachary Forbes*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, Washington, DC.

*Jay C. Campbell*, *Richard G. King*, and *Matthew W. Solomon*, White & Case LLP, Washington, DC, on the brief for Defendant-Intervenors.

*Baker*, Judge: A domestic petitioner challenges the Department of Commerce's determination that melamine from Qatar is not dumped in the American market. The court holds that the agency failed to adequately explain its selection of Turkey as a proxy for determining the home-market price and therefore remands for reconsideration.

Insofar as Commerce sticks by its decision to use Turkey or instead employs some other third country for comparison purposes, the court sustains the Department's refusal to adjust the cost of natural gas inputs from an affiliated supplier reported by a Qatari producer, even though the transactions were at less than the global market rate. When the agency uses either the home market or a third country to determine the price of the foreign like merchandise, it only looks to the producing country to determine whether transactions between affiliated entities were valued below

the market price. Here, it is undisputed the natural gas inputs traded above the Qatari-market price.

## I

The question Commerce must answer in an antidumping investigation is whether imported goods are being sold in the United States at "less than fair value." 19 U.S.C. § 1677b(a). To do that, the Tariff Act of 1930, as amended, instructs the Department to make "a fair comparison" between the export price— i.e., the U.S. sales price—and the "normal value" of the subject merchandise. *Id.* This case is about how the agency determines "normal value."

As relevant here, "normal value of the subject merchandise" means "the price at which the foreign like product is first sold . . . in the exporting country." *Id.* § 1677b(a)(1)(B)(i).[1] In plain English, Commerce is to use sales charges in the producer's home market. *See Smith-Corona Grp. v. United States*, 713 F.2d 1568, 1573 (Fed. Cir. 1983).

---

[1] "'[S]ubject merchandise' means the class or kind of merchandise that is within the scope of an investigation, a review, . . . [or] an order" imposing antidumping or countervailing duties. *Id.* § 1677(25). "'[F]oreign like product' means merchandise in the first" of three categories which is usable, starting with subject merchandise but also including other goods from the same country that are similar enough for enumerated reasons. *Id.* § 1677(16).

Ct. No. 25-00005                                   Page 4

But the statute makes certain exceptions to using the home-market price. One of them is when there are insufficient sales of the foreign like merchandise in that country. *See* 19 U.S.C. § 1677b(a)(1)(C)(i), (ii). Another is when "the particular market situation in the exporting country does not permit a proper comparison with the export price," *id.* § 1677b(a)(1)(C)(iii)—a *sales*-based particular market situation.[2]

If the home market is disqualified, Commerce uses sales charges from a third country if available. 19 U.S.C. § 1677b(a)(1)(B)(ii).[3] Eligibility for selection as such a proxy requires, among other things, that the Department "not determine that the particular market situation prevents a proper comparison with the export price," 19 U.S.C. § 1677b(a)(1)(B)(ii)(III)—once again, a *sales*-based particular market situation. *See* note 2.

---

[2] *See* 19 C.F.R. § 351.416(c), (e) for the criteria the Department uses to determine whether such a situation exists.

[3] The statute allows the Department to immediately turn to "constructed value" (discussed below) if the home market is not available. *See id.* § 1677b(a)(4). But a regulation establishes an agency preference for using third-country sales "if adequate information is available and verifiable." 19 C.F.R. § 351.404(f). "[W]here prices in more than one third country satisfy" the relevant statutory criteria, Commerce considers various factors in deciding which proxy to use. *See id.* § 351.404(e).

If Commerce finds that normal value cannot be determined from charges in either the home market or a third-country proxy, as a last resort it will calculate the product's "constructed value." *See* 19 U.S.C. § 1677b(a)(4); *see also* note 2; *Saha Thai Steel Pipe Pub. Co. v. United States*, 87 F.4th 1328, 1330 (Fed. Cir. 2023) ("If the agency cannot determine the normal value of the subject merchandise based on price, then § 1677b(e) authorizes [it] to calculate a constructed value based on costs."). This term represents the estimated total cost of materials, processing, overhead, profit, and packing expenses in the producing nation. *See* 19 U.S.C. § 1677b(e)(1)–(3). Where a "particular market situation exists such that the cost of materials and . . . processing . . . does not accurately reflect the cost of production in the ordinary course of trade," *id.* § 1677b(e)—a *cost*-based particular market situation,[4] *cf. Hyundai Steel Co. v. United States*, 19 F.4th 1346, 1355 n.10 (Fed. Cir. 2021) (distinguishing the "different standards" for cost-based versus sales-based particular market situations)—the agency "may use . . . any other . . . methodology" to figure such costs. 19 U.S.C. § 1677b(e).[5]

---

[4] *See* 19 C.F.R. § 351.416(d), (e) for the criteria the Department uses to determine whether such a situation exists.

