A-518-001
Court No. 25-00005
Slip Op. 26-64
POI: 01/01/2023 – 12/31/2023
**Public Document**
E&C/OII: AH

***Cornerstone Chemical Company v. United States,***
**Court No. 25-00005 (CIT June 17, 2026)**
**Melamine from Qatar**

# FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND

## I. SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of redetermination pursuant to the opinion and remand order of the U.S. Court of International Trade (Court) in *Cornerstone Chemical Company v. United States*, Consol. Court No. 25-00005, Slip Op. 26-64 (CIT June 17, 2026) (*Remand Order*). These final results of redetermination concern the *Final Determination* of the less-than-fair-value (LTFV) investigation on melamine from Qatar.[1] The Court remanded for Commerce to reconsider Cornerstone Chemical Company's (Cornerstone)[2] argument that a sales-based particular market situation exists in the Republic of Türkiye (Türkiye) which disqualifies that nation from serving as a third-country comparison market.

As discussed below, pursuant to the Court's *Remand Order*, Commerce has addressed parties' comments regarding Commerce's determination that a sales-based particular market situation (PMS) does exist in Türkiye. As such Commerce compared QMC/Muntajat's[3] U.S.

---

[1] *See Melamine from Qatar: Final Negative Determination of Sales at Less-Than-Fair-Value and Final Negative Determination of Critical Circumstances*, 89 FR at 97592 (December 9, 2024) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).
[2] Cornerstone is the petitioner in the underlying investigation of melamine from Qatar.
[3] QMC/Muntajat is a single entity composed of the following companies: Qatar Melamine Company (QMC); Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C. (Muntajat); and Qatar Fertiliser Company (P.S.C.) (QAFCO).

sales to normal value based on constructed value. Lastly, unlike in the *Final Determination*,[4] where no cost-based particular market situation adjustment could be made because none of the U.S. sales were compared to constructed value, Commerce is now able to make the cost-based particular market situation adjustment.

After considering the comments received, Commerce finds it appropriate to make no further changes to its analysis and continues to find that a sales-based particular market situation exists in Türkiye which disqualifies that nation from serving as the third country comparison market. Based on this analysis, QMC/Muntajat's revised final dumping is 15.58 percent, and the revised all-others rate is also 15.58 percent.

## II. BACKGROUND

Commerce published its *Preliminary Determination* on September 24, 2024.[5] Relevant here, Commerce used Türkiye as the third-country comparison market for the purposes of dumping margin calculations as Commerce found Cornerstone's arguments that a PMS exists in Türkiye were not persuasive because it failed to sufficiently support its allegation.[6] Commerce made no changes at the *Final Determination*.[7]

In its *Remand Order*, the Court held that Commerce's negative PMS finding did not sufficiently address Cornerstone's argument that Chinese imports of melamine into Türkiye were unfairly traded as evidenced by the presence of a U.S. countervailing duty (CVD) order on melamine from China.[8] The Court held, "maybe the government and the intervenors are right that China's subsidization of its melamine exports does not distort the Turkish market – but maybe they're wrong. We don't know because {Commerce} skipped past the issue…The

---

[4] *See Final Determination* IDM at Comment 1.
[5] *See Melamine from Qatar: Preliminary Negative Determination of Sales at Less Than Fair Value*, 89 FR 77824 (September 24, 2024) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM).
[6] *See* Memorandum, "Selection of an Appropriate Third Country Market," dated August 21, 2024.
[7] *See Final Determination* IDM at Comment 4.
[8] *See Remand Order* at 14-17.

argument the agency rejected may yet become the cornerstone of a constructed value determination."[9] The Court instructed Commerce to reconsider whether a sales-based PMS in Türkiye disqualifies that nation from serving as a third-country comparison market.[10] Additionally, if Commerce were to find that Türkiye was ineligible by reason of a sales-based PMS, it must then decide whether to use another proxy to determine an appropriate third-country market or instead use constructed value.[11]

## III. ANALYSIS

### 1. Sales Based PMS Determination

In the *Final Determination*, Commerce found that there was insufficient evidence that a sales-based PMS existed in Türkiye during the POI and continued to utilize Türkiye as the third-country comparison market.[12] Specifically, Commerce determined that: (1) evidence of AD orders on melamine from China imposed by the EU and India does not demonstrate that melamine from China is dumped in another country; (2) the average unit values are not evidence of subsidized or dumped prices, nor do they prove that the dominant presence of low-priced Chinese imports distorted the Turkish market; (3) the UN COMTRADE data showed that Qatar's average unit price was the second highest among the top five exporters to Türkiye.[13] The Court remanded Commerce's decision, holding that Commerce has not adequately addressed the existence of a *Melamine from China CVD Order*[14] and the impact that order has, specifically stating "the problem here is that both the preliminary and final decision memoranda are

---

[9] *Id*.
[10] *Id*. at 23.
[11] *Id*.
[12] *See Final Determination* IDM at Comment 4.
[13] *Id*.
[14] *See Melamine from the People's Republic of China: Antidumping Duty and Countervailing Duty Orders*, 80 FR 80751 (December 28, 2015) (*Melamine from China CVD Order*).

completely silent about subsidies. While the government and intervenors seek to wave away the issue, {Commerce} cannot shirk its responsibility so easily."[15]

We have re-examined the record pursuant to the *Remand Order* and have determined that a sales-based PMS does exist in Türkiye. The Court found that Commerce "reasonably explained that {the European and Indian antidumping orders} did 'not constitute evidence that melamine from Qatar is dumped' in {Türkiye}."[16] Furthermore, the Court highlighted Cornerstone's admission "that a dumping order in one nation is not probative of market conditions elsewhere."[17] However, the Court distinguished the *Melamine from China CVD Order* that Cornerstone had included in its PMS allegation,[18] stating that "{Cornerstone} correctly argues that 'the subsidization' for such purposes 'generally does not depend on whether a Chinese producer is selling to the United States, {Türkiye}, or another export market.'"[19] After reviewing the *Melamine from China CVD Order*, Commerce acknowledges that the order was in effect during the POI of this investigation. When analyzing the effect of the melamine covered by the *Melamine from China CVD Order* on Cornerstone's sales-based PMS allegation, Commerce has determined that the *Melamine from China CVD Order*, in conjunction with other evidence on the record, provides sufficient evidence that Chinese imports into Türkiye were distorted due to unfair subsidies being granted to Chinese companies producing melamine, which in turn distorted the prices of melamine in Türkiye.

In the *Melamine from China CVD Order*, Commerce found 42 subsidy programs countervailable including export financing programs, income tax programs, and several inputs

[15] *See Remand Order* at 16.
[16] *Id*. at 14-15.
[17] *Id*. at 15.
[18] See Cornerstone's Letter, "Allegation Regarding Market Viability," dated May 13, 2024 at 5-6 (Cornerstone's Market Viability Letter).
[19] *See Remand Order* at 15.

for less-than-adequate renumeration (LTAR).[20] Notably, the following programs: Preferential Export Financing from the Export-Import Bank of China, Grants to Cover Legal Fees in Trade Remedy Cases, Reduced Fee Export Insurance, and Cash Grants for Exports, were alleged as export-contingent subsidies within the meaning of section 771(5A)(B) of the Tariff Act of 1930, as amended (the Act).[21] Because the Government of China and all mandatory respondents refused to participate in that investigation, Commerce did not make an affirmative specific determination as to these or any other alleged programs, but instead applied total adverse facts available (AFA) under section 776(b) of the Act and drew an adverse inference that each alleged program, including these export-contingent programs, satisfied the financial contribution, specificity, and benefit elements of sections 771(5) and 771(5A) of the Act as alleged.

Unlike subsidies tied to general domestic production costs, export-contingent subsidies such as the ones mentioned above, are designed to reduce the cost and risk of the export sale itself, and would enable Chinese producers to offer export prices, including prices for sales in Türkiye, below what an unsubsidized producer could sustain. This provides a particularized link between the subsidization addressed in the *Melamine from China CVD Order* and the distortion of Chinese melamine pricing in export markets specifically. The Court recognized this same principle in *BYD (H.K.) Co.*, holding that where countervailing duties respond to a foreign government's subsidization of the manufacture, production, or export of merchandise, "it is reasonable to assume that the price of such goods, or of the inputs used to make them, reflects the subsidy,"[22] because "the subsidy is baked into the price."[23]

[20] *See Melamine from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 80 FR 68847 (November 6, 2015) (citing Memorandum, "Melamine from the People's Republic of China: Final Calculations," dated November 2, 2015).
[21] *See Melamine from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 80 FR 21706 (April 20, 2015), and accompanying PDM at Attachments 1 and 2.
[22] *See BYD (H.K.) Co. v. United States*, 785 F.Supp.3d 1359, 1378 (CIT 2025) (*BYD (H.K.) Co.*).
[23] *Id.,* 785 F.Supp.3d at 1378.

The market-distorting effect of subsidies is not limited to export subsidies. Any subsidy that lowers a producer's effective cost of production or export, whether by reducing input costs, financing costs, or tax liability, enables the producer to price its merchandise below the level it could otherwise sustain. Because Chinese melamine producers receive countervailable subsidies related to both the production and export of melamine, they likely have the ability to sell melamine in Türkiye at distorted prices.

Furthermore, as Cornerstone provides in its case briefs, the record reflects that Chinese imports make up approximately 65.95 percent of all melamine imports into Türkiye during 2023. As a result, Commerce finds upon re-examining the record that the large presence of subsidized Chinese imports of melamine has likely resulted in a depressed price of melamine in Türkiye market wide, as domestic producers and other exporters to Türkiye (including Qatar) would have to reduce prices in order to compete with China's dominant share of the market maintained at subsidized prices. Cornerstone provided UN COMTRADE data to illustrate this effect, which shows average unit values for melamine imports into Türkiye from the top five countries mirroring China's, with average unit values ranging from 0.95 USD/kg to 1.25 USD/kg compared to China's average unit value at 0.97 USD/kg,[24] affirming the conclusion that other countries importing melamine into Türkiye have to lower their prices to remain closer to China's import prices. These record facts, in conjunction with consideration of Commerce's *Melamine from China CVD Order*, support a finding that subsidized Chinese melamine prices had a distortive effect on the Türkiye market.