[5] "The statute therefore does not direct Commerce to a particular calculation methodology where [it] uses constructed value and finds a [cost-based particular market situation]."

(footnote continues on next page)

Other statutory roads may also lead to constructed value. When Commerce notionally determines normal value by reference to the home market or by third-country proxy, it must disregard sales at "less than the cost of production." 19 U.S.C. § 1677b(b)(1). In calculating costs for this purpose,[6] the statute imposes two requirements governing dealings between affiliated persons.

The first, the transactions-disregarded rule, allows Commerce to ignore dealings between affiliates if the bill paid for "any element of value required to be considered . . . does not fairly reflect the amount usually reflected in sales . . . in the market under considera-

---

*Vicentin S.A.I.C. v. United States*, 404 F. Supp. 3d 1323, 1335 (CIT 2019). Neither do the Department's regulations. Rather, "any other calculation methodology" means just that—for example, the Department might opt for an international market price. *See Vicentin S.A.I.C. v. United States*, 42 F.4th 1372, 1376 (Fed. Cir. 2022). The point is that the agency "may use a different measure of the cost" to ascertain what the amount "would be in the ordinary course of trade, i.e., as it would be without the particular market situation," *id.* at 1381, as long as it "provides a reasoned explanation supported by substantial evidence," *NEXTEEL Co. v. United States*, 601 F. Supp. 3d 1373, 1377 (CIT 2022). But "[t]he 'any other methodology' language is reserved solely for when normal value is determined by constructed value." *Saha Thai Steel Pipe Pub. Co. v. United States*, 476 F. Supp. 3d 1378, 1384 (CIT 2020).

[6] As well as in calculating constructed value. *See* 19 U.S.C. § 1677b(f).

Ct. No. 25-00005                                    Page 7

tion." *Id.* § 1677b(f)(2). If no other transaction is available to use instead, the agency is to use information about what the price would have been between unaffiliated parties. *Id.*

The second, the major-input rule, allows the Department to revalue a "major input to the merchandise" if it has reasonable grounds to believe or suspect that an affiliated-party sale was billed below the cost of the component's production. *Id.* § 1677b(f)(3). When the agency applies this rule, it re-assesses the input's value. A regulation provides that Commerce will "normally" use the highest of three figures—(1) the price paid by the exporter or producer to the affiliated person, (2) "[t]he amount usually reflected in sales of the major input in the market under consideration," or (3) the affiliated person's cost of producing the input. 19 C.F.R. § 351.407(b).

As relevant here, the transactions-disregarded and major-input rules are subsumed within the Department's duty to filter out sales at "less than the cost of production" in determining normal value for either the home market or the third-country proxy. 19 U.S.C. §§ 1677b(b)(1), (f). After this scrubbing, "[i]f no sales made in the ordinary course of trade remain, the normal value shall be based on the constructed value of the merchandise." *Id.* § 1677b(b)(1).

In short, Commerce bases normal value on—in descending order of priority—the home market, a third-country proxy, or constructed value. A *sales*-based

Ct. No. 25-00005                                          Page 8

particular market situation can disqualify the first two options, resulting in the use of constructed value. And even if the home market or a proxy satisfies the relevant statutory requirements, the Department must still resort to constructed value if no sales made in the ordinary course of trade remain after disregarding ones made below the cost of production.

Finally, if (and only if) Commerce does resort to constructed value, a *cost*-based particular market situation allows the agency to use "any other calculation methodology," including looking outside the producing country, to determine the cost of materials and processing in making the foreign like merchandise.