Section 773(a)(1)(B)(ii)(III) of the Act requires Commerce to reject an otherwise viable third-country market where a PMS prevents third-country prices from providing a proper comparison with U.S. prices. As the Court explained in *Davis Wire*, the SAA identifies one such

---

[24] *See* Cornerstone's Market Viability Letter at Exhibit 2B.

circumstance in which a PMS exists as a market in which prices "cannot be considered to be competitively set."[25] In this investigation, the record indicates that Türkiye's prices are materially influenced by substantial volumes of unfairly traded imports of melamine from China.[26] Commerce has separately determined in the *Melamine from China CVD Order* that Chinese producers of melamine have benefited from countervailable subsidies.[27] Furthermore, because the record shows that Chinese imports constitute 65.95 percent of all melamine imports into Türkiye during 2023, Commerce finds upon reexamining the record that the effects of the Chinese government intervention materially influence the price-setting mechanism of the melamine market in Türkiye.[28] As such, QMC/Muntajat's sales prices in Türkiye are distorted, as QMC/Muntajat must sell at depressed prices in Türkiye to compete with subsidized Chinese melamine. This prevents the "proper comparison" to U.S. prices required by section 773(a)(1)(B)(ii)(III) of the Act. Accordingly, Commerce finds that a sales-based PMS does exist in Türkiye with regards to distorted prices of melamine stemming from the substantial volume of imports of Chinese melamine and its impact on the Turkish melamine market during the POI. Because Türkiye cannot serve as a viable third-country comparison market as a result of this sales-based PMS finding, Commerce relies on calculating normal value based on constructed value. Further, we note that there is no sales data on the record from either of QMC/Muntajat's other potential third-country markets, Germany or Spain.

---

[25] *See Davis Wire Corp. v. United States*, 180 F.Supp.3d 1187, 1194 (CIT 2016) (*Davis Wire*) (citing Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, vol. 1 (1994) (SAA) at 822).
[26] *See* Cornerstone's Letter, "Petitioner's Case Brief Concerning Sales and General Issues," dated October 24, 2024, at 5-6.
[27] *See Melamine China CVD Order*.
[28] *See* Cornerstone's Letter, "Petitioner's Allegation Regarding Market Viability, dated May 13, 2024, at Exhibit 2B-1.

**2. Calculation of Normal Value based on Constructed Value**

Section 773(a)(1)(C) of the Act directs Commerce to base normal value on third country market prices or constructed value when: (1) the foreign like product is not sold (or offered for sale) for consumption in the exporting country; (2) when Commerce determines that the aggregate quantity (or if quantity is not appropriate, value) of the foreign like product sold in in the exporting country is insufficient to permit a comparison to U.S. sales; or (3) when a "PMS" in the exporting country does not permit a proper comparison with U.S. price. Under 19 CFR 351.404(f) Commerce normally will calculate normal value based on the third country rather than on constructed value if adequate information is available and verifiable. Section 773(a)(1)(B)(ii) of the Act provides that normal value may be based on the price at which the foreign like product is sold (or offered for sale) for consumption in a country other than the exporting country or the United States, if: (1) such price is representative, (2) the aggregate quantity (or, if quantity is not appropriate, value) of the foreign like product sold by the exporter or producer in such other country is five percent or more of the aggregate quantity (or value) of the subject merchandise sold in the United States or for export to the United States, and (3) Commerce does not determine that a PMS prevents a proper comparison with the export price or constructed export price.

As discussed above, we have determined that a sales-based PMS exists in Türkiye due to subsidized imports of melamine from China, which has distorted the prices of the foreign like product sold such that those sales do not permit a proper comparison with U.S. price. Because a PMS renders Türkiye unsuitable as a basis for normal value, and because there is no viable home market in this investigation, neither the home market nor the third country market in this case can provide a sufficient basis for normal value comparison. Additionally, there is no sales data on the record for QMC/Muntajat's other third country markets, Germany and Spain.

Accordingly, Commerce has relied on constructed value for the recalculation of QMC/Muntajat's final margin program under section 773(a)(4) of the Act.

Because we are relying on constructed value to determine normal value, we must determine constructed value profit and selling expenses in accordance with section 773(e) of the Act. In the absence of a viable comparison market, we are unable to calculate constructed value profit and selling expenses using the preferred method under section 773(e)(2)(A) of the Act, *i.e.*, based on the respondent's own home market or third country sales made in the ordinary course of trade, because the home market is not viable and the third country market, Türkiye, cannot be used as a result of the PMS finding.

When the preferred method is unavailable, Commerce must instead rely on one of the three alternatives outlined in sections 773(e)(2)(B)(i) through (iii) of the Act: (i) the use of the actual amounts incurred and realized by the specific exporter or producer in connection with the production and sale, in the foreign country, of merchandise that is in the same general category of products as the subject merchandise; (ii) the use of the weighted average of the actual amounts incurred and realized by exporters or producers (other than the respondent) in connection with the production and sale of the foreign like product, in the ordinary course of trade, for consumption in the foreign country; or (iii) the use of amounts incurred and realized for selling, general, and administrative expenses, and for profit, based on any other reasonable method, except that the amount for profit may not exceed the amount realized by exporters or producers (other than the respondent) in connection with the sale for consumption in the foreign country, of merchandise in the same general category of products as the subject merchandise (*i.e.*, the "profit cap"). The Act does not establish a hierarchy for selecting among these alternatives.

The first statutory option, section 773(e)(2)(B)(i) of the Act, is not available because QMC/Muntajat had no viable home market sales, and thus there is no information on the record concerning QMC/Muntajat's own sales of merchandise in the same general category as the

subject merchandise for consumption in the foreign country. The second alternative, section 773(e)(2)(B)(ii) of the Act, is likewise unavailable because, there is no viable comparison market, and the Turkish market cannot be relied upon due to the presence of sales-based PMS, such that there is no ordinary course of trade foreign like product sales data from other exporters or producers on which to base a weighted average.

Accordingly, we have calculated constructed value profit and selling expenses in accordance with section 773(e)(2)(B)(iii) of the Act, based on "any other reasonable method." The only information on the record suitable for this purpose consists of the profit and selling expense ratios submitted at the petition stage of this investigation. No other usable financial statements, surrogate data, or comparable-merchandise sales information were submitted on the record during the course of this proceeding. Accordingly, we have relied on the financial statements of the consolidated Industries Qatar Q.P.S.C. (Industries Qatar), which were used to calculate constructed value in the initiation of this investigation.[29] Specifically, we used the profit ratio of 40.86 and calculated an indirect selling expense ratio of 0.54 percent.[30]

Lastly, we are unable to calculate the amount realized by exporters or producers in connection with the sale, for consumption in the foreign country, of the merchandise "in the same general category of products as the subject merchandise" (*i.e.*, the "profit cap"), in accordance with section 773(e)(2)(B)(iii).[31] Therefore, on the basis of facts available, we find

---

[29] *See* Checklist, "Antidumping Duty Investigation Initiation Checklist," dated March 5, 2024 (Initiation Checklist) at 6 (citing Cornerstone's Letter, "Petitioner's Response to Volume VI Supplemental Questionnaire (Qatar Antidumping)," dated February 22, 2024 at Exhibit VI-S8). Industries Qatar is a parent company of QAFCO and QMC. Through its group of subsidiaries, Industries Qatar operates across three industry segments: petrochemical, fertilizer and steel.

[30] The indirect selling expense ratio of 0.54 percent was calculated by dividing the selling and distribution expenses of Qatar Riyals (QAR) 68,416 by the total cost of manufacturing of QAR 12,671,613. *See* Cornerstone's Letter, "Petition for the Imposition of Antidumping and Countervailing Duties in the Matter of Melamine from Germany, India, Japan, the Netherlands, Qatar, and Trinidad and Tobago," dated February 14, 2024, at Exhibit VI-15A; *see also* Memorandum, "Draft Remand Redetermination Analysis Memorandum for Qatar Melamine Company; Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C.; Qatar Fertiliser Company (P.S.C.), dated September 16, 2026 (Draft Redetermination Analysis Memorandum).

[31] *See* SAA at 840.

that the profit information from the initiation of this investigation serves as a reasonable profit cap in this draft redetermination.[32]

Lastly, in the *Final Determination*, Commerce found that a cost-based PMS exists with respect to natural gas, but was unable to make an adjustment because none of the U.S. sales were being compared to constructed value.[33] Because normal value is now based on constructed value, we are able to make an adjustment to cost by revising the reported natural gas cost to reflect the world market price of natural gas. We made this adjustment by increasing total cost of manufacture.[34]

Based on the changes made pursuant to these final results of redetermination, we have recalculated the weighted-average dumping margin for QMC/Muntajat which has changed from 0.00 percent to 15.58 percent.[35]

## IV. INTERESTED PARTY COMMENTS

On September 16, 2026, Commerce issued its Draft Remand Redetermination and provided interested parties with the opportunity to comment.[36] Commerce received comments from the petitioner and QMC/Muntajat.[37] We address those comments below.

**Comment 1: Whether the Draft Remand Results Comply with the Remand Order**

*Petitioner's Comment:*

The following is a verbatim summary of arguments submitted by the petitioner. For further details, *see* Petitioner's Draft Remand Comments at pages 1-3.

---

[32] *See* Initiation Checklist at 6.
[33] *See Final Determination* IDM at Comment 1.
[34] *See* Memorandum, "Cost of Production and Constructed Value Adjustments for the Draft Results of Redetermination Pursuant to Court Remand – Qatar Melamine Company and Qatar Fertiliser Company P.S.C.," dated concurrently with this memorandum; *see also* Draft Redetermination Analysis Memorandum.
[35] *See Final Determination*, 89 FR at 97593; *see also* Draft Redetermination Analysis Memorandum.
[36] *See* Draft Results of Remand Redetermination, *Cornerstone Chemical Company v. United States* Court No. 25-00005 (CIT June 17, 2026) Slip-Op 26-64, dated September 17, 2026 (Draft Remand Redetermination).
[37] *See* Petitioners' Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand in Consol. Court Nos. 25-00235 & 26-00825," dated September 11, 2026 (Petitioners' Draft Remand Comments); *see also* QMC/Muntajat's Letter, "Comments on Draft Remand Results," dated September 25, 2026 (QMC/Muntajat's Draft Remand Comments).

> The Draft Results comply with the *Remand Order* and should be affirmed in the forthcoming final results. Given the record evidence of distortions caused by imports of subsidized melamine from China in Türkiye, Commerce reasonably found that a sales-based {PMS} exists in Türkiye, such that the country cannot be used as a comparison market for determining normal value. In accordance with that conclusion, Commerce correctly based normal value on constructed value, including by adjusting the reported natural gas cost to account for the cost-based PMS in Qatar's natural gas market.