## II

In 2024, Cornerstone Chemical Company, a domestic maker of melamine, petitioned Commerce to examine alleged dumping of that chemical by Qatari producers. The Department obliged by opening an investigation covering imports during 2023. Appx00014016, Appx00014019. To answer questionnaires, it chose a manufacturer, Qatar Melamine Company (QMC), and an exporter, Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat).[7] Appx00014016–00014017. It found that they, along with QMC's input supplier, Qatar Fertiliser Company

---

[7] Muntajat is now known as QatarEnergy Marketing. ECF 51, at Glossary and 1. This opinion uses the old name for consistency with the administrative record.

Ct. No. 25-00005                                    Page 9

P.S.C. (QAFCO), were all owned by their nation's government. Appx00001323. It accordingly treated them as a single entity. Appx00001321.

The agency found that it could not use data from Qatar—the home market—for calculating normal value because transactions there were less than five percent of the aggregate volume of U.S. sales. Appx00001000. That resulted in a search for a suitable third-country proxy.

QMC and Muntajat provided information about their sales in Turkey, Germany, and Spain. *Id.* Based on those submissions, Commerce determined that all three countries satisfied the requirements of 19 U.S.C. § 1677b(a)(1)(B)(ii). Appx00001003. Applying the criteria of 19 C.F.R. § 351.404(e), the Department preliminarily selected Turkey as the comparison proxy market. Appx00001005.

But Cornerstone asserted that under § 1677b(a)(1)(B)(ii)(III), a sales-based particular market situation disqualified Turkey.[8] It contended that subsidized Chinese melamine, which represented about 65 percent of Turkish imports, artificially depressed prices and thereby prevented a valid comparison between Turkish pricing and the export price in

---

[8] Cornerstone maintained that if the agency agreed, the latter should resort to constructed value "because the record does not contain information sufficient" to use "another third-country market." Appx00012110.

the U.S. Appx00001005. Commerce found the allegation "not persuasive" because the petitioner "failed to sufficiently support" it. *Id.*

Cornerstone's attempt to shape the Department's decision wasn't limited to contesting Turkey as a proxy. As relevant here, the petitioner also alleged that for purposes of calculating constructed value under 19 U.S.C. § 1677b(e), a cost-based particular market situation in Qatar for the natural gas input rendered the cost of production outside the ordinary course of trade. Appx00001307.[9]

Commerce agreed. Appx00001310–00001311. It explained that the Qatari government both dominated the production of natural gas in that country and owned the entities involved in the making and selling of melamine. Appx00001311. The effect was "a distortion in the price of natural gas" compared to the global rate, which created a cost-based particular market situation. *Id.* But the Department concluded that this circumstance in Qatar was of no moment given its use of the Turkish figure, rather than constructed value, to establish normal value. *Id.* It stated that an adjust-

---

[9] The necessary predicates for this argument were the agency's agreement with Cornerstone that (1) a sales-based particular market situation in Turkey disqualified it from serving as a proxy, and therefore (2) normal value should be determined by reference to constructed value.

ment for a cost-based particular market situation only applies to the latter. *Id.*

Finally, Cornerstone contended that even if the Department did use Turkey as a comparison market, in calculating the cost of production it should apply the transactions-disregarded and major-input rules to address the distortion caused by artificially low natural gas prices in Qatar. Appx00001309. The agency disagreed because it found that QatarEnergy—also owned by the government, Appx00001323—sold natural gas to QAFCO at prices higher than either the cost of production or the rate charged to unaffiliated customers. Appx00001311–00001312. "Thus, a major input/transactions disregarded rule adjustment is not warranted." Appx00001312.

The result was that Commerce calculated a *de minimis* estimated weighted-average dumping margin[10] for the collapsed entity of QMC, Muntajat, and QAFCO. *See* 89 Fed. Reg. 77,824, 77,285, Appx00001334. Because the statute instructs the Department to disregard such margins, 19 U.S.C. § 1673b(b)(3), it preliminarily found there was no dumping. 89 Fed. Reg. at 77,285, Appx00001334. It stood by that result in its final decision. *See* 89 Fed. Reg. 97,592, 97,593, Appx00001657. The latter had the practical effect of ending the investigation because the

---

[10] A *de minimis* margin is less than two percent *ad valorem*. 19 U.S.C. § 1673b(b)(3).

statute requires that both Commerce and the International Trade Commission return affirmative findings before the former may enter a duty order. *See* 19 U.S.C. § 1673.