**Commerce's Position:** We agree with the petitioner and continue to find that the *Draft Remand* complies with the *Remand Order.* The petitioner argues that Commerce complied with the *Remand Order* and reasonably found that a sales-based PMS exists in Türkiye, such that the country cannot be used as a comparison market for determining normal value.[38] Additionally, the petitioner argues that Commerce duly considered the evidence of unfair subsidization of melamine from China and reasonably found that Chinese imports of melamine into Türkiye likely depressed melamine prices, and that it therefore follows that QMC/Muntajat must sell at depressed prices in Türkiye to compete with subsidized Chinese melamine.[39] The petitioner also argues that Commerce appropriately based normal value for QMC/Muntajat on constructed value using information from the petition as there is no sales data on the record from either of QMC/Muntajat's other potential third country markets.[40] Lastly, the petitioner argues that Commerce correctly adjusted the reported natural gas cost to account for its prior finding of a cost-based PMS in Qatar's natural gas market.[41] Commerce agrees.

In the Draft Remand Redetermination, Commerce found that a sales-based PMS exists in Türkiye, and as a result Türkiye cannot serve as the third country comparison market for QMC/Muntajat.[42] Accordingly, due to the lack of other data on the record, QMC/Muntajat's normal value must be calculated via constructed value.[43] Furthermore, in the Draft Remand

[38] *See* Petitioner's Draft Remand Comments at 1.
[39] *Id.*
[40] *Id*. at 3.
[41] *Id*.
[42] *See* Draft Remand Redetermination at 3-7.
[43] *Id.* at 7-10.

Redetermination, Commerce continued to find that cost-based PMS exists with respect to natural gas, and because QMC/Muntajat's normal value is now calculated via constructed value, we were able to make an adjustment to cost by revising the reported natural gas cost to reflect the world market price of natural gas.[44]

Therefore, for this final remand redetermination we find that our Draft Remand Redetermination complied with the *Remand Order* and have made no changes.

**Comment 2: Whether Commerce's Sales-Based PMS Finding for Türkiye is Supported by Substantial Evidence**

*QMC/Muntajat's Comment*:

The following is a verbatim summary of arguments submitted by QMC/Muntajat. For further details, *see* QMC/Muntajat's Draft Remand Comments at pages 7-14.

> Commerce's new finding that a sales-based PMS exists in Türkiye rests on a chain of assumptions, not on record evidence tying Chinese subsidization to actual melamine pricing in Türkiye during the 2023 period of investigation {(POI)}. Commerce reasons that export contingent subsidies identified in a 2015 Chinese countervailing duty order "would enable" Chinese producers to underprice; that they "likely have the ability" to sell at below-market prices in Türkiye; and that subsidized imports have "likely resulted" in market-wide price distortion. Each link in that chain is conditional or an assumption of what might have occurred – not what actually did occur. Commerce never connects what subsidies could theoretically enable to what Chinese exporters actually charged in Türkiye during the POI – much less to the impact of Chinese import pricing on market prices for melamine in Türkiye.
>
> A succession of "would," "likely," and "has likely resulted" assumptions does not constitute substantial evidence. The *2015 Melamine from China CVD Order* fails to provide actual evidence because it was based on adverse facts available, not affirmative factual findings, and concerns conduct years before the POI. Nor do import-share or average unit value data fill the gap: Commerce previously recognized that Qatar's melamine {average unit value} in Türkiye was 10 {percent} higher than China's, refuting any inference of market-wide price depression to Chinese levels, and Commerce's Draft Remand Redetermination fails to explain why that contrary finding no longer applies. Foreign trade remedies against Chinese melamine likewise do not establish a PMS specific to Türkiye, since the existence and extent of dumping, and the impact of subsidization on local market prices, may vary from country to country, and the burden of establishing a sales-based PMS rests with the party alleging it. Commerce should restore its

[44] *Id*. at 10

original finding that no sales-based PMS exists in Türkiye, continue to use Türkiye as the comparison market, and maintain the *de minimis* dumping margin.

**Commerce's Position:** We disagree with QMC/Muntajat. For the reasons discussed below, Commerce continues to find that a sales-based PMS exists in Türkiye with regards to Chinese imports of subsidized melamine.

In the Draft Remand Redetermination, Commerce re-evaluated the record and determined that a sales-based PMS did exist in Türkiye during the POI with regards to Chinese imports of subsidized melamine which in turn depressed melamine prices in Türkiye.[45] Commerce's finding did not rest on the existence of the *Melamine from China CVD Order* alone; rather, the average unit value data for melamine imports into Türkiye, considered together with China's substantial import share, corroborated that the subsidized pricing as evidenced by that order was in fact reflected in the Turkish melamine market during the POI.[46]

QMC/Muntajat argues that the *Remand Order* simply requires Commerce to consider the missing evidentiary link concerning the *Melamine from China CVD Order* and explicitly does not support wholesale reconsideration or reversal of findings that the Court already sustained.[47] QMC/Muntajat is incorrect. The *Remand Order* instructs Commerce to "reconsider Cornerstone's argument that a sales-based {PMS} in {Türkiye} disqualifies that nation from serving as a third-country comparison market."[48] The *Remand Order* does not prohibit Commerce from determining that the *Melamine from China CVD Order* provides the necessary evidence required under 19 CFR 351.416(d) to determine that a sales-based PMS exists. In fact, the *Remand Order* alludes to the possibility of the *Melamine from China CVD Order* being the "cornerstone of a constructed value determination."[49]

---

[45] *See* Draft Remand Redetermination at 3-7.
[46] *Id.*
[47] *See* QMC/Muntajat's Draft Remand Comments at 8; *see Melamine from China CVD Order*.
[48] *See Remand Order* at 23.
[49] *Id*. at 18.

QMC/Muntajat also argues that Commerce's finding of a sales-based PMS in Türkiye is reliant on conditional or assumptive language.[50] However, 19 CFR 351.416(d)(2) provides that a PMS determination can be based on a finding that it is more likely than not that a circumstance or set of circumstances contributed to distorted costs or prices; "{Commerce} will weigh the information on the record and determine whether it is ***more likely*** than not that the circumstance or set of circumstances contributed to the distortion in the cost of production of subject merchandise during the {POI} or {period of} review, and therefore, that a market situation existed during that period." Commerce's use of language such as "would enable" and "likely have the ability" reflects this governing probabilistic standard; it does not, as QMC/Muntajat suggests, indicate that Commerce's finding rests on mere theoretical possibility rather than a reasoned conclusion that distortion more likely than not occurred. Furthermore, as discussed further below, the existence of *Melamine from China CVD Order*, considered together with the average unit value and import-share data on this record, provides substantial evidence that it is more likely than not that Chinese imports into Türkiye were priced at distorted levels due to unfair subsidies granted to Chinese melamine producers, and that this distortion, in turn, distorted the prices of melamine in Türkiye during the POI.

Additionally, QMC/Muntajat argues that the *Melamine from China CVD Order* fails to provide factual evidence to support Commerce's PMS finding because Commerce made no affirmative finding as to the specific subsidy programs at issue in that proceeding, because the entire order was based instead on total adverse facts available and because the investigation leading to the Order is from 2015, years before this investigation's POI. We disagree with QMC/Muntajat. Of the 42 countervailable subsidy programs found in *Melamine from China CVD Order*, four were export-contingent subsidies within the meaning of section 771(5A)(B) of

[50] *See* QMC/Muntajat's Draft Remand Comments at 8.

the Act and are specifically designed to reduce the cost and risk of the export sale itself, enabling Chinese producers to offer export prices, including into Türkiye, at levels that are below what an unsubsidized producer could sustain. The remaining programs, while not export-contingent, nonetheless lower Chinese producers' cost of production, which likewise enables underpricing. Furthermore, the existence of a CVD order based on total adverse facts available does not indicate that the underlying subsidy benefit was non-existent. In *Essar Steel*, the Court agreed that Commerce's adverse facts available methodology in CVD proceedings relies on the premise that the behavior of the government provides a reasonable estimate of the level of subsidization at issue.[51] Regarding QMC/Muntajat's argument that the *Melamine from China CVD Order* is too dated to be probative, Commerce has completed a second sunset review[52] of the order and determined that revocation of the order would likely lead to continuation or recurrence of countervailable subsidies, confirming that the subsidization underlying the order has persisted, not lapsed, in the years following its issuance.

QMC/Muntajat next argues that the "mere fact that a portion of Türkiye's melamine imports originate from a particular source does not, without more, establish that melamine prices in Türkiye are not market-based," particularly given that other market-economy exporters, including Qatar, Germany, the Netherlands, and Austria, continued to find it profitable to export melamine to Türkiye during the POI.[53] We disagree with QMC/Muntajat's premise. During the POI, Türkiye imported 65.95 percent of its total melamine imports from China.[54] In fact, China was the largest importer of melamine to Türkiye during the POI, which, by its nature, would naturally have a depressing price effect on melamine sales in Türkiye via the large imports of

[51] *See Essar Steel Ltd. v. United States*, Slip Op. 13-48 (CIT April 9, 2013) (*Essar Steel*) at 7.
[52] *See Melamine from the People's Republic of China: Final Results of the Expedited Second Sunset Review of the Countervailing Duty Order*, 91 FR 62700 (October 2, 2026).
[53] *See* QMC/Muntajat's Draft Remand Comments at 10.
[54] *See* Petitioner's Letter, "Petitioner's Allegation Regarding Market Viability," dated May 13, 2024 (Market Viability Letter) at Exhibit 2B.

subsidized melamine.[55] Furthermore, average unit values for melamine imports into Türkiye illustrates this effect as the top five countries importing melamine to Türkiye range from 0.95 USD/kg to 1.25 USD/kg, with China's average unit value of 0.97 USD/kg.[56] These average unit values, in tandem with the large import values from China, support the conclusion that other countries importing melamine into Türkiye have to lower their prices in order to compete with Chinese imports.