## III

Cornerstone sued under 19 U.S.C. § 1516a(a)(2)(B)(i) to challenge the Department's final determination and invoked subject-matter jurisdiction conferred by 28 U.S.C. § 1581(c). QMC and Muntajat intervened as defendants urging the court to sustain the decision. The petitioner's motion for judgment on the agency record is fully briefed and ripe for disposition.

In § 1516a(a)(2) actions, "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The question is not whether the court would have reached the same decision on the same record. Rather, it is whether the administrative record as a whole permits Commerce's conclusion:

> Substantial evidence has been defined as more than a mere scintilla, as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. To determine if substantial evidence exists, we review the record as a whole, including evidence that supports as well

as evidence that fairly detracts from the substantiality of the evidence.

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (cleaned up); *see also SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n*, 718 F.2d 365, 382 (Fed. Cir. 1983) (if Commerce makes a choice between "two fairly conflicting views," the court may not substitute its judgment even if its view would have been different "had the matter been before it *de novo*") (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

The court also reviews to ensure the agency engaged in "reasoned decisionmaking," meaning its result must be "within the scope" of its authority and "the process" it uses to reach that outcome "must be logical and rational." *Michigan v. EPA*, 576 U.S. 743, 750 (2015). The agency must "examine the relevant data and articulate a satisfactory explanation . . . including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). While courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *id.*, they will also find a decision to be arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem," *id.*

IV

A

Cornerstone first challenges Commerce's selection of Turkey as a proxy. The petitioner argues that its evidence demonstrated that during the period of investigation, there was a sales-based particular market situation in that nation caused by unfairly traded melamine imports. It cites data showing that 65.9 percent of Turkish imports of that chemical in 2023 came from China. ECF 36, at 13 (citing Appx00004723–00004729).

According to Cornerstone, Chinese imports drove Turkish melamine prices during 2023. The petitioner observes that it urged Commerce to find that these imports were unfairly traded and that it cited—among other evidence—U.S. antidumping and countervailing duty orders on melamine from China, as well as antidumping orders from the EU and India. ECF 36, at 14–15.

The Department found the arguments "unavailing." Appx00001350. As to the European and Indian antidumping orders,[11] it reasonably explained that

---

[11] Commerce referred to evidence that "the EU and China have AD orders on melamine from China." *Id.* The petitioner excoriates the agency for this "nonsensical" statement. ECF 36, at 18. As the government correctly observes,

(footnote continues on next page)

they did "not constitute evidence that melamine from Qatar is dumped" in Turkey. Appx00001350. Cornerstone's briefing, in turn, acknowledges that "the existence and extent of dumping may theoretically vary from country to country." ECF 36, at 15. The court views that as an admission that a dumping order in one nation is not probative of market conditions elsewhere, just as the agency determined.

But Commerce ignored the flip side of Cornerstone's argument about the Chinese imports—the U.S. *countervailing* duty order. The petitioner correctly argues that "the subsidization" for such purposes "generally does not depend on whether a Chinese producer is selling to the United States, [Turkey], or another export market." *Id.*

The government responds by seizing on the word "generally" to argue that Cornerstone is relying on "general statements, not specific evidence." ECF 44, at 17. It says the petitioner's "arguments do not *necessarily* establish that Chinese imports into [Turkey] are unfairly subsidized, let alone . . . that [they] created significant distortion requiring a particular market situation finding." *Id.* at 17–18 (emphasis in original). QMC and Muntajat similarly assert that the peti-

---

ECF 44, at 18, *in context* the first reference to China was an obvious typo. And under the glass-house doctrine, litigants should be careful when throwing typographical stones. *Cf.* ECF 36, at 24 (Cornerstone brief erroneously citing the U.S. Code after quoting an agency regulation).

tioner's theory "is simply an assumption, . . . not evidence—let alone substantial evidence." ECF 51, at 19.

The intervenors invert the standard of review. The question is not whether the party *challenging* an administrative decision has supported its arguments with substantial evidence—instead it is whether the agency has done so for its findings. The problem here is that both the preliminary and final decision memoranda are completely silent about subsidies. While the government and the intervenors seek to wave away the issue, the Department cannot shirk its responsibility so easily.