QMC/Muntajat further argues that Commerce's analysis of Turkish melamine imports, specifically, Qatar's average unit values compared to China's average unit values, is inconsistent with Commerce's own prior finding. In the *Final Determination*, Commerce determined that "Qatar's melamine {average unit value} was the second highest and 10 percent higher than China's, undercutting the petitioner's argument."[57] Commerce has reconsidered this finding and no longer finds that the 10 percent differential undermines a sales-based PMS finding. The *Final Determination* focused on the relative ranking of average unit value among the six largest exports to Türkiye and the fact that Qatar's average unit value exceeds China's but did not examine the distribution of average unit values across the largest exporters in conjunction with China's share of Turkish melamine imports.[58] Upon reexamination, Commerce has considered this broader context. The average unit values of the top five exporters, including Qatar, range narrowly from 0.95 USD/Kg to 1.25 USD/Kg, while China's average unit value was 0.97 USD/Kg, near the low end of that range. Although Qatar's average unit value was approximately 10 percent higher than China, that difference does not, by itself, establish that Chinese import prices had no effect on pricing elsewhere in the Turkish market. Nor does the fact that the exporters sold at average unit values within the same general range establish that

[55] *Id.*
[56] *Id.*
[57] *See Final Determination* IDM at Comment 4.
[58] *Id.*

their prices were unaffected by competitive pressure from Chinese imports. Considered together with China's 65.95 percent share of Turkish melamine imports in 2023, the clustering of average unit values is consistent with Commerce's finding that the substantial volume of subsidized Chinese imports exerted downward pressure on prices throughout the Turkish melamine market. Accordingly, Commerce has reconsidered the significance of the average unit value in light of their distribution and substantial presence of Chinese imports, rather than treating Qatar's higher average unit value relative to China as determinative when determining whether a sales-based PMS exists in Türkiye.

QMC/Muntajat also argues that Commerce's analysis of the average unit value data lacks proper context because a single year of trade data, considered in isolation, does not demonstrate that prices were suppressed or depressed relative to what they would have been.[59] Commerce disagrees that the absence of data covering multiple years precludes a finding that a sales-based PMS exists during the POI. Under 19 CFR 351.416(a)(1) and (c), the relevant inquiry is whether a circumstance or set of circumstances prevented or did not permit a proper comparison of sales prices in the home market or third country market with export prices and constructed export prices during the POI. The data provided by the petitioner to indicate large imports of Chinese melamine were depressing the price of Turkish melamine was from 2023, the same year as the POI, and therefore provide contemporaneous evidence of the composition of the Turkish melamine imports and the relative average unit values of the principal exporting countries during the relevant period.[60] Although, these data do not, standing alone, establish the precise magnitude of any price depression relative to a hypothetical undistorted market, Commerce does not rely on them for that purpose. Rather, Commerce considers the average unit value data together with China's substantial share of Turkish melamine imports and the record evidence

[59] *See* QMC/Muntajat's Draft Remand Comments at 11.
[60] *See* Market Viability Letter at Exhibit 2B.

concerning countervailable subsidies to Chinese melamine producers in determining whether Chinese imports influenced the Turkish market's price-setting mechanisms during the POI.

QMC/Muntajat also argues that Commerce cannot reasonably rely solely on the existence of the *Melamine from China CVD Order* as the basis for finding a sales-based PMS exists in Türkiye, particularly because Commerce previously determined that foreign antidumping orders do not constitute evidence that melamine from China is dumped in another country.[61] Commerce disagrees with QMC/Muntajat. Commerce noted in the *Final Determination* that while the European Union and {India} have antidumping duty orders on melamine from China, those orders alone do not constitute evidence that melamine from {China} is dumped in another country.[62] Although a finding that merchandise is dumped in one country does not establish that the same merchandise is dumped in another country, the *Melamine from China CVD Order* addresses the distinct issue of subsidization. The subsidies identified in the *Melamine from China CVD Order* benefit Chinese producers regardless of whether they export melamine to the United States, Türkiye, or another export market. Thus, the *Melamine from China CVD Order* provides evidence that Chinese melamine producers benefited from countervailable subsidies that could affect their pricing in Türkiye. Commerce considers this evidence together with the substantial volume of Chinese melamine imports into Türkiye during 2023, which accounted for 65.95 percent of total imports, and the average unit value data, which show that prices are within a narrow gap from Chinese average unit values. Considered together, these facts support Commerce's determination that subsidized Chinese imports likely exerted downward pressure on prices throughout the Turkish melamine market. Accordingly, Commerce does not rely on the *Melamine from China CVD Order* alone but considers it in conjunction with the import-share, and average unit value data in determining that a sales-based PMS exists in Türkiye.

---

[61] *See* QMC/Muntajat's Draft Remand Comments at 12 (citing *Final Determination* IDM at 15).
[62] *See Final Determination* IDM at 15.

QMC/Muntajat further argues that Commerce's reliance on *BYD (H.K.) Co.*, for the proposition that a countervailable subsidy is "baked into the price" of subsidized goods is misplaced, because *BYD (H.K.) Co.* addressed a distinct statutory question under the anticircumvention provision.[63] Commerce agrees that *BYD (H.K.) Co.* did not itself involve a sales-based PMS determination or finding that a countervailable subsidy against imports of a product from one country means that exports of that product from the country depress prices in a separate, third-country market. However, Commerce notes that it did not rely on *BYD (H.K.) Co.* as establishing, by itself, that a sales-based PMS exists in Türkiye. Rather, Commerce cited *BYD (H.K.) Co.* only for the narrower, underlying economic principle that a countervailable subsidy is generally reflected in the price of the subsidized goods.[64] That principle is not confined to the anticircumvention context; it reflects a basic economic premise about the relationship between subsidization and pricing that is equally applicable here, where the question is whether export-contingent subsidies conferred on Chinese melamine producers are reflected in the prices at which those producers sold melamine into Türkiye. Commerce's sales-based PMS finding rests on the full body of record evidence discussed above, including the *Melamine from China CVD Order*¸ China's import share, and the average unit value data of Turkish melamine imports, of which the general principle recognized in *BYD (H.K.) Co.* is only one supporting component, not the sole basis for Commerce's determination.

Accordingly, based on the totality of the record evidence, for this final remand redetermination, Commerce continues to find that a sales-based PMS exists in Türkiye during the POI.

---

[63] *See QMC/Muntajat's Draft Remand Comments* at 12-13 (citing Section 781(b)(1)(D)).
[64] *See* Draft Remand Redetermination at 5.

**Comment 3: Whether to Develop the Record on Germany and Spain as Third-Country Markets Rather than Default to Constructed Value**

*QMC/Muntajat's Comment*:

The following is a verbatim summary of arguments submitted by QMC/Muntajat. For further details, *see* QMC/Muntajat's Draft Remand Comments at pages 14-17.

> If Commerce nonetheless maintains that Türkiye is disqualified as a third-country market, it should not default to {constructed value} without first developing the record on Germany or Spain. The *Remand Order* expressly left open whether Commerce should use {constructed value} or a different third country if Türkiye is disqualified, explaining that this choice is for Commerce to address "in the first instance."[65] Commerce's Draft Remand Redetermination does not meaningfully engage with that choice; it states only that no sales data exist on the record for Germany or Spain and proceeds directly to {constructed value} on that basis.
>
> Germany and Spain are not speculative alternatives: Respondents identified both as viable third-country markets in QMC's Section A questionnaire response, and Commerce itself evaluated all three markets against the regulatory criteria before selecting Türkiye as the largest and most comparable of the three. Commerce's own regulations provide that Commerce "normally will calculate normal value based on sales to a third country rather than on constructed value if adequate information is available and verifiable,"[66] and Commerce has reopened the administrative record in other remand proceedings to develop the data necessary to reconsider a comparison or surrogate country selection rather than defaulting to a less-preferred methodology. Respondents structured their questionnaire responses and benchmark submissions around Commerce's selection of Türkiye; it would be fundamentally unfair to treat the resulting gap in the record concerning Germany or Spain, a gap attributable to Commerce's own sequencing of the underlying proceeding, as a basis for resorting to {constructed value}.

**Commerce's Position:** We disagree with QMC/Muntajat. For the reasons discussed below, Commerce continues to rely on constructed value to calculate QMC/Muntajat's normal value for this final remand redetermination.

In the *Final Determination*, Commerce utilized Türkiye as the third country comparison market to calculate QMC/Muntajat's normal value, after finding insufficient evidence to support the existence of a sales-based PMS in Türkiye during the POI.[67] In the Draft Remand

---

[65] *See* QMC/Muntajat's Draft Remand Comments at 3 (citing *Nexteel Co. v United States*, 355 F.Supp.3d 1336. 1349-51 (CIT 2019) and *Hyundai Steel Co. v United States*, 415 F.Supp.3d 1293, 1300-01 (CIT 2019)).
[66] *Id.* at 4 (citing *Giorgio Foods, Inc. v United States*, Slip. Op. 2025-90 (CIT July 16, 2025) (*Giorgio Foods*)).
[67] *See Final Determination* IDM at Comment 4.

Redetermination, Commerce reevaluated the record and determined that a sales-based PMS existed in Türkiye due to subsidized imports of melamine from China.[68] Because a PMS renders Türkiye unsuitable as a basis for normal value, and because there is no viable home market in this investigation, neither the home market nor the third country market in this case provides a sufficient basis for normal value comparison. Additionally, there is no sales data on the record for QMC/Muntajat's other third country markets, Germany and Spain. Accordingly, Commerce relied on constructed value for the recalculation of QMC/Muntajat's final margin calculation under section 773(a)(4) of the Act. Furthermore, the *Remand Order* instructs Commerce to decide between using a different proxy for QMC/Muntajat's third country comparison market or instead using CV.[69]

QMC/Muntajat argues that the *Remand Order* expressly declined to resolve what Commerce should do if it were to find Türkiye ineligible as a comparison market, pointing to the Court's statement "whether Commerce uses constructed value or instead looks to a different third country in that contingent scenario is an open question that it must address in the first instance."[70] However, this statement from the Court is the very reason that Commerce has utilized constructed value to value QMC/Muntajat's normal value. Section 773(a)(4) of the Act states that if Commerce determines that the normal value of the subject merchandise cannot be determined under paragraph (1)(B)(i), then, notwithstanding paragraph (1)(B)(ii), the normal value of the subject merchandise may be the constructed value of that merchandise.[71] In this case, the only third country market data available on the record is from Türkiye, where Commerce has found a sales-based PMS to exist. Accordingly, the normal value of the subject

[68] *See* Draft Remand Redetermination at 3-7.
[69] *See Remand Order* at 23.
[70] *See* QMC/Muntajat's Draft Remand Comments at 14*, citing Remand Order* at 17.
[71] *See* section 773(a)(4) of the Act.

merchandise cannot be determined using Turkish data. As no other data exists on the record, the next best option for Commerce to value QMC/Muntajat's normal value is thus constructed value.