Consider what a countervailing duty represents— subsidization of the manufacture, production, or export of merchandise. *See* 19 U.S.C. § 1671(a)(1). That happens in the country of origin, not in the recipient nation. As the court has observed in a different context, a "subsidy is baked into the price" *wherever* such products are sold. *BYD (H.K.) Co. v. United States*, 785 F. Supp. 3d 1359, 1378 (CIT 2025), *appeal pending*, No. 25-1937 (Fed. Cir.).

Maybe the government and the intervenors are right that China's subsidization of its melamine exports does not distort the Turkish market—but maybe they're wrong. We don't know because the Department skipped past the issue. It has "entirely failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, so the court must remand for it to do so. The argument the agency rejected may yet become

the cornerstone of a constructed value determination.[12]

B

In an effort to compel Commerce to use constructed value even if it properly found—or finds again on remand—that Turkey did not suffer from a sales-based particular market situation, Cornerstone tries a second line of attack. It argues the agency "used the Qatari Respondents' reported natural gas costs without addressing the distortions arising from transactions between affiliated parties." ECF 36, at 23. It also contends that given the distorted natural gas market in that country, it was "illogical to use QatarEnergy's prices to unaffiliated entities in Qatar to test whether its transfer prices to QAFCO are at arm's length." *Id.* at 27. It maintains that the agency should have instead "used [world-]market determined prices to value the collapsed entity's natural gas costs." *Id.* It rests this theory on the transactions-disregarded and

---

[12] The petitioner asks the court to direct Commerce on remand to resort to constructed value if the Department finds Turkey ineligible to serve as a proxy market. *See* ECF 56, at 15–16. The court's job, however, is to review—not preempt—agency action. Whether Commerce uses constructed value or instead looks to a different third country in that contingent scenario is an open question that it must address in the first instance.

Ct. No. 25-00005                                    Page 18

major-input rules. *See* ECF 36, at 24–25 (citing 19 U.S.C. § 1677b(f)(2), (3)).[13]

Cornerstone makes no attempt, however, to show how the relevant statutory language and implementing regulation support its argument. And for good reason, as its contention is untethered to those provisions.

The transactions-disregarded rule allows Commerce to ignore dealings between affiliates if the bill paid for "any element of value required to be considered . . . does not fairly reflect the amount usually reflected in sales of merchandise under consideration *in the market under consideration.*" 19 U.S.C. § 1677b(f)(2) (emphasis added).[14] The problem for Cornerstone is that in this context—where the Department determined normal value by looking to sales in a proxy country instead of constructed value—the market under consideration for purposes of calculating

---

[13] Recall that these provisions affect how Commerce determines whether there are any sales in the home market or third-country proxy at "less than the cost of production." 19 U.S.C. § 1677b(b)(1). All such sales must be disregarded. *Id*. After that filtering, if no sales remain at or higher than cost, the Department must use constructed value. *See id*.

[14] The caselaw uniformly interprets this provision as meaning that the Department must determine both what the market cost is for the "element of value" (input or service) and whether the affiliated-party transaction fairly reflects that price. *See, e.g.*, *Hyundai Steel Co. v. United States*, 279 F. Supp. 3d 1349, 1354–55 (CIT 2017).

input costs is *where the subject merchandise was produced*, not the world price or some other value.

The statutory structure makes this clear. Recall that § 1677b(f) does not exist in isolation. When the Department uses the home market or a proxy to determine normal value, this provision applies when the agency weeds out sales of the "foreign like product" that were at prices that "represent less than the cost of production of *that product*." 19 U.S.C. § 1677b(b)(1) (emphasis added). This can only mean the cost of production in the *place of manufacture*, as the definition of "foreign like product" is limited to the subject merchandise and similar goods "produced *in the same country*" as the former. *See id.* § 1677(16) (emphasis added).

Reinforcing this reading, the definition of "cost of production" is the sum of three categories of expenses incurred in the place of manufacture. *See id.* § 1677b(b)(3)(A) ("the cost of materials and . . . processing of any kind *employed in producing the foreign like product*") (emphasis added); *id.* § 1677b(b)(3)(B) ("an amount for selling, general, and administrative expenses based on actual data pertaining to production and sales of the foreign like product *by the exporter in question*") (emphasis added); and *id.* § 1677b(b)(3)(C) (the cost of preparing the good for shipment from where it was made).