QMC/Muntajat also argues that both Spain and Germany are potential alternatives for Commerce to utilize as third country comparison markets. QMC/Muntajat correctly states that "Commerce itself acknowledged and evaluated all three markets {Spain, Germany, and Türkiye} against the criteria in Section 773(a)(1)(B)(ii) and (C) of the Act before selecting Türkiye as the largest and most comparable market of the three."[72] In the Third Country Memo, Commerce stated that it selected Türkiye as the third country comparison market for the following reasons: (1) Türkiye was QMC/Muntajat's largest third-country market during the POI; (2) Türkiye was the only country among the three largest third-country markets in which QMC/Muntajat sold all melamine to unaffiliated customers on a spot-basis; and (3) QMC/Muntajat shipped melamine directly from Qatar to unaffiliated customers in both Türkiye and the U.S., whereas sales to Germany and Spain were made through warehouses located in Belgium, Italy and Spain, on a mixed basis of bulk and packed-bag product, and pursuant to both contract and spot sales.[73] Commerce determined that Germany and Spain satisfied the statutory threshold for viability under section 773(a)(1)(B)(ii) of the Act, but, when weighted against Türkiye under the comparability, sales-volume, and other-factors criteria of 19 CFR 351.404(e) were less comparable to the U.S. market.[74] Specifically, this was due to German and Spanish sales reliance on warehouse-based distribution, mixed contract and spot sales, and lower export volumes relative to Türkiye.[75] Thus, Commerce determined that the respondents' sales of melamine to Türkiye during the POI provide the most appropriate comparison to the

[72] *See* QMC/Muntajat Draft Remand Comments at 15 (citing Memorandum, "Selection of an Appropriate Third Country Market," dated August 21, 2024 (Third Country Memo)).
[73] *See Final Determination* IDM at Comment 4 (citing Third Country Memo).
[74] *See* Third Country Memo at 4-6.
[75] *Id.* at 5.

respondents' sales to the United States, because products exported to Türkiye provide the highest level of similarity to the respondents' subject merchandise exported to the United States, and it was the respondents' largest third country market during the POI.[76]

We find that the reasons expressed for selecting Türkiye over Germany and Spain as a third country market also support relying on constructed value over Germany and Spain as potential third country markets. As explained in the Third Country Memo[77] and by QMC/Muntajat themselves in their submission to the underlying proceeding,[78] the German and Spanish sales markets suffer from a variety of distinct factual circumstances that make them less appropriate for use as a comparator when compared to constructed value. Unlike QMC/Muntajat's sales to the U.S., the sales to Germany and Spain rely on warehouse-based distribution, mixed contract and spot sales, and lower export volumes relative to Türkiye.[79] Thus, the Germany and Spain sales prices would not be "representative" of the sales made to the United States as required by the statute.[80] These differences are sufficient that Commerce has determined, based on QMC/Muntajat's own representations to Commerce in the underlying proceeding and Commerce's decision in the Third Country Memo, that reliance on constructed value as the basis for normal value is appropriate here over reliance on the Germany and Spain third country sales.

Separately, 19 CFR 351.416(c)(3) provides that where a PMS prevents or does not permit a proper comparison of sales prices in the home market or third-country market with export prices or constructed export prices during the POI, Commerce may determine that it is necessary to calculate normal value using constructed value in accordance with section 773(e) of the Act

---

[76] *Id.*
[77] *Id.*
[78] *See* QMC/Muntajat's Letter, "Response to Section A of the Antidumping Duty Questionnaire," dated Aprill 11, 2024 (Section A Questionnaire Response) at A-4 and A-5.
[79] *Id.* at 5.
[80] *See* section 773(a)(1)(B)(ii)(I) of the Act.

and 19 CFR 351.405. A statement that Commerce will "normally" rely on third-country market data over constructed value does not require that Commerce pursue all potential third-country market data before relying on constructed value in every case, including where, as here, the preferred market is disqualified by a PMS, and no adequate alternative third-country data exists on the record. While Commerce has the discretion to reopen the record to develop a new third-country market, nothing in Commerce's regulations or the Act obligates it to seek a new third-country market each time a PMS finding eliminates one option before resorting to constructed value. Having found that the sales-based PMS in Türkiye precludes a proper comparison, and with no adequate third-country data on the record for Germany or Spain, reliance on constructed value is reasonable on this record.

In any event, regardless of how the gap in the record arose, section 773(a)(4) of the Act confirms that constructed value was the correct basis for normal value. QMC/Muntajat point to 19 CFR 351.404(f) to illustrate that Commerce "normally will calculate normal value based on sales to a third country rather than on constructed value if adequate information is available and verifiable" contending that constructed value is a methodology of last resort when determining normal value. QMC/Muntajat further argues that Commerce's regulation "requires {the agency} to develop the record for alternative third country markets," rather than treat its own prior choice of Türkiye "as a permanent bar to considering Germany or Spain."[81] QMC/Muntajat is wrong; respondent conveniently ignores the remaining half of 19 CFR 351.404(f) – "*if* adequate information is available and verifiable" (emphasis added). In this case, the record is devoid of data for potential alternate third country markets, thus Commerce's decision to turn to constructed value is consistent with both the statute and Commerce's regulations. Furthermore, the statute states that "{i}f the administering authority determines that the normal value of the

[81] *See* QMC/Muntajat's Draft Remand Comments at 15-16.

subject merchandise cannot be determined under paragraph (1)(B)(i), then, notwithstanding paragraph (1)(B)(ii), the normal value of the subject merchandise *may be* the constructed value of that merchandise."[82] As explained, there is *no* information, beyond Türkiye (which was found to have a sales-based PMS), available for a third country sales database to rely on. Thus, Commerce has the authority to determine normal value based on constructed value.

QMC/Muntajat further argues that the only reason fully developed sales records do not exist for Germany or Spain is that Commerce selected Türkiye at an early stage of the investigation, thereby obviating the need to collect further information on the other two markets.[83] This assertion is not supported by the record. In its Section A Questionnaire Response, QMC/Muntajat identified Türkiye, Germany, and Spain as its three largest-third country markets, and in response to the specific question inviting respondents to identify "special circumstances" bearing on third-country selection.[84] QMC/Muntajat itself affirmatively argued that Türkiye, not Germany or Spain, was "the most comparable third-country market to the U.S. market," citing the similarity of the product (bagged melamine), the channel of distribution (direct shipment from Qatar on cost, insurance, and freight/cost and freight terms), terms of sale (spot-basis only), and U.S. Dollar- denominated pricing.[85] QMC/Muntajat went on to describe, in that same response, the respects in which Germany and Spain differed substantially from Türkiye, including their reliance on warehouse-based distribution, mixed bulk and bagged product, mixed contract and spot sales and Euro-denominated pricing.[86]

Consistent with its Section A Questionnaire Response, in its Sections B-D Questionnaire Response QMC/Muntajat then limited its response to Türkiye alone, stating that "this response to

---

[82] *See* section 773(a)(4) of the Act; *see also Floral Trade Council v. United States*, 74 F.3d 1200, 1202 (Fed. Cir. 1996) ("We find no restriction either in the statute or the regulations limiting use of constructed value to situations where verified information is not available for third country prices.").
[83] *See* QMC/Muntajat's Draft Remand Comments at 15.
[84] *See* SECTION A QUESTIONNAIRE RESPONSE at A-4.
[85] *Id.* at A-4 and A-5.
[86] *Id.*

section B relates solely to Muntajat's sales of melamine to {Türkiye} during the POI."[87] Commerce did not instruct QMC/Muntajat to confine its sales reporting to a single market; QMC/Muntajat made the choice itself, based on its own characterization of Türkiye as the superior comparison market. It merely happened that, upon review of the record, Commerce's own analysis in the Third Country Memo agreed with QMC/Muntajat's characterization of Türkiye as the most comparable country market.[88] Accordingly, the absence of a developed sales record for Germany and Spain is not a gap attributable to Commerce's sequencing of the investigation. It is a direct result of QMC/Muntajat's own reporting decisions at the outset of the investigation. It is QMC/Muntajat, not Commerce, that bears responsibility for the resulting gap in the record.

QMC/Muntajat argues that it would be fundamentally unfair to treat the gap in the administrative record based on Commerce's selection of Türkiye as the third country market as a basis for resorting to CV rather than reopening the record to develop the Germany and/or Spain sales data.[89] Commerce notes that reopening the record to solicit additional sales information from QMC/Muntajat poses significant administrative challenges. This remand redetermination is due to the Court on October 15, 2026. The draft comments by both parties were only received by Commerce at 5:00 p.m. on September 28, 2026, following a request for extension requested by QMC/Muntajat.[90] This leaves Commerce only 13 business days between the receipt of comments and the remand's due date to the Court; *i.e.*, not a reasonable amount of time to reopen the record, solicit new information from QMC/Muntajat, solicit rebuttal or deficiency comments, and analyze the new information on the record to make a new third country determination.

---

[87] *See* QMC/Muntajat's Letter, "Sections B-D Response," dated May 2, 2024 (Sections B-D Questionnaire Response).
[88] *See* Third Country Market Memo at 4-5.
[89] *See* QMC/Muntajat's Draft Remand Comments at 17.
[90] *See* Memorandum, "Extension of Deadline to Submit Draft Remand Comments," dated September 18, 2026.

Furthermore, QMC/Muntajat's reliance on *Giorgio Foods* is misplaced. In that case, Commerce had originally selected Germany as the third-country comparison market based on its larger sales volume relative to France.[91] The Court remanded because Commerce had not adequately supported its calculation of the respondent's sales volume to Germany, specifically because the record did not establish what portion of sales to a multinational retailer were ultimately resold in Germany as opposed to Austria.[92] On remand, Commerce reopened the record to collect supplemental data, including retail outlet counts, population figures, and consumption statistics for Germany and Austria, and used the data to recalculate a conservative estimate of the respondent's Germany sales volume, which it then compared against France's sales volume to confirm that Germany remained the larger market.[93] Germany already had a fully developed sales record from the original proceeding, the remand did not require Commerce to obtain an entire new sales database for a third-country. By contrast QMC/Muntajat asks Commerce to consider replacing Türkiye with an entirely different country for which no sales database exists on this record at all. Developing a Germany or Spain sales record would require QMC/Muntajat to submit a complete section B questionnaire response, followed by responses to supplemental questionnaires to address and clarify deficiencies. *Giorgio Foods*, therefore, does not support the proposition that Commerce must, or reasonably could, undertake that scale of record development within the time remaining in this remand.