Finally, turning back to § 1677b(f), it states that for purposes of determining the cost of production, "[c]osts

shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records" are consistent "with the generally accepted accounting principles of *the exporting country (or the producing country, where appropriate*[15]*)* and reasonably reflect the costs associated with the production and sale of the merchandise." *Id.* § 1677b(f)(1)(A) (emphasis added). Because the relevant records must satisfy the accounting principles of the place where the foreign like merchandise was made, the cost of production must also be determined by reference to that same place. That's true even when, as here, Commerce is using a third-country comparison market to determine normal value.

So the relevant "market under consideration" here for § 1677b(f)(2) purposes is Qatar, where the melamine was produced. And Commerce found that the natural gas market price there was distorted because of the intervention of that country's government. Appx00001311. But that is irrelevant under § 1677b(f)(2), which on its face is agnostic as to whether any such distortion exists in the place of production. Instead, that provision only requires that a transaction between affiliate entities be disregarded when the input sale is for less than the prevailing price *in that market*. And here, Cornerstone does not

---

[15] If the goods were not made in the exporting country, the statute implies that the Department is to look to the cost of production in the nation of manufacture.

Ct. No. 25-00005                                    Page 21

challenge Commerce's finding that QatarEnergy charged the collapsed entity *more* than the market rate (distorted as it was).

The transactions-disregarded rule thus offers no succor to Cornerstone. That leaves the major-input rule. It directs that when the agency suspects an affiliated-party sale is priced below the cost of production, it may adjust the charges upwards to reflect that cost, *provided* the result is greater than the figure it would reach using the transactions-disregarded rule. 19 U.S.C. § 1677b(f)(3).

Commerce, in turn, has implemented the major-input rule with a regulation directing it to use the highest of the actual purchase price paid, the amount "usually reflected in sales of the major input in the market under consideration," or the cost of production. 19 C.F.R. § 351.407(b). The Department acknowledged that QAFCO bought natural gas from an affiliated company. It therefore examined what QatarEnergy charged unaffiliated customers for that product—that is, what the Qatari market price was—and found that QAFCO's purchase charges exceeded both the market price and the cost of production. Appx00001355. It accordingly made no adjustment to QAFCO's figure. Appx00001355–00001356.

Cornerstone does not dispute that the Department followed its regulation in applying the major-input rule. Thus, that provision also offers no help to the petitioner.

What Cornerstone invites the court to do is disregard the statutory requirements and implementing regulation governing the transactions-disregarded and major-input rules in the third-country proxy context simply because the market price for natural gas in the place of production (Qatar) is distorted. Thus, the argument fails on its own terms.

But it also fails because of binding precedent. The transactions-disregarded and major-input rules govern the calculation of costs for purposes of the home-market and third-country proxy prices, 19 U.S.C. § 1677b(b), as well as constructed value under § 1677b(e), *see id.* § 1677b(f). There is, however, a critical difference.

"Congress amended section 1677b(e) to allow for a [cost-based particular market situation] adjustment" when determining constructed value, "but did not" so "amend section 1677b(b)." *Hyundai*, 19 F.4th at 1353. It is therefore "reasonable to infer that Congress intended for" such an adjustment "to be available for calculations of constructed value, but not for calculations of the cost of production" under § 1677b(b). *Id.*; *see also Saha*, 87 F.4th at 1331 ("The agency cannot use constructed value language found in § 1677b(e) as a backdoor to slip in a [cost-based particular market situation] adjustment for cost of production calculations.").

Thus, Cornerstone's argument that Commerce erred by not making a cost-based particular market situation adjustment under the transactions-

disregarded and major-input rules doubly fails. The court therefore sustains the agency's cost-of-production analysis for purposes of determining the normal value of melamine in the putative third-country proxy, Turkey.

*   *   *

The court remands for the Department to reconsider Cornerstone's argument that a sales-based particular market situation in Turkey disqualifies that nation from serving as a third-country comparison market. Insofar as Commerce stands by that choice, the court sustains its cost-of-production analysis. On the other hand, if the agency finds Turkey ineligible, it must then decide whether to use another proxy or instead use constructed value.

Dated: June 17, 2026          /s/ *M. Miller Baker*
      New York, NY          Judge