Moreover, in this case, reopening the record to develop a Germany or Spain sales database carries risks of triggering a cycle of repeated record development and PMS challenges that would unnecessarily delay this proceeding when the statute and Commerce's regulations permit the use of constructed value under the facts presented in this proceeding. If Commerce

---

[91] *See Giorgio Foods*, Slip Op. 2025-90 at 4-5.
[92] *Id.*
[93] *Id.*

were to select Germany or Spain as a substitute comparison market, there is no assurance that Cornerstone would not raise a new sales-based PMS allegation as to that market as well, given that China is a substantial supplier of melamine to many markets worldwide. Commerce would then be required to reopen the record yet again, solicit briefing, and resolve a new PMS allegation. Potentially eliminating that market in turn and leaving Commerce to repeat the same process with respect to the remaining third-country market. Commerce declines to unnecessarily embark on a cycle of successively substituting, developing, and potentially disqualifying one third-country market after another, when appropriate constructed value is already available on this record.

Lastly, QMC/Muntajat separately invoke Commerce's duty under the statute to calculate dumping margins as accurately as possible.[94] QMC/Muntajat's disputes regarding the use of Industries Qatar's consolidated financial statements for the calculation of constructed value, are addressed separately in Comment 4, below. For purposes of the third-country market/constructed value methodology question addressed here, QMC/Muntajat does not dispute that constructed value, properly calculated under section 773(e) of the Act using the best information available on this record, is capable of yielding an accurate result. Accordingly, Commerce's reliance on constructed value is fully consistent with its obligation to calculate QMC/Muntajat's dumping margin as accurately as possible.

Therefore, for this final remand redetermination, Commerce continues to rely on constructed value to calculate QMC/Muntajat's normal value.

**Comment 4: Whether Commerce's PMS Adjustment to Constructed Value is Not Supported by Substantial Evidence**

*QMC/Muntajat's Comment*:

The following is a verbatim summary of arguments submitted by QMC/Muntajat. For further details, *see* QMC/Muntajat's Draft Remand Comments at pages 18-29.

[94] *See* QMC/Muntajat's Draft Remand Comments at 16.

> If Commerce continues to use Türkiye and {constructed value}, its cost-based PMS adjustment to Respondents' natural gas costs is not usable. That adjustment relies on the same "world natural gas price" benchmark Petitioner submitted in the underlying investigation, derived from UN Comtrade export data reported in kilograms. That benchmark is fatally flawed because the underlying UN Comtrade kilogram volumes are grossly and irrefutably understated, which inflates Petitioner's resulting price benchmark by a multiple of the accurate figure. Commerce previously recognized that UN Comtrade natural gas data are problematic, finding in another proceeding that UN Comtrade kilogram-based natural gas data cannot be reliably converted to a usable benchmark; and Respondents irrefutably demonstrated in the underlying investigation that Petitioner's conversion factor does not cure this underlying problem with the UN Comtrade data.
>
> Respondents, by contrast, submitted benchmarks satisfying 19 CFR 351.416(d)(3)(i) using market-based natural gas prices from the United States and Canada, both of which have privately-held natural gas industries and, like Qatar, are significant net exporters of natural gas. QatarEnergy's average transfer price for natural gas during the POI exceeded these regulatory compliant benchmarks, confirming the absence of any market distortion. Commerce should reject Petitioner's distorted benchmark, and either find that no cost-based PMS exists with respect to natural gas in Qatar or modify its cost-based PMS adjustment to use regulatory-compliant benchmarks.

**Commerce's Position:** We disagree with QMC/Muntajat. For the reasons discussed below, Commerce continues to rely on the benchmarks provided by the petitioner in the underlying investigation to determine that a cost-PMS with respect to natural gas exists in Qatar and continues to rely on the same benchmarks to calculate the cost-based PMS natural gas adjustment for QMC/Muntajat.

In the *Final Determination*, Commerce found that a cost-based PMS did exist in Qatar with regards to the purchase price of natural gas, however, Commerce declined to make an adjustment because no sales were compared to CV.[95] Additionally, Commerce determined that the natural gas benchmarks provided by the petitioners based on UN Comtrade data, was preferable to the benchmarks provided by QMC/Muntajat given that the benchmarks supplied by QMC/Muntajat are only from two countries, the United States and Canada, which are not

[95] *See Final Determination* IDM at Comment 1.

geographically close to Qatar and are not representative of world-market prices, while the benchmarks provided by the petitioners are indeed representative of world-market prices.[96]

In the Draft Remand Redetermination, because QMC/Muntajat's normal value was, for the first time, based entirely on constructed value, Commerce was able to make an adjustment to cost by revising the reported natural gas cost to reflect the world market price of natural gas, consistent with its finding of a cost-based PMS in the *Final Determination*.

Furthermore, prior to the *Preliminary Determination*, Commerce requested that interested parties provide, "natural gas benchmarks for gaseous natural gas (not liquified natural gas) (*i.e.*, Harmonized System (HS) subheading 2711.21.00) that met the following requirements: (1) are at world-benchmark prices, (2) are either in cubic meters or converted to cubic meters with any conversions properly illustrated including density conversions and with the source of the conversion factor properly cited and (3) are appropriately adjusted for sales terms including ocean freight, import duties, and brokerage and handling expenses.[97] QMC/Muntajat did not provide world-market prices as required by Commerce, and instead argued that selecting the United States and Canada as comparison markets for natural gas was appropriate because "each country exhibits the same fundamental market condition that exist in Qatar: abundant domestic reserves of natural gas, such that each country is a net gas exporter."[98] Accordingly, in the *Final Determination* Commerce declined to utilize QMC/Muntajat's proposed benchmarks and instead utilized the petitioner's benchmarks, as they were the only benchmarks on the record that conformed to Commerce's standard.[99]

---

[96] *Id*.
[97] *See* Memorandum, "Particular Market Situation Allegation Request for Information," dated August 23, 2024 (PMS Benchmark Request).
[98] *See* QMC/Muntajat's Letter, "Response to the Department's Particular Market Situation Allegation Request for Information," dated August 28, 2024, at 3 (Request for Info Memo).
[99] *See Final Determination* IDM at Comment 1.

QMC/Muntajat argues that Commerce's reliance on the petitioner's UN Comtrade benchmark in the *Final Determination* was flawed due to the data being in kilograms as opposed to cubic meters, which in turn distorts the data and results in inflated benchmarks.[100] QMC/Muntajat claim that the UN Comtrade data reflecting a U.S. price of 17.15 USD/MMBTU for Canada and 22.65 USD/MMBTU for the United States is unreliable because the unit of measure used in the UN Comtrade data is kilograms as opposed to MMBTUs. Commerce notes this issue was addressed in the underlying investigation *Final Determination* IDM with Commerce finding:[101]

> QMC/Muntajat's argument that the UN Comtrade data are grossly inflated is misplaced. While the data used in the petitioner's benchmark is reported in kilograms, the petitioner provided adequate conversions from kilograms to cubic meters as requested.[102] QMC/Muntajat are correct in stating that in *Chlorinated Isocyanurates from China 2021*, Commerce found that the benchmarks provided from UN Comtrade were rejected because of the need to "convert the data, which is reported in kilograms, to a usable benchmark in cubic meters."[103] However, as the respondent admits, in that case Commerce found that "attempting to convert the UN Comtrade data into a usable benchmark is not possible because the conversion factors do not take into account the density of the gas, and therefore, such conversions create a distorted benchmark."[104] In the instant case, Commerce requested, and the petitioner provided, numerous conversion factors including a density factor in order for Commerce to properly convert kilograms of natural gas into cubic meters.[105] Therefore, the world-market benchmarks provided in this case are not distorted like those in *Chlorinated Isocyanurates from China*, and can be used to compare the average transfer prices of natural gas from QatarEnergy to QAFCO during the POI.

QMC/Muntajat separately argues that petitioner's own conversion factor demonstrates that the underlying UN Comtrade kilogram export volumes themselves are erroneous, such that

---

[100] *See* QMC/Muntajat's Draft Remand Comments at 18.
[101] *See Final Determination* IDM at Comment 1.
[102] *Id.* (citing PMS Benchmark Request).
[103] *Id.* (citing *Chlorinated Isocyanurates from the People's Republic of China: Preliminary Results of the Countervailing Duty Administrative Review and Recission of Review, in Part; 2021,* 88 FR 85214 (December 7, 2023) (*Chlorinated Isocyanurates from China 2021*), and accompanying PDM at 21).
[104] *Id.*
[105] *Id.* (citing Petitioner's Letter, "Petitioner's Response to Request for Information," dated August 28, 2024 (Request for Information Memorandum) at Attachment 2).

the resulting benchmark is distorted regardless of whether the conversion methodology properly accounts for density.[106] In support, QMC/Muntajat compares UN Comtrade's reported kilogram and cubic-meter export volumes for Canada and the Unites States against corresponding data from the Government of Canada and the U.S. Energy Information Administration, and contends that its own benchmark, built using UN Comtrade's cubic-meter data, is corroborated by that government data and yields prices substantially lower than the petitioner's benchmark.[107]

This argument does not provide a basis for departing from the petitioners' benchmark. Commerce's benchmark request specifically anticipated the possibility that UN Comtrade's reported units of measure could affect the resulting price calculation, which is why Commerce required that any benchmark reported in, or converted to, cubic meters include a documented conversion factor accounting for the density of the gas.[108] The petitioner satisfied that requirement. QMC/Muntajat's comparison of pricing results under different units of measure does not identify any flaw in the petitioner's documented conversion methodology, and Commerce need not resolve, for purposes of this redetermination, whether or to what extent UN Comtrade's reported volumes in one unit of measure may differ from those in another. Regardless of that question, the petitioner's benchmark satisfies the three requirements that Commerce established prior to the *Preliminary Determination*: it reflects world-market prices across a broader basket of exporting countries, it was converted from kilograms to cubic meters using a documented density conversion factor, and it was adjusted for the specified sales terms. QMC/Muntajat's proposed benchmark, by contrast, does not satisfy the threshold requirement that the data reflects world-market prices as it is limited to two countries.

---

[106] *See* QMC/Muntajat's Draft Remand Comments at 19-24.
[107] *Id.*
[108] *See* PMS Benchmark Request.

QMC/Muntajat argues that their benchmark meets the data requirements for four main reasons: (1) their benchmark data is based on a list of countries that are similar to Qatar in that they are significant producers of liquified natural gas (LNG) and chose the United States and Canada because their case industries are privately owned; (2) their data does not represent "imports into an individual country," but rather consists of exports from two significant exporting countries which together constitute a substantial portion of world natural gas supply indicating that the data is broad based with regards to market value; (3) there is no requirement that the benchmark data be selected from a country that is geographically close to the subject merchandise; and (4) their reported benchmarks are not distorted simply due to the fact that they are not representative of world market prices.[109] QMC/Muntajat's claim that the LNG market is similar in the United States and Canada to Qatar is immaterial. Commerce requested benchmark data for natural gas that was at world-market prices[110] which QMC/Muntajat blatantly ignored. QMC/Muntajat instead reported a narrowly constructed set of benchmark data stemming from only two countries natural gas exports because they claimed that the conversions from kilograms to MMBTUs resulted in distortion despite conversion factors being present on the record to properly convert the units from kilograms to MMBTUs. QMC/Muntajat is correct in their assessment that there is no requirement that the country used as a benchmark be geographically close, however, this does not rectify the other issues associated with QMC/Muntajat's proposed benchmark highlighted in this final remand redetermination. Lastly, QMC/Muntajat's own comments contend that their data is "not representative of world market prices."[111] This alone is sufficient to disqualify QMC/Muntajat's benchmarks in favor of the petitioner's provided benchmarks that have proper conversions and are based on world market prices.

---

[109] *See* QMC/Muntajat's Draft Remand Comments at 29.
[110] *See* Request for Info Memo at 3.
[111] *See* QMC/Muntajat's Draft Remand Comments at 29.

QMC/Muntajat further argues that 19 CFR 351.416(d)(3)(i) does not itself require that benchmark data reflect world-market prices, but only that it reflects "prices paid for the same input under market-based circumstances, either in the home market or elsewhere," and that Commerce's administrative requirement for world-market pricing therefore improperly narrow the regulatory standard.[112] This argument is unpersuasive. Commerce's requirement that benchmark submissions reflect world-market prices does not displace or narrow the regulatory text; it implements the regulation's "elsewhere" standard by ensuring that a benchmark comparison is sufficiently representative of market-based pricing conditions, rather than reflecting the price of import into a single, potentially unrepresentative market. As Commerce has previously explained, "it would not be appropriate to compare {the} average price of imports into an individual country to the price paid by the respondent," because such a narrow comparison does not provide a reliable basis for assessing whether a respondent's input price departs from market-based circumstances.[113] A benchmark limited to two countries, selected and narrowed according to criteria of the submitting party's own choosing, raises precisely this representativeness concern, regardless of whether it is described as "elsewhere" pricing under the regulation or as "world-market" pricing under Commerce's benchmark request. In any event, Commerce need not resolve whether the regulation independently requires world-market pricing, because QMC/Muntajat's own submission concedes that its benchmark is "not representative of world market prices," a concession that undermines the reliability of QMC/Muntajat's data as a basis for assessing market-based circumstances "elsewhere," whether or not that term is read to require a world-market scope.

[112] *Id.* at 24-28.
[113] *See Urea Ammonium Nitrate Solutions from the Republic of Trinidad and Tobago: Final Affirmative Determination of Sales at Less Than Fair Value*, 87 FR 37824 (June 14, 2022), and accompanying IDM at Comment 2.

Accordingly, for this final remand redetermination, Commerce continues to find that a cost-based PMS exists in Qatar with respect to the purchase price of natural gas. Commerce continues to apply the cost-based PMS adjustment using the natural gas price benchmarks provided by the petitioner in the underlying investigation because they are the only data on the record that conformed to the requisite parameters requested by Commerce when soliciting benchmark data.

**Comment 5: If Commerce Uses Constructed Value, It Must Correct the Profit and Selling Expense Ratios**

*QMC/Muntajat's Comment*

The following is a verbatim summary of arguments submitted by QMC/Muntajat. For further details, *see* QMC/Muntajat's Draft Remand Comments at pages 30-32.

> If Commerce nonetheless calculates {normal value} using {constructed value}, Commerce's reliance on {Industries Qatar Q.P.S.C. (Industries Qatar's )} consolidated financial statements to calculate a 40.86 {percent} {constructed value} profit ratio is unreasonable, because those statements combine unrelated petrochemical, fertilizer, and steel operations rather than reflecting the profitability of melamine production specifically (or even a product within the same general category), and were never tested against a developed record. A profit ratio of that magnitude is facially difficult to reconcile with ordinary-course profitability in the melamine business. Commerce should instead use QMC's and Muntajat's own financial data, consistent with the statute's preference for actual amounts realized by the producer and exporter of merchandise in the same general category as the subject merchandise. If Commerce develops the record on Germany or Spain as an alternative comparison market, as urged above, this issue would be avoided altogether, since Commerce could then rely on actual third-country sales data rather than {constructed value}.

**Commerce's Position:** We disagree with QMC/Muntajat. Neither QMC's nor Muntajat's own financial statements provide a suitable basis for calculating constructed value profit and selling expenses on this record, and Industries Qatar's consolidated financial statements remain the best information available. Accordingly, for this final remand redetermination, Commerce continues to rely on Industries Qatar's consolidated financial statements to calculate constructed value profit and indirect selling expense ratios.

In the *Final Determination* Commerce used Türkiye as a third country comparison market in order to properly value QMC/Muntajat's normal value.[114] In the Draft Remand Redetermination, Commerce determined that a sales-based PMS existed in Türkiye with regards to distorted prices of melamine stemming from the substantial volume of imports of Chinese melamine and its impact on the Turkish melamine market during the POI.[115] Because Türkiye could no longer serve as the third country comparison market, Commerce calculated QMC/Muntajat's normal value based on constructed value.[116] The constructed value ratios were calculated using the consolidated financial statements of QMC/Muntajat's parent company Industries Qatar, which were also used to calculate constructed value ratios used in the initiation of the underlying investigation.[117]

QMC/Muntajat argues that utilizing Industries Qatar's consolidated financial statements reflect the combined operations of a corporate group that spans the petrochemical, fertilizer, and steel industries rather than a company that is only involved in the production and sale of melamine or merchandise in the same general category as melamine.[118] QMC/Muntajat further argues that aggregating profit and expense data across such a broad range of dissimilar products does not yield a ratio that reasonably reflects the profitability or selling expenses associated with melamine production, nor does it constitute a "reasonable method" within the meaning of section 773(e)(2)(B)(iii) of the Act.[119] As an alternative, QMC/Muntajat argues that Commerce should use QMC and Muntajat's own financial statements to calculate constructed value, consistent with the statutory preference under section 773(e)(2)(A) of the Act for the actual amounts incurred and realized by the specific exporter or producer in connection with the production and sale, in a

---

[114] *See Final Determination* IDM at Comment 4.
[115] *See* Draft Remand Redetermination at 7.
[116] *Id*. at 7-11.
[117] *Id*. at 10 (citing Initiation Checklist at 6).
[118] *See* QMC/Muntajat's Draft Remand Comments at 31.
[119] *Id*.

foreign country, of merchandise in the same general category of products as the subject merchandise.[120]

In selecting financial statements to calculate constructed value profit and selling expenses, section 773(e)(2) of the Act establishes a hierarchy of methods. The preferred method, under section 773(e)(2)(A) of the Act, is to use the actual amounts incurred and realized by the specific exporter or producer for selling, general, and administrative expenses, and for profit, in connection with the production and sale of the foreign like product, in the ordinary course of trade, for consumption in the foreign country. Only "if actual data are not available with respect to" that preferred method does Commerce turn to alternatives under section 773(e)(2)(B) of the Act:

> (i) the actual amounts incurred and realized by the same exporter or producer in connection with the production and sale, for consumption in the foreign country, of merchandise in the same general category of products as the subject merchandise;
>
> (ii) the weighted average of the actual amounts incurred and realized by other exporters or producers subject to the investigation or review, in connection with production and sale of the foreign like product, in the ordinary course of trade, for consumption in the foreign country, or
>
> (iii) amounts incurred and realized for selling, general, and administrative expenses, and for profit, based on any other reasonable method, subject to a statutory profit cap that may not exceed the amount normally realized by exporters or producers.

The statute does not establish a hierarchy among the three alternatives in section 773(e)(2)(B). As the SAA explains, "the selection of an alternative will be made on a case-by-case basis, and will depend, to an extent, on available data," and "no one approach is necessarily appropriate for use in all cases."[121] In evaluating potential surrogate data sources under the "any other reasonable method" alternative of section 773(e)(2)(B)(iii), Commerce has applied the criteria set out in *Magnesium from Israel* and *CTVs from Malaysia*: (1) the similarity of the

---

[120] *Id*. (citing section 773(e)(2)(A) of the Act).
[121] *See* SAA at 840.

potential surrogate company's business operations and products to the respondent's business operations and products; (2) the extent to which the surrogate company's financial data reflect sales in the home market and do not reflect sales to the United States; (3) the contemporaneity of the data to the period under consideration; and (4) the extent to which the surrogate company's customer base is similar to the respondent's.[122]

Neither QMC's nor Muntajat's financial statements, however, are a suitable source to calculate constructed value. The specific bases for this finding involve business proprietary information regarding QMC's financial statements; for this discussion, *see* Proprietary Analysis Memorandum.[123] In general terms, QMC's financial statements during the POI do not reflect the "ordinary course of trade" required under section 773(e)(2)(A) of the Act, a fact QMC/Muntajat itself acknowledges in its draft comments.[124] As such, QMC's financial statements are not suitable for use in calculating constructed value.

We also find that Muntajat's financial statements are not suitable for constructed value. Commerce has previously found that Muntajat, under Qatari law has exclusive rights to sell chemicals, fertilizers, and polymers produced in Qatar including melamine produced by QMC.[125] Muntajat, however, acts solely as a trading company and is not a producer of melamine or any other product. Commerce has previously excluded the financial statements of a company found to be primarily engaged in trading, rather than producing, subject merchandise from its constructed value calculation under section 773(e)(2)(B)(iii).[126] In *Mattresses from Indonesia*,

[122] *See Notice of Final Determination of Sales at Less Than Fair Value: Pure Magnesium from Israel*, 66 FR 49349 (September 27, 2001) (*Magnesium from Israel*), and accompanying IDM at Comment 8; *see also Notice of Final Determination of Sales at Not Less Than Fair Value: Certain Color Television Receivers from Malaysia*, 69 FR 20592 (April 16, 2004) (*CTVs from Malaysia*), and accompanying IDM at Comment 26;
[123] *See* Memorandum, "Business Proprietary Information Accompanying the Final Results of Redetermination for Melamine from Qatar," dated concurrently with this final remand redetermination.
[124] *See* QMC/Muntajat's Draft Remand Comments at 32.
[125] *See* Memorandum, "Preliminary Affiliation and Collapsing Analysis Memorandum," dated September 18, 2024 at 4.
[126] *See Mattresses from Indonesia: Preliminary Results of Antidumping Duty Administrative Review; 2020-2022*, 88 FR 37027 (June 6, 2023) (*Mattresses from Indonesia Prelim*), and accompanying PDM at 15, unchanged in

Commerce explained that such a company's financial statements do not reflect the production-related profit experience that constructed value is intended to capture.[127] Consistent with that practice, Muntajat's financials are not suitable for use in calculating constructed value.

QMC/Muntajat argues that the 40.86 percent profit ratio derived from Industries Qatar's consolidated financial statements is "facially difficult to reconcile with ordinary-course profitability in the melamine business."[128] This argument is unsupported. QMC/Muntajat identify no record evidence, such as industry benchmarks, or other data points specific to melamine or related petrochemical production, to substantiate the claim that a ratio of this magnitude is unreasonable or aberrational. A bare assertion that a ratio appears high, without any comparative data demonstrating that it departs from ordinary-course profitability in this or a comparable industry, does not establish that the ratio is unreliable. Although Industries Qatar's consolidated financial statements reflect a mix of products across the petrochemical, fertilizer, and steel segments, rather than melamine exclusively, nonetheless they reflect the operations of a Qatari corporate group that is profitable overall and whose group includes melamine production. In the absence of a more suitable alternative on this record, Commerce continues to find that Industries Qatar's financial statements are the best available information on the record suitable to calculate constructed value.

**Comment 6: Whether To Use the Standard Average-to-Average Comparison Methodology Rather than the Alternative Average-to-Transaction Method**

The following is a verbatim summary of arguments submitted by QMC/Muntajat. For further details, *see* QMC/Muntajat's Draft Remand Comments at pages 33-35.

*QMC/Muntajat's Comment*:

> Independent of the PMS and {constructed value} issues outlined above, Commerce should use the standard average-to-average (A-to-A) comparison methodology to

*Mattresses from Indonesia: Final Results of Antidumping Duty Administrative Review; 2020-2022*, 88 FR 85240 (December 7, 2023) (*Mattresses from Indonesia Final*).
[127] *See Mattresses from Indonesia Prelim*, unchanged in *Mattresses from Indonesia Final.*
[128] *See* QMC/Muntajat's Draft Remand Comments at 30 and 31.

> calculate Respondents' dumping margin rather than the average-to-transaction (A-to-T) method it applied in the remand proceeding. Commerce may depart from the standard A-to-A method only where it finds a pattern of export prices that differ significantly among purchasers, regions, or periods of time. In the Draft Remand Redetermination, Commerce continued to rely, without revisiting or updating, the same differential pricing analysis and {Cohen's} *d* test from the underlying determination to find such a pattern. That analysis remains unreliable because the Test Groups and Base Groups Commerce compared are small, are not normally distributed, and have unequal variances and sizes, the same defects the Federal Circuit has held undermine the reliability of the *Cohen's d* test as a measure of significant price differences.[129] Commerce's Draft Remand Redetermination did not address or cure any of these defects on remand.

**Commerce's Position:** We disagree with QMC/Muntajat. For the reasons discussed below, Commerce continues to rely on the differential pricing analysis and Cohen's *d* test from the underlying investigation.

In the Draft Remand Redetermination, Commerce utilized the differential pricing analysis and Cohen's *d* test from the underlying determination.[130] Accordingly, we found that 100 percent of the value of U.S. sales passed the Cohen's *d* test and confirmed the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods. Further, we determined that the average-to-average method cannot account for such differences because there is a 25 percent relative change between the weighted-average dumping margin calculated using the A-to-A method and the weighted-average dumping calculated using an alternative comparison method based on applying the average-to-transaction method to all U.S. sales.[131] Thus, for the draft remand redetermination results, we applied the A-to-T method to all U.S. sales to calculate the weighted-average dumping margin for QMC/Muntajat.

QMC/Muntajat argues that there is no basis for Commerce to depart from the standard A-to-A comparison methodology in favor of the A-to-T comparison methodology in this case.[132]

---

[129] *See* QMC/Muntajat's Draft Remand Comments at 4 (citing *Stupp Corp. v United States*, 5 F.4th 1341, 1347 (Fed. Cir. 2021)).
[130] *See* Draft Redetermination Analysis Memorandum.
[131] *Id*.
[132] *See* QMC/Muntajat's Draft Remand Comments at 33.

QMC/Muntajat claims that the use of the A-to-T method is unwarranted because the assumptions underlying the Cohen's *d* test – used by Commerce to determine whether prices differ significantly among purchasers, regions, or periods of time – are not satisfied in this case.[133] Furthermore, QMC/Muntajat also argues that the Court of Appeals for the Federal Circuit (Federal Circuit) has cautioned that the "use of Cohen's *d* with test groups consisting of very few observations may be particularly problematic"[134] Commerce notes that QMC/Muntajat argued this issue in their final case briefs and Commerce addressed the issue at length in the *Final Determination*.[135] Specifically, Commerce stated:[136]

> Regarding the Cohen's *d* test, the respondent cites a Federal Circuit decision in *Stupp*, where the court found that there were "significant concerns relating to the Commerce's application of the Cohen's *d* test … in adjudications in which the data groups being compared are small, are not normally distributed, and have variances.[137] QMC/Muntajat argue that in this investigation all three conditions are unmet and as a result, the Cohen's *d* test is unreliable and cannot serve as the basis for utilizing the A-to-T methodology. However, as the petitioner notes, in *Stupp*, the Federal Circuit simply remanded the issue to Commerce asking for additional explanation in support of its methodology.[138] In fact, in *Stupp IV*, Commerce provided the {Court} with the additional information, and the {Court} upheld Commerce's longstanding application of the Cohen's d test in the differential pricing context.[139] The {Court} notes in its decision that "the Cohen's *d* test does not operate in a vacuum, but as part of the differential pricing analysis as a whole."[140] Furthermore, regarding small test groups, the {Court} found that even if the Cohen's *d* values of small test groups were less accurate than for large test groups, this difference does not by itself render Commerce's use of the Cohen's *d* test unreasonable, because the ratio test and meaningful differences test compensate for inaccuracies.[141] Similarly, for comparing data sets without distributions and have variances, the {Court} found that "even if {the} Cohen's {*d*} test can produce positive results under unusual circumstances, this possibility does not mean its use

[133] *Id*.
[134] *See* QMC/Muntajat's Draft Remand Comments at 34 (citing *Stupp*, 5 F.4th at 1358).
[135] *See Final Determination* IDM at Comment 2.
[136] *Id*.
[137] *See* QMC/Muntajat's Letter, "Case Brief," dated October 24, 2024 (QMC/Muntajat Sales Case Brief) at 18, (citing *Stupp*).
[138] *See* QMC/Muntajat's Letter, "Rebuttal Brief," dated October 31, 2024 (QMC/Muntajat's Sales Rebuttal Brief) at 11 and *Stupp*.
[139] *See Stupp Corp. v. United States*, 619 F.Supp.3d 1314 (CIT 2023) (*Stupp IV*); *see also Marmen Inc. v. United States*, 627 F.Supp.3d 1312 (CIT 2023) (*Marmen*) (upholding Commerce's established practice regarding the application of the Cohen's *d* test).
[140] *See Stupp IV*.
[141] *Id*.

> of Cohen's *d* is unreasonable when combined with the ratio test and meaningful differences test."[142]

Commerce notes that no party contested Commerce's differential pricing analysis in this litigation. Thus, the question of whether Commerce should change its differential pricing analysis was raised in the first instance for the purposes of this litigation in QMC/Muntajat's comments on the draft remand. Furthermore, Commerce has analyzed QMC/Muntajat's margin calculation under the new differential pricing analysis utilized by Commerce following the Federal Circuit decision in *Marmen,* which has now been upheld on several occasions by the Court,[143] and determined that 100 percent of QMC/Muntajat's sales passed the price difference test, indicating that whether Commerce uses the Cohen's *d* test, or the price difference test implemented post *Marmen*, the end result is the same, rendering the issue moot.[144]

Accordingly, for the reasons stated above, for this final remand redetermination Commerce is continuing to use differential pricing analysis and Cohen's *d* test from the underlying investigation.

## V. FINAL RESULTS OF REDETERMINATION

Consistent with the *Remand Order*, Commerce has reviewed and reconsidered whether a sales-based PMS exists in Türkiye which disqualifies that nation from serving as a third-country comparison market. In these final results of remand redetermination, Commerce has determined that a sales-based PMS does exist in Türkiye. As such, Commerce is comparing

---

[142] *Id*.

[143] *See Toyo Kohan Co., Ltd. v. United States*, Court No. 24-00261, Slip Op. 26-54 (CIT May 22, 2026) (*Toyo*), at 20 (sustaining Commerce's price difference test as a reasonable method of finding whether prices differ significantly in accordance with *Marmen III* and the language of the statute, which both afford Commerce discretion to fashion its methodology) (citing *Garg Tube Export LLP v. United States*, 740 F.Supp.3d 1355, 1367 (CIT 2024)); *accord Marmen Inc. v. United States*, Court No. 20-00169, Slip Op. 26-62 (CIT June 15, 2026) (*Marmen IV*); *Gov't of Canada v. United States*, Consol. Court No. 23-00187, Slip Op. 26-82 (CIT July 27, 2026) (*Gov't of Canada*); *Universal Tube & Plastic Indus., Ltd, v. United States*, Court No. 23-00113, Slip Op. 26-98 (CIT August 19, 2026) (*Universal Tube*); *Maquilacero S.A. de C.V. v. United States*, Consol. Court No. 23-00091, Slip Op. 26-111 (CIT September 14, 2026) (*Maquilacero*); *Stupp Corp. v. United States*, Consol. Court No. 15-00334, Slip Op. 26-113 (CIT September 15, 2026) (*Stupp VIII*).

[144] *See* Memorandum, "Business Proprietary Information Accompanying the Final Results of Redetermination for Melamine from Qatar," dated concurrently with these final results of remand redetermination.

QMC/Muntajat's U.S. sales to normal value based on constructed value. Unlike in the *Final Determination*, where no cost-based PMS adjustment could be made because none of the U.S. sales were compared to constructed value, Commerce is now able to make the cost-based PMS adjustment. Consequently, for these final results of remand redetermination, Commerce made a change to the estimated weighted-average dumping margin established in the *Final Determination* for QMC/Muntajat, which is now at 15.58 percent.[145]

10/15/2026

X

Signed by: SCOT FULLERTON

Scot Fullerton
Acting Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

[145] *See Final Determination*, 89 FR at 97593.